Darold W. Killmer, No. 8-6643
**KILLMER LANE, LLP**
1543 Champa St., Suite 400
Denver, CO 80202
dkillmer@killmerlane.com
(303) 571-1000

Elisabeth C. Frost*
Katie Chamblee-Ryan*
Daniel Cohen*
Nicole Wittstein*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20002
efrost@elias.law
kchambleeryan@elias.law
dcohen@elias.law
nwittstein@elias.law
Tel: (202) 968-4490

*Attorneys for Plaintiff*
*\*Motion for Admission Pro Hac Vice forthcoming*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **EQUALITY STATE POLICY CENTER,** | |
| Plaintiff, | Case No.: _____ |
| v. | |
| **CHUCK GRAY**, in his official capacity as Wyoming Secretary of State; | |
| **KAYLA WHITE**, in her official capacity as Albany County Clerk; | |
| **LORI SMALLWOOD**, in her official capacity as Big Horn County Clerk; | |
| **CINDY LOVELACE**, in her official capacity as Campbell County Clerk; | |
| **LISA SMITH**, in her official capacity as Carbon County Clerk; | |
| **KAREN RIMMER**, in her official capacity as Converse County Clerk; | |
| **MELISSA JONES**, in her official capacity as Crook County Clerk; | |
| **JULIE FREESE**, in her official capacity as Fremont County Clerk; | |

**MARY B. FEAGLER**, in her official
capacity as Goshen County Clerk;
**BECKY KERSTEN**, in her official capacity
as Hot Springs County Clerk;
**JACKIE CAMINO**, in her official capacity
as Johnson County Clerk;
**DEBRA LEE**, in her official capacity as
Laramie County Clerk;
**APRIL BRUNSKI**, in her official capacity
as Lincoln County Clerk;
**TRACY GOOD**, in her official capacity as
Natrona County Clerk;
**BECKY FREEMAN**, in her official
capacity as Niobrara County Clerk;
**COLLEEN RENNER**, in her official
capacity as Park County Clerk;
**MALCOLM J. ERVIN**, in his official
capacity as Platte County Clerk;
**EDA SCHUNK THOMPSON**, in her
official capacity as Sheridan County Clerk;
**CARRIE S. LONG**, in her official capacity
as Sublette County Clerk;
**CYNTHIA L. LANE**, in her official
capacity as Sweetwater County Clerk;
**MAUREEN MURPHY**, in her official
capacity as Teton County Clerk;
**AMANDA HUTCHINSON**, in her official
capacity as Uinta County Clerk;
**LILY RAKNESS PARRA**, in her official
capacity as Washakie County Clerk; and
**BECKY HADLOCK**, in her official
capacity as Weston County Clerk,

Defendants.

**COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

## NATURE OF THE CASE

1.      In 1869—more than half a century before the 19th Amendment would guarantee women the right to vote under the U.S. Constitution—the Wyoming Territory passed the first women's suffrage law. Nineteen years later, the Territory was invited to join the Union, but only if it agreed to abandon women's suffrage. Wyoming refused, responding that it would "remain out of the Union 100 years rather than come in without the women." Eventually, Congress relented. And when Wyoming became the 44th state in 1890, it was the first to enshrine the right to vote for women in its state constitution, earning its moniker, the "Equality State."

2.      With the enactment of House Bill 156, Wyoming breaks this 156-year commitment. When HB 156 becomes effective on July 1, 2025, it will impose new, burdensome, and entirely unnecessary requirements that will make it harder for eligible citizens to vote—including, in particular, women. Specifically, it will bar qualified Wyomingites from being able to register to vote unless they can first produce a form of DPOC that the new law deems acceptable.[1] Women—as well as Hispanic, young, and low-income voters—are less likely to have acceptable documentation and, in many cases, face greater hurdles to obtaining it.

3.      The bill's proponents swept aside concerns that HB 156's DPOC requirements will exclude qualified citizens from the franchise, claiming that this is what Wyomingites want *to be sure* that noncitizens are not voting in the State's elections. But while it has become politically fashionable to claim that the "integrity" of American elections is being undermined by the participation of noncitizens, this is simply not true—including in Wyoming.

4.      As Governor Mark Gordon has confirmed, Wyoming has an "excellent track record with election integrity and security[.]" There is no evidence of any meaningful voter fraud—

---

[1] This Complaint refers to these new documentary proof of citizenship requirements by the shorthand "DPOC."

involving noncitizens or otherwise. Wyomingites understand this—the University of Wyoming's 2024 Election Year Survey found that nearly 90% trust the State's election systems. At the same time, Wyoming's noncitizen population is markedly small. Only 3.6% of its population was born outside the United States—the fourth lowest rate in the nation—and about half of those people are naturalized citizens.

5.     Still, Defendant Secretary of State Chuck Gray championed HB 156 at every stage of the legislative process. When it passed, he declared a victory for "election integrity" and claimed the bill's DPOC requirements were the first of their kind. Not so. Other states have tried to impose similar restrictions, and their experience proves that the real effect of HB 156's new DPOC requirements will *not* be to safeguard Wyoming's elections from noncitizen voting—a problem that does not exist. Instead, the new restrictions will exclude *citizens* from the electoral process.

6.     For example, after Kansas passed a similar DPOC law in 2011, *over 30,000* would-be voters were excluded from the process, with approximately 12% of new registrants affected. Virtually all were eligible citizens, and the Tenth Circuit affirmed the district court's finding that the law violated the U.S. Constitution. *See Fish v. Schwab*, 957 F.3d 1105, 1136 (10th Cir. 2020). More recently, New Hampshire enacted a similar law in 2024. In the first elections to take place subject to the new requirements, substantial numbers of New Hampshirites—many young or women voters— were unable to vote because of it. In some towns, non-partisan election observers found that as many as *25% to 30%* of new registrants were turned away because of the new DPOC requirements.

7.     Secretary Gray has stressed that New Hampshire's DPOC law is far *more lenient* than the one Wyoming has enacted with HB 156. Thus, HB 156's requirements are likely to have an even more devastating disenfranchising effect. This is all the more so because of Wyoming's uniquely aggressive voter list maintenance procedures, which require cancellation of a person's voter registration if they fail to vote in even *one* general election. Wyo. Stat. Ann. § 22-3-115(a)(i). Thus,

2

after low turnout in the 2022 election, Wyoming purged 28% of registered voters from its rolls, many of whom will now have to comply with HB 156's new DPOC requirements to register and vote in future elections.

8.    If there is a problem with the "integrity" of Wyoming's elections, it is that they already suffer from low levels of voter registration and turnout. In November of 2022, only 62.8% of Wyoming's eligible residents were registered to vote, putting it in 47th place among the States for voter registration. That same year, only 44.4% of eligible Wyomingites actually voted in the general election. Those numbers were even lower for voters between the ages of 18 and 24—only 13% of whom participated.

9.    In other words, not only are Wyoming's elections reflective of the views of a minority of its residents, they largely reflect the views of certain subsections of the population, with young residents' voices barely registering at all. Rather than work to address this crisis of democracy and make voter registration and voting more accessible, the Legislature has voted to make it harder with HB 156, based on scaremongering about noncitizen participation. As in Kansas and New Hampshire, the result will be the exclusion and disenfranchisement of *citizens*, and Wyoming's elections will become even less reflective of the actual will of its residents than they currently are.

10.    Like millions of Americans, many Wyomingites do not have or cannot easily access the documents that HB 156 will require for voter registration. This is particularly true for young, low-income, and already underrepresented voters. Many more do not have documents that match their current name—including women who changed their names after marriage. And for many, obtaining acceptable documentation will require navigating a labyrinth of bureaucracy, all with attendant costs and delays, while election day draws nearer. Many people will not realize they need this documentation until it is too late and will be disenfranchised altogether.

11.    If Wyoming's election results are to reflect the will of its people, HB 156's new, burdensome, and unnecessary DPOC requirements cannot stand. As with the similar restrictions that Kansas attempted to impose before it, HB 156's DPOC provisions violate the U.S. Constitution's First and Fourteenth Amendments. *See Fish*, 957 F.3d at 1136.

12.    Plaintiff Equality State Policy Center's purpose is to make Wyoming's democracy accessible to all its citizens, including those who have been historically underrepresented. Unless enjoined, HB 156's burdensome DPOC requirements will injure Equality State Policy Center's ability to advance its mission, require it to divert critical resources to address the law's significant and inevitable harms, and impose severe and unconstitutional burdens on the voting rights of the very Wyomingites that Equality State Policy Center works to enfranchise.

13.    Equality State Policy Center accordingly brings this lawsuit, seeking a declaratory judgment that HB 156's DPOC requirements are unconstitutional, and for preliminary and permanent injunctive relief against their enforcement.

## JURISDICTION AND VENUE

14.    Plaintiff Equality State Policy Center brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the U.S. Constitution, specifically by the First and Fourteenth Amendments.

15.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matter in controversy arises under the Constitution and laws of the United States and asserts the deprivation, under color of state law, of rights under the U.S. Constitution.

16.    Venue is proper under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because Defendant Gray is a resident of this district and a substantial part of the events that gave rise to Plaintiff's claims for relief occurred in this district.

17.    This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

18.    Plaintiff Equality State Policy Center is a nonprofit organization currently comprised of a coalition of about twenty social justice, conservation, and labor organizations in Wyoming, many of which have individual members who are qualified to vote in Wyoming. Equality State Policy Center's mission is to advance fair elections and transparent government. Each organization in the coalition pays membership dues to Equality State Policy Center and Equality State Policy Center work to advance fair elections and governmental transparency to benefit those organizations, their members, and the constituencies they serve, as well as all Wyoming communities. Equality State Policy Center's fundamental driving philosophy is that democracy works better for all hard-working Wyomingites when it is inclusive and accessible to all citizens.

19.    To advance its mission, Equality State Policy Center devotes significant resources to helping qualified Wyomingites register to vote and successfully participate in Wyoming elections. To that end, Equality State Policy Center regularly conducts voter outreach and mobilization programs, including through tabling, webinars, training coalition partners, direct voter education, and creating and distributing educational materials on how to register and vote. Equality State Policy Center's voter education and mobilization activities take place across Wyoming, most prominently in Sweetwater, Albany, and Laramie Counties. In addition, recognizing the unique burdens that have historically been shouldered by Wyoming's Hispanic population that have caused them to be underrepresented among the voting population, Equality State Policy Center has developed programs geared specifically toward increasing civic participation among Wyoming's Hispanic communities, including through creating and distributing bilingual voter education materials, providing translation services for answering voter questions, and addressing specific voter concerns relevant to that

community, including regarding documentation requirements. Equality State Policy Center's Chair Project also works with Hispanic families and college students to promote voting and long-term civic engagement.

20.    HB 156 strikes at the heart of and severely threatens Equality State Policy Center's mission, and Wyoming citizens have already looked to Equality State Policy Center to help them navigate its consequences. Starting when the bill was being discussed in the legislature, Equality State Policy Center staff were inundated with questions about its requirements and impact. Equality State Policy Center is one of the few Wyoming organizations focused on voting rights and elections with Spanish-speaking staff. As a result, the Hispanic community, in particular, has already begun to rely on Equality State Policy Center to explain the new requirements and help them find ways to meet them. Some Hispanic citizens, including some with family members who are non-naturalized immigrants, have expressed their fears to Equality State Policy Center staff that registering to vote might make their family members targets for retaliation. Equality State Policy Center's ultimate goal is to build civic engagement and eventually leadership in the Hispanic community, but after HB 156, it must focus instead on the more immediate consequences of the law, which threaten in particular to suppress the fundamental voting rights of Wyoming's Hispanic population.

21.    Equality State Policy Center's member organizations have also already turned to Equality State Policy Center for information about how the law will impact their own membership and the constituencies they serve. Equality State Policy Center's member organizations serve the public interest on a broad range of issues including labor, conversation, and other social justice issues. Many of those organizations have their own members—including laborers, women who are victims of domestic violence, and others—who will be burdened by the law and fear that they will be unable to satisfy its requirements and be disenfranchised as a result. Although these citizens are

qualified and eligible to vote in Wyoming, many do not have or cannot readily access the documents to satisfy HB 156's DPOC requirements.

22.     To address the needs of its members and protect against the severe threat that HB 156 constitutes to its mission, Equality State Policy Center must divert significant time not only to fielding questions from its members and constituents about the new law's requirements, but also to redeveloping its existing voter education materials to ensure that they reflect the demands of the new law. Equality State Policy Center is an organization with limited resources. It develops its educational materials in house, and completing this task—including translating the materials into Spanish—will be a significant undertaking. As a result of the resources it will need to divert to this effort, Equality State Policy Center will have to pause its ongoing Vote Wyoming campaign, which aims to keep voters informed about how to participate in upcoming elections.

23.     HB 156's DPOC requirements also impede Equality State Policy Center's core work of encouraging voters to register and participate in their democracy. Although Equality State Policy Center's goal is to increase voter turnout in Wyoming, because HB 156 makes registration more onerous, Equality State Policy Center will also need to redirect significant resources to increase its voter registration education efforts while encouraging many more people to register, simply to prevent the registration rate from severely backsliding. Based on reactions to the law so far, Equality State Policy Center also anticipates that successfully achieving its voter registration education and encouragement efforts will require additional and new work and programs, including additional and new voter education materials and research, to dispel fears of retaliation and surveillance, particularly in the Hispanic community.

24.     The resources required to meet these needs is already undermining Equality State Policy Center's other mission-critical programs, since it must focus on translating and communicating the new rules and answering questions about them instead of working on tasks

related to its core programming, including planning and organizing educational webinars; offering local and statewide trainings to increase civic engagement; building social media content; and conducting other communications outreach from newsletters to media interviews.

25.     Equality State Policy Center has long hoped to build initiatives that will strengthen Wyoming's democracy and empower its diverse communities, and it has already launched these efforts through initiatives like the Chair Project, which was created to increase representation for underrepresented groups, starting with Wyoming's Hispanic population. Through another initiative, SHAPE Wyoming, Equality State Policy Center trains citizens on how to advocate on their values and issues with their elected officials, and it hopes to build on these efforts by teaching citizens to take on local leadership roles, from serving on the boards of non-profits to running for elected office. But because of the threat that HB 156 poses to the franchise for the people Equality State Policy Center serves, it will have far less time and resources to advance these projects. Some projects Equality State Policy Center has planned may need to be abandoned altogether so that it can focus on mitigating the suppressive impact of HB 156. For the same reason, although Equality State Policy Center often undertakes programs and campaigns to support its coalition partners, it expects that it will not be able to do so. Instead of undertaking work to expand civic participation, Equality State Policy Center must dedicate its time to helping citizens navigate the DPOC law so that they can exercise their right to vote.

26.     Defendant Chuck Gray is the Secretary of State of Wyoming and is named as a Defendant in his official capacity. Secretary Gray is the chief election officer for the state and is responsible for "maintain[ing] uniformity in the applications and operations of the election laws of Wyoming." Wyo. Stat. Ann. § 22-2-103. He is charged with preparing written directives and instructions relating to and based on the election laws; advising on the effect of election laws and their application, operation, and interpretation; promulgating rules as necessary to maintain uniform

voting and vote counting procedures and uniform voting; and issuing directives to county election officers necessary to ensure the proper conduct of elections. *Id.* §§ 22-2-120–21. Defendant Gray is being sued in his official capacity for actions taken under color of law to enforce HB 156's DPOC requirements.

27.    Defendants Kayla White, Lori Smallwood, Cindy Lovelace, Lisa Smith, Karen Rimmer, Melissa Jones, Julie Freese, Mary Feagler, Becky Kersten, Jackie Camino, Debra Lee, April Brunski, Tracy Good, Becky Freeman, Colleen Renner, Malcolm Ervin, Eda Schunk Thompson, Carrie Long, Cynthia L. Lane, Maureen Murphy, Amanda Hutchinson, Lily Rakness Parra, and Becky Hadlock ("County Clerk Defendants") are each the "chief election officer for the county" in which they serve. *Id.* § 22-2-103. Among other responsibilities, county clerks are charged with establishing and maintaining voter registration facilities, sending notices of intent to cancel voter registrations; annually purging and updating voter registration information; certifying and transmitting poll lists; preparing pollbooks; appointing and training judges of election; and transmitting the vote tabulation to the Secretary. *Id.* §§ 22-3-104(j), 22-3-116, 22-2-113(e), 22-3-109, 22-3-111, 22-8-102, 22-8-113, 22-14-107. County Clerk Defendants are each being sued in their official capacity for actions taken under color of law to enforce HB 156's DPOC requirements.

## STATEMENT OF FACTS AND LAW

### A.  Overview of HB 156

28.    Secretary Gray has touted HB 156 as one of the most important pieces of his "election integrity" agenda. It is now codified in Wyoming law as Wyo. Stat. Ann. §§ 18-16-102, 22-1-102, 22-3-102, 22-3-103, 22-3-117, 22-3-118, and 22-29-104.

29.    When it becomes effective July 1, 2025, HB 156 will prohibit anyone from registering to vote in Wyoming unless they first show one of the following documentary "proofs" of citizenship: a valid Wyoming driver's license or identification card; a valid tribal identification card from a

federally recognized Indian tribe; a valid state ID that is consistent with the REAL ID Act;[2] a valid U.S. passport; a certificate of U.S. citizenship; a certificate of naturalization; a U.S. military draft record or a selective service registration acknowledgment card; a consular report of birth abroad issued by the U.S. Department of State; or "[a]n original or certified copy of a birth certificate in the United States bearing an official seal." Wyo. Stat. Ann. §§ 22-1-102(a)(lvi)(J), 22-3-103(a) (eff. July 1, 2025).[3]

30.     HB 156 also authorizes county clerks to reject a voter's driver's license, state identification, or tribal identification if it "contain[s] any indication that the person is not a United States citizen." *Id.* § 22-1-102(lvi)(A)–(C). The bill's text offers no guidance on what may "indicate" noncitizen status or explain how a county clerk should make that determination. Nor does the law require "proof" of noncitizen status before rejecting an application on these grounds.

31.     The impact of HB 156's new DPOC requirements will be to make it more onerous for eligible citizens to register to vote in Wyoming. This includes brand new eligible residents—those who have just turned 18 or recently moved to Wyoming—as well as previously registered voters who must re-register to vote, whether due to a change of address or because they have been purged from the voter rolls. Most recently, consistent with the State's aggressive voter list maintenance procedures, 28% of all registered voters were removed from Wyoming's voter rolls simply because they did not vote in the last general election.

---

[2] These first three categories of documentation are acceptable provided that they do not contain "any indication that the person is not a United States citizen[.]" Wyo. Stat. Ann. § 22-1-102(lvi)(A)–(C).
[3] HB 156 also imposes new requirements that registrants provide documentary proof of residency. *See* Wyo. Stat. Ann. § 22-1-102(a)(xxvii), (lv). It defines this term to mean "the documents or other proof of residence specified by rule of the secretary of state," and the Secretary has not yet issued these rules. *Id.* § 22-1-102(a)(lv). As a result, Plaintiff's lawsuit is presently focused on the defined DPOC requirements and does not currently challenge the documentary proof of residence requirements. Plaintiff reserves the right to later do so, either through an amendment of the complaint or a new action, whichever may be appropriate.

32.     HB 156 adds new burdens and complications to a registration process that is already arduous. Wyoming has notably low voter registration and turnout compared to most other states. The crisis is particularly acute for young voters whose voter participation rates have sometimes failed to crack even 10% in Wyoming. At the same time, young voters are far more likely to lack easy access to the types of DPOC that they now must provide to register to vote, making it more likely that they will be barred from voting altogether.

33.     And, despite Wyoming having long been rightfully proud to have been the first state in the nation to enfranchise women 156 years ago, HB 156 threatens this legacy: because women are more likely to change their names as a result of marriage, if they have an acceptable form of DPOC it may not match their voter registration records. As a result, as was the case in New Hampshire's recent municipal elections where that state's new DPOC requirement was in force for the first time, women are more likely than men to be turned away when they go to register as a result of HB 156.

   1.  **Even before HB 156, Wyoming's elections suffered from low rates of voter registration and turnout.**

34.     Wyoming elections do not reflect the will of its citizens as a whole because only a portion of Wyoming's citizens participate in its democracy. For years, the State's voter registration and turnout have been low.

35.     By the general election in 2024, only 65.4% of Wyoming's eligible voters were registered, including the people who registered on election day.  The actual turnout rate was 59.7%.

36.     And although participation in primaries is rarely as robust as in general elections, in 2024 only 27% of eligible citizens voted in the primary—down from 40.8% in 2022. A Wyoming news station called this rate "shockingly low."

37.    In 2022, turnout was especially dismal; only 44.4% of eligible voters cast their ballots in the general election. That number was low overall, but within it, certain groups of voters exercised an outsized influence, while others barely participated at all.

38.    Of particular note, journalists who reviewed data from the Secretary of State reported marked disparities between younger and older voters in the 2022 general election. According to the report, just 13% of Wyomingites ages 18–24 and 19% of people between 25–29 participated. Turnout was not much better for people between 30–39 (29%) and 40–49 (40.8%). On the other hand, Wyomingites age 50 and older had the state's highest voter turnout in that election, and they ultimately accounted for more than two-thirds of the ballots cast.

39.    This is not a new issue—low voter participation has long plagued Wyoming elections, and youth turnout in particular has been a serious problem for years.

40.    For example, in 2014, youth turnout was particularly low: only 10% of Wyoming voters between 18–24 years old voted. Wyoming's then-Secretary of State said that figure "appalled and shocked" him and called it "unacceptable." He called for the government to take steps to encourage more young people to vote.

## 2.  Wyoming has increasingly made it harder for lawful, eligible citizens to participate in the state's elections.

41.    Despite persistent issues with low levels of voter registration and turnout, Wyoming has not made it easier to vote. Instead, it has implemented more barriers to voting, often under the guise of addressing unfounded claims of voter fraud—or, more recently, voters' purported fears about the possibility of voter fraud.

42.    While in 1996, Wyoming ranked as the 7th *least* restrictive state for voting, by 2024 it had fallen precipitously and is now ranked as the 11th *most* restrictive.

43.    This is quite a feat, particularly in light of the fact that Wyoming allows voters to register when they present at the polls on election day—a mechanism for voter registration that studies have shown generally boost voter participation and turnout.

44.    But while Wyoming had a very accessible election system in 1996, it has increasingly moved to make it harder for voters to successfully register and participate, and the statistics reflect those restrictions.

45.    For example, in 2022, then-Representative Gray sponsored (and the Legislature enacted) HB 75, which required voters to present photo ID to vote in-person. The bill was largely justified based on false claims that the 2020 presidential election result was fraudulent.

46.    At the same time, Wyoming is one of just eight states that does not allow online voter registration. To register to vote, an applicant must either do so in person at their county clerk's office or at the polls on election day, or by mail by printing an application, having it notarized, and then mailing it to the clerk's office.

47.    The lack of online voter registration, and the requirement that a voter either register in person or have their application notarized, all make it extremely difficult for many to successfully register to vote, including in particular among young and marginalized communities with fewer resources or access to reliable and easily accessible information to help them to navigate the process.

48.    Even if a person is able to successfully register in Wyoming, it can be difficult to *stay* registered. This is because Wyoming law requires county clerks to regularly purge large numbers of qualified voters from the voter rolls, requiring thousands of residents who have successfully navigated the registration process once (or more) to do so all over again in order to vote in future elections.

49.    Wyoming is allowed to conduct this extremely aggressive list maintenance because it has election day registration. That has allowed it to claim exemption from the requirements of the

National Voter Registration Act ("NVRA"), which Congress passed to increase the number of eligible citizens who register to vote and to enhance voter participation in elections for federal office while also maintaining accurate and current voter rolls. *See, e.g.*, 52 U.S.C. § 20503(b)(2) (exempting states that, as of August 1, 1994, and continuously thereafter, allowed all voters to register to vote at the polling place at the time of voting in a general election for Federal office).

50.     States that are subject to the NVRA are prohibited from removing voters from the voter rolls solely because of their failure to vote. *Id.* § 20507(b)(2). Those states may only remove voters from the rolls for a change of residence after receiving written confirmation that the voter has moved, or after the voter fails to respond to a notice with a postage prepaid and pre-addressed return card and then fails to vote in *two* consecutive general elections. *Id.* § 20507(d).

51.     Unshackled from the NVRA's voter protections, Wyoming is an aggressive outlier in purging voters from its rolls, requiring that a voter's registration be cancelled if the voter "fail[s] to vote in *any* general election." Wyo. Stat. Ann. § 22-3-115(a)(i) (emphasis added). In order to vote, a person who is purged from the rolls must register again.

52.     Following record low turnout in the 2022 general election, Wyoming purged roughly 28% of its voters—more than 80,000 people—from the rolls.

53.     Wyoming's total number of registered voters subsequently declined from over 303,000 in 2020 to under 297,000 in 2024 (a decline of over 2%, or 6,000 net registrants)—despite Wyoming's population increasing by over 10,000 people in that time period.

54.     HB 156's new DPOC requirements apply to voter registration whether conducted at the polls on election day or before election day in person or with a notarized form.

55.     As a result of the recent substantial purge of voters from the rolls, tens of thousands of Wyoming's previously registered voters will not be able to vote again unless they can comply with HB 156's new DPOC requirements.

### 3. Secretary Gray previously tried and failed to impose burdensome "proof" requirements on Wyoming's voter registration process.

56.    Following his election as Secretary of State in 2022, Secretary Gray announced a "conservative election integrity reform agenda" and made adding DPOC and documentary proof of residency requirements its "first priority."

57.    To that end, in December 2023, Secretary Gray proposed a rule change to require documentary proof of residency to register to vote. He proposed this rule change outside of the legislative process and without scheduling a public hearing.

58.    The County Clerks' Association of Wyoming ("CCAW") expressed serious concerns about the rulemaking. In a formal memorandum to Secretary Gray, the CCAW emphasized the "overarching ambiguity regarding the lack of clarity for what it means to be a 'bona fide resident,'" and stressed that "[a]chieving clarity must be done with utmost care to ensure that no citizen is disenfranchised from their right to vote and that implementation of residency requirements are clearly defined and simple to understand and implement."

59.    In April 2024, Governor Gordon rejected Secretary Gray's proposed documentary proof of residence rules on the grounds that they exceeded the Secretary's legal authority.

60.    In a letter explaining his decision, the Governor further wrote, "The assertion that there is no mechanism for ensuring voters do not misrepresent their residency or citizenship is inaccurate."

61.    In the same letter, the Governor also wrote: "[C]urrently available data indicates that Wyoming does not have a significant problem with either fraudulent voter registrations or our ability to investigate and verify voter qualifications. . . . [A]ssuming the worst when experience shows that our system continues to be effective at preventing voter fraud does not support upending a decades long practice."

**4. In 2025, the Legislature passed HB 156, and it became law without the Governor's signature.**

62.     After Secretary Gray's failed rulemaking efforts, the House Freedom Caucus assumed the "election integrity" mantel.

63.     Working with Secretary Gray, Representative John Bear drafted and introduced HB 156.

64.     Representative Bear claimed that the Legislature must require documentary proof of eligibility to register to vote to "build [constituents'] confidence" in the electoral process. Only then, according to Bear, would there be "more participation in elections."

65.     In reality, both federal and Wyoming law have long prohibited noncitizens from voting. And pre-existing Wyoming law required anyone registering to vote to attest to their eligibility in a sworn statement.

66.     But Representative Bear claimed that the attestation requirement did not adequately safeguard Wyoming elections, because an attestation "is not the same thing as proof."

67.     On another occasion, Representative Bear acknowledged that, under existing standards, county clerks work "phenomenal[ly]" hard to ensure electors are qualified when they register to vote.

68.     Representative Bear even acknowledged a real-life example of the effectiveness of that process, noting an incident where, after speaking with the clerk and "reading what they [would be] attesting to," an unqualified voter "chose not to vote in our state."

69.     Still, Representative Bear pressed forward with HB 156 and its restrictions, and Secretary Gray championed the bill on the House floor.

70.    When asked about whether HB 156 would increase the odds "that legal voters in the state [would] be disenfranchised," Secretary Gray responded that he could not "say what's going to happen speculatively," before speculating, "I don't think there's going to be disenfranchisement[.]"

71.    At no point did Secretary Gray or any other of HB 156's proponents provide any meaningful response to concerns raised about the practical realities of implementing the DPOC requirements, including the problems that would be faced by qualified citizen voters when faced with these new restrictions.

72.    Nor has any one of HB 156's proponents been able to show that there is, in fact, a real problem with noncitizens voting in Wyoming. Quite the opposite, Representative Bear stated expressly that there was *not* "any real significant proof of voter fraud."

73.    The most that Secretary Gray and other proponents of HB 156 could point to was a *single* case of one alleged noncitizen who registered as a Republican and voted in the 2020 election—a man named Christian Lopez.

74.    If anything, the Lopez case only illustrates how pointless HB 156's DPOC requirements actually are.

75.    Lopez used a fraudulent birth certificate to get a Wyoming driver's license and register to vote. As a result, even if HB 156's DPOC requirements had been in place at the time, Lopez's *valid* Wyoming driver's license would have satisfied the bill's requirements and the new restrictions would have had no impact whatsoever.

76.    It is also telling that the Lopez case appears to be the *only* case of which HB 156's proponents were aware of in which any noncitizen has in fact registered to vote and voted in a Wyoming election.

77.    No other example of a noncitizen voting was offered by the bill's proponents throughout the legislative proceedings. This complete lack of any evidence that this is an actual

problem led the League of Women Voters of Wyoming to appropriately question, during the legislative proceedings, whether one case could possibly justify the bill's "draconian" approach.

78.    Nevertheless, on March 3, 2025, both chambers of the Wyoming Legislature passed HB 156.

79.    Governor Gordon allowed the bill to become law without his signature on March 21, 2025.

80.    That same day, Governor Gordon sent a letter to Secretary Gray explaining his decision not to sign the bill.

81.    In that letter, the Governor emphasized that Wyoming has an "excellent track record with election integrity and security[.]"

82.    The Governor also expressed concerns that the law would disenfranchise eligible Wyoming voters. He questioned whether the law offered sufficient guidance to county clerks, noting that the "'any indication' standard for rejection of voter registration" was "far reaching" and "may be difficult for clerks to administer, as it is unclear and perhaps awkward for our county clerk to consistently apply with any degree of certainty."

83.    The Governor predicted that "well worn, sunbleached, or wrinkled identification cards" may trigger arbitrary denials. And "[s]eniors may also be disenfranchised, as may rural residents who carry their wallets as they work may find their ID insufficient if it has suffered a drop on a shop floor."

84.    The Governor was "concerned that the vagueness of the language in [the] Act could lead clerks to either err on the side of over-enforcement or under-enforcement."

85.    The Governor emphasized that "it is ultimately essential and core to the workings of both our Wyoming and United States Constitutions that a bona fide citizen be able to vote without

undue difficulty, and that right should not be abridged or diminished as a result of measures taken to conduct an election."

86.    Governor Gordon also acknowledged "the likelihood that [HB 156] will invite litigation."

87.    Nevertheless, Secretary Gray celebrated the bill's passage, claiming that with it, Wyoming became the "first in the nation to apply proof of citizenship for registering to vote for all elections."

88.    Unless this Court issues an injunction, HB 156 will become effective on July 1, 2025.

**B.  HB 156's DPOC requirements will substantially burden citizens' right to vote.**

89.    Despite Secretary Gray's claims, Wyoming is not the first state to attempt to impose DPOC requirements for voting. Arizona, Kansas, and New Hampshire each passed earlier laws imposing DPOC requirements.

90.    In each prior case when a state has attempted to impose DPOC requirements on voters, the result has been the disenfranchisement of lawful, eligible, *citizen* voters.

91.    Courts that have considered the legality or constitutionality of these laws have also repeatedly enjoined them.

92.    There is no logical reason to conclude that the result of Wyoming's law will be different than the experience in other states that have attempted to impose DPOC requirements.

93.    If anything, the disenfranchisement in Wyoming of lawful, eligible citizen voters is likely to be more severe and widespread than in these other states, both because—as Secretary Gray has stressed—Wyoming's law is *stricter* than these prior unlawful efforts to impose DPOC on voters, and because of unique features of Wyoming's election system that will mean that the law applicable to a far greater number of voters.

94.     In Wyoming, as in these other states, lawful, eligible voters will struggle to comply with the DPOC requirements—if they even learn about them in time at all—and the result will be that Wyoming's elections are less accessible and less reflective of the will of the eligible, qualified electorate.

**1. Prior attempts to impose documentary proof of citizenship requirements have repeatedly disenfranchised citizens.**

95.     There is no need to hypothesize about the likely impact of HB 156's DPOC requirements on Wyoming's voting population. The experiences of other states that have passed similar laws confirm their grim effects on voter registration and participation. This has been true in Arizona, where In Arizona, its dual-track DPOC based registration system has denied tens of thousands of qualified voters the ability to participate in state elections. There is no basis to conclude that any of those voters are anything other than U.S. citizens.

96.     It was true in Kansas, where its attempt to impose DPOC left over 30,000 voters with their registrations canceled or suspended and a court found that the law was an unconstitutional burden on the right to vote.

97.     And, most recently, it has been true in New Hampshire, where the state's first elections to take place under that state's new DPOC requirements have been rife with reports of citizens being turned away at the polls.

**a. In Arizona, its dual-track DPOC based registration system has denied tens of thousands of qualified voters the ability to participate in state elections.**

98.     Arizona was the first state to pass a DPOC law, which initially took effect in 2004. Its consequences previewed the exclusion that would result from other states' versions.

99.     Certain features of Arizona's law made it less burdensome than Wyoming's newly enacted. HB 156. For example, unlike HB 156, which requires a voter to provide DPOC every time that they register or re-register, Arizona's law expressly provided that once a person submits

satisfactory DPOC, it is retained in their permanent voter file, so that if they ever need to re-register, they do not have to resubmit it. *See* Ariz. Rev. Stat. § 16-166(I), (J) (2004). And while HB 156 repeatedly requires that certain forms of DPOC be "valid" to suffice, Arizona's law clearly allowed for the use of expired forms of identification. Moreover, under the Arizona law, citizens could register without a physical ID card by providing the number on their Arizona driver's license.

100. Unlike Wyoming, Arizona is subject to the NVRA. The DPOC law was challenged in court and the U.S. Supreme Court ultimately held that it violated the NVRA as applied to federal elections. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).

101. Following the Supreme Court's decision, Arizona implemented a system that created two classes of voters: those who provided DPOC when they registered could vote in any election, while those who did not were designated as "federal only," and allowed to vote only for federal offices.

102. By July 2023, there were 19,439 active "federal only" voters in Arizona: that is, people who did not provide DPOC required under the law, and whose franchise in state elections has been extinguished because of it.

103. There is *zero* evidence that even one "federal only" voter in Arizona is not a citizen. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 1011 (D. Ariz. 2024) (noting "the absence of evidence that Arizona's 19,439 Federal-Only Voters are non-citizens"), *judgment entered*, No. CV-22-00509-PHX-SRB, 2024 WL 2244338 (D. Ariz. May 2, 2024), *aff'd in part, vacated in part on other grounds*, *remanded*, 129 F.4th 691 (9th Cir. 2025), and *aff'd in part, vacated in part on other grounds, remanded*, 129 F.4th 691 (9th Cir. 2025).

104. But while there was no evidence that the people the DPOC law excluded were non-citizens, there was ample evidence that it worsened racial disparities in the voting population. Although non-white voters comprised only 28.8% of eligible voters, in July 2023, an estimated

21

46.7% of Arizona's 19,439 "federal only" voters were non-white. *Mi Familia Vota,* 719 F. Supp. 3d at 948 n.5.

105.   The Arizona legislature tried to impose limited DPOC requirements on these voters again in 2022, when it enacted a new law that stated that, unless a voter provided DPOC, they could not vote for president, nor could they vote by mail. *Mi Familia Vota*, 129 F.4th at 705.

106.   That law was challenged and a federal district court found that these laws, too, violated the NVRA and enjoined them. *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1088–96 (D. Ariz. 2023). The Ninth Circuit affirmed. *Mi Familia Vota*, 129 F.4th at 702 (9th Cir. 2025) (affirming the district court's ruling on the NVRA and vacating in part on other grounds).[4]

**b. In Kansas, its unconstitutional attempt to impose DPOC resulted in tens of thousands of citizens having their voter registrations canceled or suspended.**

107.   Kansas passed a DPOC law in 2011. Although that law applied to all elections in Kansas—state or federal—by its terms it was less stringent than Wyoming's HB 156.

108.   Not only did Kansas allow for a far broader range of documentation to satisfy the DPOC requirement than what Wyoming will now allow, its law provided that if an applicant did not have any of the documentation listed as acceptable by the law, they could submit "*any evidence*" that they believed demonstrated their citizenship and election officials had broad discretion to accept it—or even to affirmatively work to affirm citizenship themselves. Kan. Stat. Ann. § 25-2309(m).

109.   Kansas also had an affidavit option for those applicants whose DPOC was inconsistent in terms of the applicant's name or sex, when compared with their voter registration

---

[4] Because the district court found that the DPOC laws violated the NVRA, it did not reach the plaintiffs' alternative claims that they also violated the federal constitution. *Mi Familia Vota*, 691 F. Supp. 3d 1077 at 1090 n.7, *judgment entered*, No. CV-22-00509-PHX-SRB, 2024 WL 2244338 (D. Ariz. May 2, 2024), *aff'd in part, vacated in part, remanded*, 129 F.4th 691 (9th Cir. 2025), and *aff'd in part, vacated in part, remanded,* 129 F.4th 691 (9th Cir. 2025).

application—a provision that protected against the disenfranchisement of women who changed their name when they married, among other scenarios. *Id.* § 25-2309(q). And unlike Wyoming's law, Kansas did not restrict acceptable proof of citizenship to "valid" IDs and explicitly allowed people to used expired passports to register.

110. Despite the far broader array of options that the Kansas DPOC law provided prospective voters, it broadly disenfranchised citizens.

111. After the Kansas law took effect, *31,089* people had their applications to register to vote canceled because they did not provide satisfactory DPOC. *Fish*, 957 F.3d at 1128. Ultimately, "approximately 12% of the total voter registration applications submitted [after] the law was implemented" were suspended or canceled. *Id.* (internal citation omitted).

112. The Kansas law would have disenfranchised more people still, but a federal court enjoined the law as an unconstitutional burden on voters' rights, and the Tenth Circuit Court of Appeals affirmed. *See id.* at 1121, 1127–36.

113. As a result, Kansas's DPOC law has not been enforced since 2018.

       **c. In New Hampshire, the first elections held subject to a DPOC requirement resulted in as much as 20–30% of voters being turned away.**

114. Most recently, New Hampshire passed a DPOC law in 2024. Although passed before the 2024 general election, the law's effective date was not until afterward—November 11, 2024.

115. The documentation that the New Hampshire law deems acceptable for DPOC is similar to that required by Wyoming's HB 156, with a notable exception. New Hampshire allows voters to submit a birth certificate, passport, naturalization papers, or "*any other* reasonable documentation which indicates the applicant is a United States citizen." N.H. Rev. Stat. § 654:12(I)(a) (emphasis added).

116.    The first elections held in New Hampshire subject to its new DPOC law were an array of local elections held on March 11, 2025. The disenfranchising effects were severe.

117.    Non-partisan election observers found that 25 to 30 percent of voters in some New Hampshire towns were turned away because they did not have DPOC.

118.    Election officials reported similar effects: in two New Hampshire towns, election officials reported that around 20 percent of New Hampshirites who tried to register at the polls were turned away because of the new law.

119.    In public reports, several election officials described the law's impact on women, and particularly married women who had changed their names. One town clerk observed, "They're really making women jump through a lot of hoops to vote." Another clerk described the impact more succinctly: "It's disenfranchising women."

120.    The New Hampshire law is currently the subject of ongoing federal litigation. *See N.H. Youth Movement v. Scanlan*, No. 1:24-cv-00291 (D.N.H. filed Sept. 17, 2024); *Coal. for Open Democracy v. Scanlan*, No. 1:24-cv-00312 (D.N.H. filed Sept. 30, 2024).

### 2.    HB 156's DPOC requirements will impose burdens on and, in some cases, disenfranchise, qualified citizen voters.

121.    As the experiences of other states show, when DPOC laws have been enacted, the result has been to burden and—in tens of thousands of cases—entirely disenfranchise lawful, citizen voters.

122.    There is no reason to expect that the results will be different in Wyoming. Quite to the contrary, because Wyoming law is stricter—and because of particular features of Wyoming's election processes that will both cause the law to impact a greater number of voters, and effectively ensure that many voters will not even find out about the DPOC requirements until it is too late—the impact of the law is almost certain to be more severe than the laws in other states.

123.    Secretary Gray has repeatedly bragged that Wyoming's law is even stricter than these other states' broadly disenfranchising DPOC laws and closes what he viewed as loopholes in the other schemes.

124.    For example, Secretary Gray criticized New Hampshire's law for allowing "other reasonable documentation" of citizenship beyond those identified in the law itself, calling it "not a requirement law" and praising HB 156 as comparatively "ironclad" because HB 156 "doesn't have some carve-out [where] the election judge's judgment can override the [DPOC] requirement."

125.    Moreover, unlike in Kansas, HB 156 does not include any exception or affidavit option for those who have changed their name (such as married women), nor is any discretion afforded to election officials to be satisfied that the applicant is a citizen by any other form of documentation or means.

126.    And, unlike in Arizona, if a voter cannot or does not provide one of the limited forms of DPOC deemed acceptable by HB 156, they will not be permitted to participate in federal elections. They are barred from registering and participating in any election—state or federal—entirely.

127.    Many qualified voters do not have the documents that HB 156 requires. Many more do not have ready access to them.

128.    A recent nationwide study found that 15% of adult citizens either lack a State ID or driver's license altogether or do not have one that matches their current name and address.

129.    Certain groups of people are especially likely to lack the documentation that HB 156 will now require them to produce to register to vote.

130.    The same nationwide study referenced above found that young voters between ages 18 and 29 were nearly three times as likely to lack current identification that shows their name and address as older adults.

131.    And people with incomes below $30,000 were more than twice as likely to lack identification with their current name and address as people who make $100,000 or more.

132.    Aside from these systemic factors, some Wyoming voters will face circumstances outside of their control that destroy their documents (like a fire) or make the documents impossible to access (like leaving an abusive spouse).

133.    If a prospective voter does not already have an acceptable form of DPOC, obtaining one can be costly and complex. And for some qualified voters in Wyoming, it will be impossible for them to do so, whether at all or in time to avoid being disenfranchised.

134.    For most people, the most accessible form of identification that satisfies HB 156's DPOC requirements is a Wyoming driver's license or State ID card.

135.    But for people who do not already have a valid ID, obtaining one can be anything but straightforward.

136.    A person who wants a Wyoming driver's license or State ID card must apply for one in person at a Wyoming Department of Transportation Driver Services office. In many places in Wyoming, that is no simple task.

137.    The Baggs Driver Services office in Carbon County, for example, is open only on the first Thursday of the month for six months out of the year (during the other six months, it does not open at all). Its hours are 10 a.m. to 2:45 p.m. The next closest office is more than 70 miles away.

138.    In total, only nine of Wyoming's 29 Driver Services offices are open Monday through Friday, and more than half of them are open three days per week or less.

139.    Counties with the sparsest access to Driver Services are among the state's poorest. They also have among the largest proportions of non-white voters.

140.    After arriving at a Driver Services office, for people who do not already have photo identification, obtaining one presents additional challenges. Different forms of government

identification build on one another: having one makes it easier to obtain another. And conversely, not having one makes the process more difficult at every step.



141.   A person who wants a driver's license or State ID must provide proof of identity and residence. Wyo. Stat. Ann. § 31-7-111(a). Proof of identify can include a certified birth certificate, a valid unexpired U.S. passport, a license or ID from another State, or certain records particular to immigrants or people born abroad. *Id.*[5]

142.   For most people who do not already have an out-of-state license or ID, the most accessible of these options is a birth certificate.

---

[5] The statute also provides that when a person cannot present the required documents due to "reasons beyond the applicant's control," a person can use some "other document required by the division to establish identity," without specifying what those documents might be. Wyo. Stat. Ann. § 31-7-111(a).

143.    Only 40% of Wyoming citizens have a passport, and obtaining one normally costs at least $165 and takes at least four weeks, excluding mailing times.

144.    Wyoming does not offer free birth certificates to newborns. Therefore, anyone who needs a certified copy of a Wyoming birth certificate must separately apply for one.

145.    But applying for a birth certificate requires a photo ID. Specifically, it requires a "valid government issued picture identification that includes a permanent signature," like a passport, driver's license, or military ID.

146.    People who do not have an accepted photo ID can submit a notarized signature instead. But the notarization process requires a photo ID too. *See* Wyo. Stat. Ann. § 32-3-102(xiv). Otherwise, a person must use a notary that they know personally or bring a second person along who has a valid photo ID and who will verify the person's identity under oath. *Id.* § 32-3-102(xxxi)(A).

147.    Some people who need birth certificates face additional barriers. To apply for a birth certificate, a person must be at least 18 years old. So, for 17-year-olds who hope to register for an upcoming election in which they will be old enough to vote, getting a birth certificate requires asking one of the parents named on the certificate or a legal guardian (with a certified copy of guardianship papers) to request the certificate instead. Absent that, the 17-year-old must both "demonstrate the requirement for the [birth] certificate" and request it through a lawyer or with a signed affidavit.

148.    People who do not know specific details about their births or either of their birth parents—like adoptees—may also struggle to get a birth certificate: the application requires detailed information that many people may not have, including the full names of both parents, the mother's maiden name, and the city or county of birth. Adoptees seeking this information must first obtain an order from a state or federal court. The application includes no instructions about what to do if you do not know these details.

149.  Once the application for a birth certificate is submitted by mail to Vital Statistics Services, the processing time is at least five days.

150.  In addition to a birth certificate or other acceptable photo ID, people who have changed their names—for example, through marriage or divorce—must prove it before they can get a State ID. To do so, they must submit a marriage certificate, divorce decree, court order, or another proof of name change signed by a judge. But of course, applying for a Wyoming marriage certificate or divorce decree requires a valid government-issued photo ID. Absent that, a person must follow the same process to get a notarized signature as for the birth certificate application. And again, notarization itself generally requires an ID, unless a person uses a notary they know personally or brings a witness who has a valid ID to attest to their identity under oath.

151.  Even after presenting the required documents to prove a name change, Wyoming will not issue a new driver's license or ID card until the new name can be verified with the Social Security Administration. Thus, going through the name change process with the Social Security Administration is a prerequisite to changing it on an ID in Wyoming.

152.  People who have a State ID can apply for the name change with the Social Security Administration online. People who do not have a State ID must schedule an appointment with a local office to submit the required documentation. So too must people who are changing their names for any reason other than marriage (like divorce) and people who were married within the past 30 days.

153.  In 2023, the average time period between requesting an appointment with the Social Security Administration and the date of the appointment was 32 days. After the appointment, it takes about two more weeks to receive an updated social security card.

154.  Aside from the logistical burdens of document collection, many people face another barrier as well. For people who do not have photo identification, obtaining one usually costs money.

Requesting a birth certificate, which many people must do in order to get an ID, costs $25. That sum must be paid by a money order (which costs an additional fee) or bank-personalized check.

155.   For people who need to prove a name change, requesting a marriage or divorce certificate in Wyoming also costs $25, payable by bank-personalized check or money order.

156.   People who submit a notarized signature to obtain a birth certificate or marriage license will also have to pay a notary, who can charge up to $10 per signature.

157.   In total, a person who has no photo identification and needs both a birth and marriage certificate will need at least $60 (assuming they can pay the notary a single fee for both requests).

158.   These webs of document requests describe a few common scenarios for people without IDs who want to register to vote. But they are only examples. Other complications can cause additional requirements, delays, and costs.

159.   The barriers many face to obtaining DPOC are intensified by the problem of timing. To be sure, many people who need a license or ID eventually collect the necessary documents and go to a Driver Services office, despite the inconvenience. But obtaining an ID to register to vote means doing so between the time the person realizes they need the ID and the election.

160.   Since Wyoming allows same-day registration, many people will only learn that they lack sufficient documents on election day itself. This was the experience of many voters who found themselves unable to comply with New Hampshire's DPOC requirements in the state's recent local elections.

161.   Confusion is likely to be particularly acute in Wyoming, because the state also allows a much wider range of documents to prove identity to satisfy its voter ID law as compared to its new DPOC requirements, including student IDs, Medicaid insurance cards, and even Wyoming concealed firearm permits.

162.   With the passage of HB 156's DPOC requirements, prospective voters who seek to register on election day now must be fully aware that there are separate requirements for voter registration and identification, and that an ID that works for one may not work for the other.

163.   This may prove especially confusing for voters who successfully registered and voted in past elections but are among the 28% that have been recently purged from the voter rolls because they skipped the 2022 low-turnout general election (or the additional voters who will be purged because they did not vote in the 2024 general election). It is highly likely that these voters may not realize that the form of identification they used to register to vote even a few short years ago is no longer acceptable.

164.   In Wyoming, people who try to register on election day without the appropriate documentation have only "until the close of business on the day following the election to present documentation." Wyo. Stat. Ann. § 22-3-104(g). This makes it functionally impossible for people to comply if they do not already have the required DPOC—especially since the closest Driver Services office may not even be open during that time. *See supra* §§ 136–139. As a result, people in this position will be entirely disenfranchised.

165.   In a memorandum expressing concerns with Secretary Gray's failed rulemaking attempt in 2022, the County Clerks Association of Wyoming offered a clear admonition about the impact of burdening voters with additional registration requirements—especially for voters who have been purged from the rolls.

166.   "Requiring these voters to produce additional documentation when re-registering at the polls in 2024 will create lengthy delays on Election Day," the memorandum warns. "As such, we must state clearly: this requirement will increase the length of lines and wait times on Election Day."

167.    These delays—an inevitable consequence of introducing new requirements on voters the day they come to vote, many of whom do not know they must re-register at all—will suppress the vote of Wyoming citizens, whether they can satisfy the DPOC requirements or not.

**3. The law's burdens will be more significant on citizens in underrepresented or marginalized communities, including Wyoming's Hispanic population.**

168.    Wyoming's Hispanic population spiked in the early 20th century, when Spanish-speaking people, many from Texas and New Mexico, came to work for the State's burgeoning sugar beet industry. Two large sugar companies both recruited the migrants and built housing for them, which locals dubbed the "Mexican Colony." During the same period, the Hispanic population also grew in Wyoming's mining towns, where Spanish-speaking laborers were recruited to work in the coal mines.

169.    The migrants were not embraced as members of the community. Signs in shop windows admonished, "No Mexicans," and Spanish-speakers were largely restricted to the "Mexican" parts of town (regardless of whether they were in fact of Mexican nationality or Spanish-speaking citizens).

170.    In more recent times, Wyoming's Hispanic community has continued to grow, with many recruited as laborers for the State's construction, service, and energy sectors, where many work in oil fields and coal mines.

171.    Hispanic people now comprise approximately 10% of Wyoming's population. The Hispanic population is highest in Laramie, Sweetwater, and Carbon Counties, where it approaches nearly a fifth of the population. Rock Springs, a city in Sweetwater County, is known as the "Home of 56 Nationalities" due to the diverse immigrant population that settled there, primarily to work in the mines.

172.    The vast majority of the Hispanic residents in Wyoming are American citizens. Only 3.6% of Wyoming's population was born outside of the United States. About half of Wyoming's foreign-born residents are naturalized Americans, and about half of its foreign-born residents are from Spanish-speaking countries.

173.    But as the Hispanic-American population in Wyoming has increased, the community's representation in government has not.

174.    In every level of government—from school boards to city councils to county commissions—Hispanic Wyomingites are starkly underrepresented. In the Wyoming State Legislature, only one of its 93 members is Hispanic. And, according to a Town Councilor in Jackson Hole, where more than 20% of the population is Hispanic, the town has never had a Hispanic official.

175.    Hispanic Wyomingites are also drastically underrepresented as voters. In the 2020 General Election, Wyoming had nearly 32,000 Hispanic eligible voters, but fewer than 7,000 actually cast a ballot—a turnout rate of around 20%.

176.    The burdens the DPOC law imposes will fall acutely on Wyoming's Hispanic community, making this registration and turnout problem worse.

177.    Many communities with the highest populations of Hispanic residents are also among the most under-served by Wyoming's driver services offices, where prospective voters must go to request the documents they need.

178.    In Carbon County, for example, the county with the highest percentage of Hispanic residents in the State, one of the two driver services offices is open for fewer than five hours, on one day a month during six months out of the year. The next closest office is more than an hour's drive away.

179.    In addition, on information and belief, the Wyoming Department of Transportation, which operates the state's driver services offices, has only one staff member who is bilingual in

33

Spanish. The department encourages Spanish-speaking Wyomingites to bring their own translators or ask their English-speaking children to translate for them.

180.    And while Hispanic residents constitute a significant part of the State's labor force, they are more likely to work low-income jobs with demanding, unpredictable shifts. This makes it more difficult for them to visit government offices to request the documents they need and makes it nearly impossible to do so if they learn that they need these documents for the first time when they attempt to register on election day.

181.    Against the backdrop of growing anti-immigrant sentiments, HB 156 imposes an additional burden on Hispanic residents as well: fear of drawing scrutiny and retaliation because of how they look.

182.    In Wyoming, like in the nation as a whole, immigration has been increasingly cast as an existential threat, driving fear not only among people who actually are non-citizens, but also among Hispanic Americans who fear their fellow citizens may falsely assume that they are not lawfully present in the United States.

183.    Wyoming has the fourth lowest foreign-born population in the nation—and as described above, nearly half of those people are naturalized citizens. Nevertheless, in recent years, Wyoming has focused its attention on the "illegal immigrant" problem. Wyoming's 2025 Legislative Session included a host of bills that—like HB 156—were aimed at rooting out people without legal status.

184.    One of these bills, which was signed into law, banned "sanctuary cities" in Wyoming—even though none exists in the state.

185.    Another proposed bill, which narrowly avoided passage, would have committed State funds to finishing the southern border wall—even though Wyoming is more than 1,000 miles from the border.

34

186.    Yet another proposed bill would have criminalized "harboring" or "transporting" undocumented people—making it a felony to, for example, give an undocumented family member a ride.

187.    Legislators also successfully passed HB 116, which provides that any driver's license issued by another state "that has markings establishing that the license or card holder did not provide proof of lawful presence in the United States shall be deemed invalid as a driver's license or operating privilege under the laws of this state." But Lieutenant Colonel of Wyoming Highway Patrol confirmed that "there's no way to tell the [immigration] status" just from reviewing a person's license. Still, the bill ultimately passed into law, albeit without the Governor's signature.

188.    For the Hispanic communities in Wyoming, these efforts have sparked fear that both non-citizens and people suspected of being non-citizens will face intensifying scrutiny from the government, and perhaps even from their neighbors. Some Hispanic residents have reported to local press that they are afraid to leave their homes.

189.    The vague language in HB 156 exacerbates this problem. The law authorizes county clerks to reject a voter's identification for registration purposes if it "contain[s] any indication that the person is not a United States citizen." Wyo. Stat. Ann. § 22-1-102(lvi)(A)–(C) (eff. July 1, 2025). But the bill never explains what may "indicate" noncitizen status, leaving it entirely to the clerk's individual discretion. Hispanic citizens may also fear that, if a clerk draws this conclusion, it could lead to unjust investigation or arrest, despite their status as citizens.

190.    Thus, HB 156 risks suppressing the vote of Hispanic citizens because they may fear that registering could make them or their family members a target.

> **4.  The law's DPOC requirements will impose unique burdens on women as compared to their male counterparts.**

191.    The DPOC requirement will also uniquely threaten Wyoming's women voters.

192.    Although Wyoming was the first state to give women the right to vote in 1869, with the enactment of HB 156, many women will now face additional barriers to the franchise.

193.    More than 80% of American women change their names when they marry or divorce. As a direct consequence, a significant number of women do not have documents that match their current legal name. Nationwide, an estimated 69 million women—but only five million men—have legal names that do not match the name on their birth certificates. To obtain identification that they can use to register to vote, these women have to produce not only their birth certificates, but their marriage licenses or divorce certificates as well. (The men they married do not have to do this).

194.    Meanwhile, one of the documents that can be used to prove citizenship under HB 156—a military draft record—is *only* available to men because women have never been subject to the draft. Another, a selective service registration acknowledgement card, is overwhelmingly possessed by men because all men must register with the Selective Service when they turn 18.

195.    And although the selective service card does give mostly men a free way to satisfy the DPOC requirement, its inclusion is curious because it does not actually prove citizenship, since registration is required of "parolees, undocumented immigrants, legal permanent residents, asylum seekers, refugees, and all males with visas of any kind which expired more than 30 days ago."

196.    Women also face structural barriers that make the heightened documentation requirements more challenging. They are more likely to be caretakers for children or adult dependents who require around-the-clock care and they spend more time on unpaid household labor. They are therefore less likely to have time to navigate a potential maze of documentation requirements to obtain an accurate and accepted ID in time to vote.

   **5.  The law's DPOC requirements will disproportionately burden young voters.**

197.    HB 156's DPOC requirement also will uniquely burden young voters, who are already suffering from dramatically low registration and turnout rates in Wyoming elections.

198.    Young voters are less likely to have accurate, government-issued IDs in the first place. A 2023 study measuring access to ID nationwide found that age was the single most powerful predictor of whether or not a person has an unexpired state-issued ID that shows their current information. Specifically, the study found that more than 41% of people between ages 18 and 24 do not have an ID that accurately states their names and address.

199.    Recent years have also seen a historic decline in young Americans who have driver's licenses as surges in vehicle, gas, and insurance costs have made driving less feasible, especially for young people with low incomes. Data from the Federal Highway Administration shows that the percentage of people between 16 and 19 with a driver's license has dropped from 64 percent in 1995 to just under 40 percent in 2021.

200.    Young voters are also less likely to have an easily accessible copy of their birth certificate. Many leave these documents for safe keeping at home with their families after they move away and may not be able to retrieve them in time to use them for voting purposes. This is particularly so if they do not realize they need to bring that information when they present at the polls on election day to register and vote.

201.    Young voters who become aware of the requirements and try to obtain ID in time to be able to register to vote may face additional and exacerbated burdens as well. Many do not have access to the documents they need to obtain a license or State ID. For instance, to obtain a State ID in Wyoming, a person must show proof of residency by presenting, for example, a recent bill in the person's name, a bank statement, or a doctor's bill. But young voters are less likely to have these sorts of documents than older voters because they are more likely to rent and may have roommates and are thus less likely to pay bills directly. Students are also more likely to be on their parents' health insurance (so they will not have doctor's bills) and are more likely to be full-time students who do not have pay stubs or tax documents.

202.    Wyoming lawmakers appear to understand that many young voters may lack IDs; to satisfy its *voter ID* law, Wyoming has allowed students to use state-issued student IDs to identify themselves when they vote (during the 2025 legislative session, a bill that would have barred the use of student IDs at the polls failed to pass). But under the DPOC law, they cannot use those same documents to register in the first place.

### 6.    The DPOC requirement will impose exacerbated burdens on other groups of citizens who already face barriers to inclusion in the democratic process.

203.    HB 156's DPOC requirement favors people who have lived in the same place, with the name they were given at birth, and have a safe and stable place to store their sensitive documents. But many citizens, who are no less entitled to vote, do not enjoy these conditions.

204.    For example, women who have fled domestic abuse may not have their IDs or a way to safely access them, and they may also lack access to the documents they would need to obtain a new one.

205.    People who lack stable housing—including laborers whose work keeps them on the road for long periods of time—or have no housing at all may have no documents that prove their identities and no safe place to keep them if they did.

206.    People who were adopted or in foster care may not know the information required to get a birth certificate—a prerequisite for nearly every form of accepted ID—like their birth parents' names or their place of birth.

207.    Wyomingites who are transgender also face disproportionate burdens under the DPOC requirement, since many of them have changed their legal names. To update their names on a Wyoming driver's license or State ID, they must first change their name with the SSA—which may require waiting weeks or months for an appointment—and then present proof of the change to driver services, usually in form of a court order.

208.   For people with certain disabilities, the DPOC law poses another special barrier. Unlike the DPOC requirements passed in other states, Wyoming restricts proof of citizenship to "valid" ID. People whose drivers' licenses are suspended for medical reasons may therefore need to obtain a more expensive and more onerous form of ID, like a passport, to register to vote. Under Wyoming law, a driver's license can be suspended or cancelled if its holder has a medical disorder that renders the person unable to safely drive, *see* Wyo. Stat. Ann. § 31-7-123, meaning that people with conditions like epilepsy may be disenfranchised.

209.   That same requirement—that the ID used to prove citizenship be "valid"—may also add burdens to people with less financial resources. In Wyoming, a driver's license can be suspended for failure to pay debts, child support, or release conditions including fines or fees. *See* Wyo. Stat. Ann. § 31-9-305; *id.* § 31-7-128(g); Wyo. R. Crim. P. 46.4. Wyoming also lacks any meaningful standards for assessing a person's ability to pay those fines and fees. Therefore, under the DPOC law, a person can be disenfranchised in Wyoming merely because of their poverty. The constitutional right to vote does not depend on a person's age, their wealth, their gender, their disability status, or whether they have a home. But under the DPOC requirement, a person's ability to exercise that right very much could.

## C. Wyoming's documentary proof-of-citizenship requirement does not advance legitimate state interests.

210.   Although HB 156 will have serious consequences for Wyoming's people and its democracy, it does nothing to advance any genuine state interests.

211.   The proponents of HB 156's DPOC requirements contend that the bill is necessary to weed out and deter noncitizen voting. In reality, HB 156 is a solution in search of a problem.

212.    Both Wyoming and federal law already prohibit noncitizens from voting in Wyoming and federal elections, and pre-existing enforcement mechanisms have long effectively ensured that those rules are followed.

213.    There is scant evidence of noncitizens voting in Wyoming elections and no evidence at all that noncitizen voting has had a material effect on any Wyoming election.

214.    There is also no evidence that imposing burdensome DPOC requirements on Wyoming's entire eligible voting population will do anything more to prevent non-citizens from casting ballots.

215.    Because HB 156's DPOC requirements do not meaningfully advance any state interest in preventing fraudulent voting, the substantial burdens imposed by the requirements on eligible Wyoming voters are not justified and the law violates the First and Fourteenth Amendments.

### 1.    Lawmakers' purported concern about noncitizen voting is unfounded.

216.    Secretary Gray, HB 156's chief proponent, invoked the specter of voter fraud—and specifically voting by non-citizens—to justify the law.

217.    But aside from one example of a noncitizen voting in 2020—which HB 156 would not have prevented (*supra* §§ 73–75)—the Secretary's concerns were purely hypothetical. Without "verification measures," he claimed, "[Y]ou don't know how many times that is happening that you don't catch."

218.    At the same time, Secretary Gray dismissed concerns about the law's consequences. When given the opportunity to respond to opposition to HB 156—and specifically concerns about the law's burden on eligible voters—Secretary Gray said he recognized the "tension between security and ease of practice," but dismissed concerns as the rhetoric of "woke radical leftist[s]."

219.    Nor did anyone else championing the bill provide evidence that voter fraud is a real problem in Wyoming.

220.    The data explains why. Mary Lankford, who represents the County Clerks Association of Wyoming, testified before the House Corporations, Elections and Political Subdivisions Committee that across Wyoming's 23 counties, a total of five noncitizens tried to vote in the 2024 general election. All were turned away under the operation of Wyoming's pre-existing laws.

221.    An additional six individuals who voted in the 2024 election were flagged as potential noncitizens and are under investigation by county sheriffs. However, Lankford testified that, based on the clerks' past experience, these individuals were likely citizens who were flagged in error. But even in the unlikely event that these voters were, in fact, ineligible, they would represent a mere .0022% of the votes cast in Wyoming's 2024 general election.

222.    Lacking any real evidence of a meaningful problem with voter fraud, HB 156's proponents argued the bill was necessary to build confidence in the electoral system.

223.    According to Representative Bear, even one example of noncitizen voting "leads to a situation where constituents lose confidence in the system." HB 156, he argued, "begins to show voters that [they] are going to require that you are a citizen" to vote.

224.    Secretary Gray similarly invoked "widespread agreement" that proof of citizenship is "need[ed]."

225.    Even if these characterizations are correct, popular support for restrictions on voter registration cannot independently justify burdening the right to vote—particularly where that support is the product of baseless partisan fearmongering in the first place.

### 2. Existing measures adequately protect against noncitizen voting.

226.    Even if noncitizen voting was a real problem (it is not), HB 156's DPOC requirements are not a reasonable remedy and several preexisting laws more than adequately protect Wyoming's elections against this exceedingly rare issue.

227.    Proponents of DPOC laws—Secretary Gray included—purport to presume that noncitizens are voting (or that they *may* be voting), but the very idea is illogical.

228.    There is no incentive to vote as a noncitizen; to the contrary, a noncitizen who attempts to vote is putting themselves in grave legal peril, risking not only jail time and fines, but also deportation.

229.    For nearly 30 years, it has been a federal crime "for any alien to vote in any [federal] election." 18 U.S.C. § 611(a). A noncitizen who violates this law faces both jail time and serious immigration consequences, including deportation, for any violation. *See* 8 U.S.C. § 1227(a)(6).

230.    Wyoming similarly prohibits noncitizen voting. Both its Constitution, *see* Wyo. Const. art. VI, § 5, and its criminal laws prohibit voting "when not a qualified elector entitled to vote at the election." Wyo. Stat. Ann. § 22-26-106(a)(i). Violation of this law is punishable by up to a year in prison and a $5,000 fine. *Id.* § 22-26-106(c).

231.    The idea that noncitizens are nevertheless risking their freedom to vote in elections is further undermined by the fact that Wyoming has a uniquely strict enforcement provision for voting offenses.

232.    If a county clerk has "reasonable cause to believe that a person" has voted despite being ineligible and asks the county sheriff to investigate, the sheriff has a *nondiscretionary* duty to do so. *See id.* § 22-26-106(e) (emphasis added). And if the sheriff finds that "the allegation has merit," they "shall refer the matter to the district attorney for prosecution." *Id.*

233.    As additional safeguards, Wyoming further punishes conduct that might ultimately lead to fraudulent voting, such as making false statements to acquire the sort of documents that might be used to register to vote under the state's voter ID law. *See, e.g.*, *id.* § 31-7-133(v) (criminalizing the use of a false or fictitious name or false statement in a driver's license application).

### 3. HB 156's DPOC requirements do not actually exclude non-citizens.

234.    HB 156's DPOC requirements suffers another flaw as well: they include several forms of documentation that *noncitizens* may have, as well.

235.    This further proves that HB 156's DPOC are not true safeguards against an actual problem, but meaningless hoops that voters will now be required to jump through to exercise their most fundamental right, snaring citizens in the process.

236.    For example, HB 156's list of acceptable forms of DPOCs includes "a valid Wyoming driver's license" or "a valid identification card," "*provided that the license or identification card does not contain any indication that the person is not a United States citizen*." Wyo. Stat. Ann. § 22-1-102(a)(lvi)(A) (eff. July 1, 2025) (emphasis added).

237.    Starting in January 2026, newly issued Wyoming licenses and ID cards will identify non-citizens. But under current law, certain categories of noncitizens, including lawful permanent residents, can obtain a Wyoming driver's license or State ID card that says nothing about their citizenship status. In other words, a Wyoming driver's license does not presently provide information about U.S. citizenship.

238.    HB 156's list of acceptable DPOC also includes "a selective service registration acknowledgment card." *Id.* § 22-1-102(a)(lvi)(G) (eff. July 1, 2025). But noncitizens could have that card, as well. Indeed, many are required to: almost all male non-citizens between ages 18 and 25 are required to register with the Selective Service, while women are not required to register. And the acknowledgement card does not say whether its holder is a citizen or not.

239.    HB 156's DPOC requirements are thus ineffectual at best. At worst, they invite arbitrary (perhaps even insidious) enforcement to weed out individuals that county clerks suspect might fall into this category.

240.   Indeed, the Governor expressed this concern when he declined to sign the bill, stating that the "far-reaching new 'any indication' standard for rejection of voter registration … may be difficult for clerks to administer, as it is unclear and perhaps awkward for our county clerks to consistently apply with any degree of certainty."

241.   The single case of noncitizen voting that Secretary Gray regularly invokes underscores the point. As described above, the individual in that case used a fraudulent birth certificate to acquire an otherwise valid Wyoming driver's license to register to vote. HB 156's DPOC requirements do nothing to prevent that scenario: the fraudulent license would satisfy it. HB 156's DPOC requirements therefore fail even to address the primary case used to justify it.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Undue Burden on the Right to Vote**
**U.S. Const. amends. I & XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201–2**

242.   Under the First and Fourteenth Amendments to the U.S. Constitution, Defendants cannot utilize election practices that unduly burden the right to vote.

243.   A court considering a challenge to a state election law on the grounds that it imposes an undue burden on the right to vote must carefully balance the justifications put forward by the state against the burdens imposed by the relevant law. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). When a law will impose a significant burden on the right to vote, courts "must look at more than whether the [state's] proffered interests are legitimate in the abstract." *Fish*, 957 F.3d at 1133. Rather, courts "must ask whether the concrete evidence demonstrates that 'those interests make it necessary to burden the plaintiff's rights.'" *Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

244.   Applying this standard, the Tenth Circuit held that generalized concerns about voter fraud, unsubstantiated by concrete evidence, cannot justify DPOC requirements. *See id.* at 1134.

245.    Here, too, HB 156's DPOC requirements impose a substantial burden on otherwise qualified Wyoming citizens without any valid justification. Many eligible voters will be disenfranchised entirely.

246.    It will also impose these burdens on Wyomingites who have previously registered to vote but were purged from the rolls because they chose not to cast a ballot in just one general election. Simply for exercising their right not to participate in a single instance, these people must now re-register under the new law's more onerous requirements.

247.    Moreover, HB 156's DPOC requirements do not impose these burdens on all people equally. Women, Hispanic people, young people, and other discrete groups face more burdens under the law.

248.    HB 156's DPOC requirements also discriminate against new registrants as compared to existing voters. In order to vote, new registrants must provide the additional documentation the law requires. Existing registrants need not surmount these additional hurdles.

249.    The impacts of Wyoming's DPOC law are likely to be even more severe than similar laws have been in other states. As Secretary Gray has repeatedly acknowledged, Wyoming's law is far more stringent than these prior laws, which have worked to disenfranchise significant percentages of new registrants as soon as they have gone into effect.

250.    Wyoming's aggressive voter roll maintenance practices will further exacerbate the impact of HB 156's DPOC requirements. Under Wyoming law, the state must remove any voter from the rolls if they choose not to vote in just *one* general election. Wyo. Stat. Ann. § 22-3-115(i). As a result, tens of thousands of voters have been removed. Absent an injunction, all of them will now have to satisfy HB 156's DPOC requirements.

251.    Meanwhile, the DPOC requirement does not advance any valid state interests. Even if the state's concern with voter fraud is legitimate in the "abstract," that interest is insufficient to

justify the severe burdens the requirement imposes on the fundamental right to vote in "this case." *Fish,* 957 F.3d at 1133.

252.   HB 156's DPOC requirements are unconstitutional.

**SECOND CLAIM FOR RELIEF**
**Unconstitutional Vagueness**
**U.S. Const. amends. I, V, & XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201–02**

253.   "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

254.   A law is thus unconstitutionally vague either "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

255.   "Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement. . . the more important aspect of vagueness doctrine is not actual notice, but the. . . requirement that a legislature establish minimal guidelines" to prevent "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983) (cleaned up).

256.   HB 156 expressly authorizes arbitrary and discriminatory enforcement by requiring county clerks to reject a prospective voter's DPOC if it contains "any indication" that the person is not a United States citizen.

257.   HB 156 offers no guidance on what features of a document may "indicate" noncitizen status or otherwise constrain individual clerks' exercise of discretion.

258.    In his letter to the Secretary explaining his decision not to sign the law, Governor Gordon expressed concern that county clerks would be unable to "consistently apply" HB 156's "any indication" standard "with any degree of certainty."

259.    Indeed, given the lack of clarity and subjective nature of the "any indication" standard, Wyomingites will be unable to predict whether documentation they bring to register to vote will be accepted by the county clerk, and clerks are likely to enforce the language in arbitrary ways, failing both independent prongs of the vagueness doctrine.

260.    Because HB 156's "any indication" standard for rejecting a prospective voter's DPOC both fails to allow persons of ordinary intelligence to anticipate how the law will be enforced and invites arbitrary enforcement, it is void for vagueness.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment:

a)    Declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that HB 156 violates the First, Fifth, and Fourteenth Amendments to the U.S. Constitution;

b)    Enjoining Defendants, under the authority granted to this Court by 28 U.S.C. § 2202, from enforcing HB 156's DPOC requirements;

c)    Awarding Plaintiff its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d)    Granting such other and further relief as the Court deems just and proper

Dated: May 9, 2025                    Respectfully submitted,

*/s/ Darold W. Killmer*
Darold W. Killmer, No. 8-6643
**Killmer Lane, LLP**
1543 Champa St., Suite 400
Denver, CO 80202
dkillmer@killmerlane.com
(303) 571-1000

Elisabeth C. Frost*
Katie Chamblee-Ryan*
Daniel Cohen*
Nicole Wittstein*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20002
efrost@elias.law
kchambleeryan@elias.law
dcohen@elias.law
nwittstein@elias.law
Tel: (202) 968-4490

*Attorneys for Plaintiff
Equality State Policy Center
*Motion for Admission Pro Hac Vice
forthcoming*

48