Darold W. Killmer, No. 8-6643
Reid Allison*
Madison Lips*
**Killmer Lane, LLP**
1543 Champa St., Suite 400
Denver, CO 80202
dkillmer@killmerlane.com
(303) 571-1000

Elisabeth C. Frost*
Katie Chamblee-Ryan*
Daniel Cohen*
Nicole Wittstein*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20002
efrost@elias.law
kchambleeryan@elias.law
dcohen@elias.law
nwittstein@elias.law
Tel: (202) 968-4490

*Attorneys for Plaintiff*
*Admitted pro hac vice*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **EQUALITY STATE POLICY CENTER,** | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 25-cv-00117-SWS |
| | ) | |
| v. | ) | |
| | ) | |
| **CHUCK GRAY,** in his official capacity as | ) | |
| Wyoming Secretary of State, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.      HB 156 imposes a new DPOC requirement on Wyoming registrants. ............................. 2

II.     More lenient DPOC laws have disenfranchised substantial numbers of citizens. .............. 3

III.    Wyomingites face barriers to obtaining acceptable forms of DPOC. ............................... 5

IV.     Wyoming's existing election laws will heighten the impacts of HB 156. .......................... 7

V.      The DPOC requirement will have disparate impacts on certain groups of voters. ............. 8

ARGUMENT .................................................................................................................. 9

I.      Plaintiff is likely to prove HB 156's DPOC requirements are unconstitutional. ................ 9

        A.      The *Anderson-Burdick* balancing framework applies. ......................................... 10

        B.      The Tenth Circuit found Kansas's more lenient DPOC law unconstitutional. ...... 10

        C.      HB 156 is an unconstitutional burden on citizens' right to vote. ......................... 11

                i.      HB 156 will severely burden Wyomingites' right to vote. ...................... 12

                ii.     The State cannot justify HB 156's burden on the right to vote. .............. 16

                iii.    HB 156 does not further the state's purported interest. ........................... 19

II.     Absent an injunction, Plaintiff and its members will suffer irreparable harm. ................ 21

III.    The balance of harms and public interest weigh in favor of injunctive relief. ................ 24

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ........................................................................................ 14

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013) .............................................................................................. 3

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) ...................................................................... 24

*Bullock v. Carter*,
  405 U.S. 134 (1972) .................................................................................. 15, 16

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ......................................................................................... 13

*Democratic Exec. Comm. of Fla. v. Lee*,
  915 F.3d 1312 (11th Cir. 2019) ...................................................................... 10

*Fish v. Kobach*,
  840 F.3d 710 (10th Cir. 2016) .................................................................. 11, 24

*Fish v. Kobach*,
  No. 16-2105-JAR, 2016 WL 3000356 (D. Kan. May 25, 2016) ..................... 25

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ................................................................ *passim*

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) .................................................................. 9, 24

*League of Women Voters of Fla., Inc., v. Detzner*,
  314 F. Supp. 3d 1205 (N.D. Fla. 2018) .......................................................... 14

*Mi Familia Vota v. Fontes*,
  129 F.4th 691 (9th Cir. 2025) ............................................................... 3, 4, 15

*Mi Familia Vota v. Fontes*,
  719 F. Supp. 3d 948 (D. Ariz. 2024) ...................................................... 4, 12, 15

*Michigan State A. Philip Randolph Inst. v. Johnson*,
  833 F.3d 656 (6th Cir. 2016) .......................................................................... 14

*People First of Ala. v. Merrill,*
    491 F. Supp. 3d 1076 (N.D. Ala. 2020) ........................................................ 18

*Prairie Band of Potawatomi Indians v. Pierce,*
    253 F.3d 1234 (10th Cir. 2001) ................................................................... 22

*Priorities USA v. State,*
    591 S.W.3d 448 (Mo. banc 2020) ................................................................ 20

*Pryor v. Sch. Dist. No. 1,*
    99 F.4th 1243 (10th Cir. 2024) .................................................................... 24

*Union of N.M. v. Santillanes,*
    546 F.3d 1313 (10th Cir. 2008) ................................................................... 10

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ..................................................................... 22

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. Of Trs.,*
    680 F. Supp. 3d 1250 (D. Wyo. 2023) ......................................................... 24

## Constitutions, Statutes, and Rules

Wyo. Const. art. VI, § 5 ...................................................................................... 17

8 U.S.C. § 1101 .................................................................................................. 20

8 U.S.C. § 1227 .................................................................................................. 17

18 U.S.C. § 611 .................................................................................................. 17

49 U.S.C. § 30301 .............................................................................................. 20

50 U.S.C. § 3802 ................................................................................................ 20

52 U.S.C. § 20507 ................................................................................................ 7

Ariz. Rev. Stat. § 16-166 (2004) ......................................................................... 4

Ariz. Rev. Stat. § 16-166 .................................................................................... 4

Kan. Stat. Ann. § 25-2309 ............................................................................. 3, 12

N.H. Rev. Stat. § 654:7-a .................................................................................... 7

N.H. Rev. Stat. § 654:12 ..................................................................................... 4

Wyo. Stat Ann. § 31-7-123 ............................................................................... 16, 20

Wyo. Stat. Ann. § 31-9-305 .............................................................................. 15, 20

Wyo. Stat. Ann. § 22-1-102 (eff. July 1, 2025) .................................................... 19

Wyo. Stat. Ann. § 22-3-103 (eff. July 1, 2025) .................................................. 2, 4

Wyo. Stat. Ann. § 22-26-106 ............................................................................... 17

Wyo. Stat. Ann. § 32-3-102 .................................................................................. 6

**Other Authorities**

Heritage Foundation, Election Fraud Map, https://electionfraud.heritage.org/search .................. 17

Bannon's War Room, Interview with Secretary Gray, available at
       https://x.com/i/status/1922413611034591256 ..................................................... 1

## INTRODUCTION

In 2020, the Tenth Circuit held that a Kansas law that required documentary proof of citizenship (DPOC) to register to vote was unconstitutional. *See Fish v. Schwab ("Fish II")*, 957 F.3d 1105 (10th Cir. 2020). Although the law's proponents claimed it was necessary for election integrity, the court found that noncitizen voting was not a meaningful problem in Kansas. As a result, the Tenth Circuit held that there was no sufficient justification for the DPOC requirement, which disenfranchised tens of thousands of Kansas citizens while in effect.

Wyoming's recently enacted HB 156 bears a strong resemblance to the law held unconstitutional in *Fish II*, only it is worse. Kansas accepted more documents, gave officials discretion to accept other evidence of citizenship, and had an affidavit option for people who changed their name. HB 156 has none of this. That appears to be by design. Defendant Secretary of State Chuck Gray has criticized other states' attempts at DPOC for including "carve outs," and boasted that—unlike those other laws—HB 156's strict and unyielding approach is "the real thing."[1] Yet, as was true in Kansas, there is no evidence that noncitizen voting is a meaningful problem in Wyoming. But even if it were, HB 156 is not remotely tailored to address it. Many of the documents it accepts as "proof" of citizenship say nothing about citizenship at all. As a result, HB 156 does nothing other than erect meaningless and unnecessary hurdles to the franchise.

Unless HB 156 is enjoined, election officials will begin denying voter registration applications for people who lack an acceptable form of DPOC on July 1, 2025. Because the law is plainly inconsistent with the Tenth Circuit's holding in *Fish II*, and to avoid the severe and irreparable injuries that will otherwise follow, the Court should issue a preliminary injunction.

---

[1]  Bannon's War Room, *Interview with Secretary Gray* at 1:28, *available at* https://x.com/i/status/1922413611034591256 (May 13, 2025) (last visited May 23, 2025).

## BACKGROUND

### I.    HB 156 imposes a new DPOC requirement on Wyoming registrants.

When HB 156 goes into effect, it will require election officials to reject any voter registration application unless the applicant shows one of the following documentary "proofs" of citizenship: a valid Wyoming driver's license or ID card, valid tribal ID card from a federally recognized Indian tribe, or valid state ID that is consistent with the REAL ID Act, provided that the ID does not contain "any indication that the person is not a United States citizen"; a valid U.S. passport; a certificate of U.S. citizenship; a certificate of naturalization; a U.S. military draft record or a selective service acknowledgement card; a consular report of birth abroad issued by the U.S. Department of State; or "[a]n original or certified copy of a birth certificate in the United States bearing an official seal." Wyo. Stat. Ann. §§ 22-1-102(a)(lvi), 22-3-103(a) (eff. July 1, 2025).

Representative John Bear, who introduced HB 156, acknowledged that there was not "any real significant proof of voter fraud" in Wyoming. Ex. 1 at 62:1–2.[2] Mary Lankford of the County Clerks Association confirmed this, testifying that in the 2024 general election, no more than five noncitizens tried to vote across all of Wyoming's 23 counties. All were turned away under the operation of pre-existing laws. Ex. 2 at 87:12-15. The only example of noncitizen voting that HB 156's proponents could point to was one alleged incident in 2020. *E.g.*, Ex. 2 at 27:16-20; Ex. 3 (Apr. 12, 2024 Media Release). That person used a fraudulent birth certificate to obtain a Wyoming driver's license, so HB 156 would not have prevented it anyway. *See* Ex. 4.

HB 156 became law without the Governor's signature. In a letter explaining why he did not sign, the Governor emphasized Wyoming's "excellent track record with election integrity and security," expressed his concern that HB 156 would disenfranchise eligible citizens, and

---

[2] An Index of exhibits is attached to this memorandum.

underscored that "it is . . . essential and core to the workings of both our Wyoming and [U.S.] Constitutions that a bona fide citizen be able to vote without undue difficulty, and that right should not be abridged or diminished as a result of measures taken to conduct an election." Ex. 5 at 2, 4. The Governor had previously rejected Secretary Gray's attempt to impose "proof" of residency requirements through rulemaking, similarly emphasizing that "currently available data indicates that Wyoming does not have a significant problem with either fraudulent voter registrations or our ability to investigate and verify voter qualifications." Ex. 9 at 2.[3]

## II.    More lenient DPOC laws have disenfranchised substantial numbers of citizens.

Prior attempts by Arizona, Kansas, and New Hampshire to impose DPOC requirements show that they consistently and broadly disenfranchise *citizens*. *See generally* Ex. 6 (Mayer Decl.) ¶¶ 31–34. Courts that have considered challenges to these types of laws have repeatedly enjoined them. *See, e.g.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 20 (2013) (holding Arizona law violated federal law); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 710–11 (9th Cir. 2025) (similar); *Fish II*, 957 F.3d at 1136 (holding Kansas law unconstitutional).[4]

Secretary Gray has stressed that HB 156 is *stricter* than these other laws. *See, e.g.*, Ex. 7; *see also* Ex. 8; Ex. 6 (Mayer Decl.) ¶ 33. He is correct. For example:

- Kansas accepted a broader range of documents to satisfy its DPOC requirement (including expired IDs), allowed applicants who lacked one of the listed forms of acceptable DPOC to submit "any evidence" that they believed demonstrated their citizenship (and gave election officials discretion to accept it), and had an alternative affidavit option for registrants who had changed their names. *See, e.g.*, Kan. Stat. Ann. § 25-2309(m), (q).

---

[3] HB 156 includes proof of residency requirements, too, but leaves those requirements to the Secretary to promulgate. He has not yet done so. The current Complaint—and this motion— concerns the DPOC requirements only. Compl. at 10 n.3, ECF No. 1.

[4] The New Hampshire law is currently the subject of ongoing litigation. *See N.H. Youth Movement v. Scanlan*, No. 1:24-cv-00291 (D.N.H. filed Sept. 17, 2024); *Coal. for Open Democracy v. Scanlan*, No. 1:24-cv-00312 (D.N.H. filed Sept. 30, 2024).

- Arizona allows voters to provide the number on their driver's license in lieu of a physical ID and allows officials to confirm citizenship through other ways. *See* Ariz. Rev. Stat. § 16-166(F)(1), (I), (J) (2004); *Mi Familia Vota*, 129 F.4th at 704. It also allows the use of expired ID to establish citizenship and does not require voters to provide DPOC when they re-register—if they provide it once, it is retained in their permanent record. Ariz. Rev. Stat. § 16-166(I), (J).

- New Hampshire allows voters to produce "other reasonable documentation" not listed in the law. NH Rev Stat § 654:12(I)(a).

HB 156 includes none of these features. *See* Wyo. Stat. Ann. §§ 22-1-102(a)(lvi), 22-3-103(a) (eff. July 1, 2025). But despite being more lenient, the DPOC laws imposed in Kansas, Arizona, and New Hampshire all disenfranchised *citizens*. After the Supreme Court held that Arizona's DPOC law violated the NVRA, Arizona created a bifurcated registration scheme, requiring DPOC to vote in state elections only. A federal court recently found that, as a result of that law, nearly 20,000 voters were barred from voting in state elections, despite *zero* evidence that any were not citizens. *See Mi Familia Vota*, 129 F.4th at 704; *Mi Familia Vota*, 719 F. Supp. 3d 929, 1011 (D. Ariz. 2024). Likewise, after Kansas imposed its DPOC law, "31,089 applicants were prevented from registering to vote because of the DPOC requirement." *Fish II*, 957 F.3d at 1127. And while New Hampshire's DPOC law took effect just six months ago, in the first elections to take place under the new restrictions this March, the disenfranchising effects were felt acutely, with reports that 25 to 30 percent of voters in some towns were being turned away due to a lack of DPOC. Ex. 10.[5]

Because HB 156 is stricter, and because of the particular difficulties Wyomingites face in obtaining acceptable forms of DPOC, as well as certain unique features of Wyoming election law,

---

[5] The exclusionary effects of DPOC laws have also been proven in other contexts. For example, when federal law imposed DPOC requirements for Medicaid eligibility in 2006, studies estimated that 300,000 people would lose coverage, virtually all of whom were U.S. citizens. *See* Ex. 6 (Mayer Decl.) ¶ 35. Notably, the Medicaid requirement required states to provide assistance to applicants who have difficulty obtaining DPOC, which is not the true for HB 156. *Id.* ¶ 37.

its disenfranchising effects are likely to be even more severe.

**III.    Wyomingites face barriers to obtaining acceptable forms of DPOC.**

Obtaining an acceptable form of DPOC can be especially difficult in Wyoming. *See generally* Ex. 6 (Mayer Decl.) ¶¶ 21–27. To get a driver's license or State ID card, one must apply in person at a Driver Services office. Ex. 11. But only eight of Wyoming's 29 Driver Services offices are open five days a week, with more than half open three days a week or less. *See* Ex. 12; *see also id.* (noting Baggs Driver Services office is open *only six days a year*—for fewer than five hours on the first Thursday of the month, six months of the year). And mass transit options can be extremely limited, leaving Wyomingites without reliable access to a personal vehicle in a particularly difficult position. *See* Ex. 13 (Hawkins Decl.) ¶ 12.

Assuming a voter can get to an open Driver Services office, they must provide proof of identity, such as a certified birth certificate, valid and current U.S. passport, or a license or ID from another state. Many people do not have these documents, and getting them can be challenging and expensive. Ex. 6 (Mayer Decl.) ¶¶ 16–18 (surveys find 7% of registered voters in Wyoming do not have a birth certificate, fewer than 50% have a passport, and 6% have neither); ¶¶ 19–26 (describing financial and administrative barriers to obtaining DPOC in time to register); Ex. 13 (Hawkins Decl.) ¶¶ 7–13 (describing difficulties survivors of domestic violence face when trying to replace ID); Ex. 14 (Teague Decl.) ¶ 4 (social worker at Wyoming shelter explaining, "It is a lot more common than people think for people to not have ID.").

Wyoming does not give free birth certificates to newborns, and applying for a certified copy can take weeks. Ex. 6 (Mayer Decl.) ¶ 23. A Wyoming birth certificate costs $25—more than the Virginia poll tax that the Supreme Court held unconstitutional in 1966 (adjusted for inflation). *See* Ex. 15 at 2; Ex. 6 (Mayer Decl.) ¶ 20. For many, this expense is insurmountable. *See* Ex. 14 (Teague Decl.) ¶ 6 (explaining over half of clients at Wyoming shelter would struggle to pay $25

5

for a birth certificate, and other states can be even more expensive). Plus, the application itself requires submission of a photo ID. Ex. 15 at 2; Ex. 14 (Teague Decl.) ¶ 9 ("[A] lot of times, the requirements for getting different kinds of ID are circular. To get an ID, you need a birth certificate, but you need a birth certificate to get an ID."). People without a photo ID can submit a notarized signature—but the notarization process *also* requires a photo ID. *See* Wyo. Stat. Ann. § 32-3-102(xiv); *see* Ex. 14 (Teague Decl.) ¶ 9. If a person does not have photo ID, they must use a notary they know personally or bring another person along who *does* have an ID and can verify their identity. *Id.* § 32-3-102(xxxi)(A). People who need birth certificates from other states face extra challenges and delays. *See* Ex. 6 (Mayer Decl.) ¶¶ 21, 24 (noting "there are 14,000 different types of birth certificate documents in the U.S." and obtaining them "can take months"); Ex. 14 (Teague Decl.) ¶ 11 (describing unsuccessful struggle to get a client's out-of-state birth certificate).

This process can be even more difficult for minors, people who do not know details about their births, or people who have changed their names, such as married women. *See* Ex. 18; Ex. 14 (Teague Decl.) ¶¶ 10–11 ("Many of our clients [at a Wyoming shelter] . . . just don't know the information they need to obtain these types of records . . . [O]ften if the person doesn't have any family to help provide additional information, there is nothing we can do."). For a person without a photo ID who needs both a birth and a marriage certificate, it will cost at least $60 to obtain the proper documents (*see* Ex. 15; Ex. 16)—and can take weeks or months to procure—before paying for the driver's license itself, which costs an additional $45. Ex. 17. Some people are never able to obtain ID at all. A caseworker at a Wyoming shelter reports that staff there once "spent over two years trying to get an ID for the client, and [they] were never able to get it" because he did not know his mother's maiden name or his exact date of birth. Ex. 14 (Teague Decl.) ¶¶ 11–12.

**IV.   Wyoming's existing election laws will heighten the impacts of HB 156.**

Unique features of Wyoming's election system will intensify the DPOC requirement's burdensome effects. Because Wyoming offers same-day registration, it is not subject to the NVRA, which prohibits states from removing voters from the rolls solely because of their failure to vote. 52 U.S.C. § 20507(b)(2).[6] Unbound from these restrictions, Wyoming has one of the nation's most aggressive voter purge systems, removing voters from the rolls if they miss a single general election. More than 80,000 voters were purged from the rolls following the 2022 general election and had to re-register if they wanted to vote again. Ex. 19; *see also* Ex. 6 (Mayer Decl.) ¶ 14(d) (estimating an additional 107,000 were removed from 2023-25). But voters do not always receive notice that their registration has been canceled. Ex. 20 (DeSarro Decl.) ¶ 12. As a result, many voters are likely to only learn they have been removed from the rolls—and now must provide DPOC—when they go to vote at the polls on election day. *See id.* ¶ 12.

This is what happened in New Hampshire's recent elections—a state that also has same-day registration. *See* N.H. Rev. Stat. § 654:7-a(I); *see* Ex. 10. If a voter presents at the polls in Wyoming without DPOC, they have until the close of business the day after the election to provide it. Wyo. Stat. Ann. § 22-3-104(g). This option is illusory for those who do not already possess DPOC, as it may take weeks or months to obtain it, Ex. 6 (Mayer Decl. ¶¶ 23–27); Ex. 13 (Hawkins Decl.) ¶ 10 ("[I]t typically takes six months, or even longer, for a person to get documentation back after they have lost it."), and nearly half of Wyoming's Driver Services offices are *never* open on Wednesdays, *see* Ex. 12. As a result, eligible voters will be disenfranchised. *See* Ex. 6 (Mayer Decl.) ¶ 27.

---

[6] Under the NVRA, states may only remove voters after receiving written confirmation that they have moved, or after they fail to respond to a notice with a postage prepaid and pre-addressed return card and then fail to vote in two consecutive general elections. 52 U.S.C. § 20507(d).

V.     **The DPOC requirement will have disparate impacts on certain groups of voters.**

Hispanic residents—the vast majority of whom are American citizens—comprise about 10% of Wyoming's population, but they are starkly underrepresented in Wyoming's government and as voters. Ex. 21; Ex. 22; Ex. 23; Ex. 24. HB 156 will make this problem worse. Hispanic Wyomingites are more likely to work low-wage jobs with demanding shifts, giving them less time to track down documents at different agencies, especially those without bilingual staff, and making it less likely that they can afford to pay for them. Ex. 25.

Beyond these practical barriers, HB 156 will chill Hispanic citizens from registering to vote for fear that they will be falsely accused of being noncitizens. Ex. 20 (DeSarro Decl.) ¶ 14. The context in which the bill was passed reinforces these fears. Although Wyoming has the *fourth lowest* foreign-born population in the country, *see* Ex. 26, Tbl. 1, HB 156 was one in a series of proposals in the 2025 session focused on rooting out—in Secretary Gray's words—"illegal aliens." Ex. 2 at 15:12. Furthermore, HB 156 includes vague language directing clerks to reject ID if it includes "any indication" that the person is not a citizen, without providing any specifics or limitations on what this "indication" could be. Some voters fear that clerks might consider a Hispanic-sounding name an "indication" that they might not be a citizen and—amid rising anti-immigrant animus in Wyoming, together with reports that Hispanic citizens across the country have been falsely arrested by immigration enforcement officials—many fear that registering to vote might even lead to unjust investigation or arrest. Ex. 20 (DeSarro Decl.) ¶ 14.[7]

Women will also face outsized burdens under the law because many change their names when they marry or divorce and are thus less likely to have documents that match their current

---

[7] Governor Gordon has raised concerns that this language could invite arbitrary and even discriminatory application of the law. *See* Ex. 5 ("[HB 156's] far reaching new 'any indication' standard for rejection of voter . . . is unclear and perhaps awkward for our county clerks to consistently apply with any degree of certainty").

legal name. *See* Ex. 6 (Mayer Decl.) ¶ 18; Ex. 18. To obtain DPOC to register to vote, they will have to provide secondary documentation, such as a marriage license or divorce certificate, to prove the name change. *See* Ex. 27. These impacts were previewed in New Hampshire in March, when town clerks noted that women in particular were being turned away in the first elections held under the new DPOC law. *See* Ex. 28 at 2–5. Wyoming also has thousands of survivors of domestic violence, most of whom are women, who face even more barriers, since they often "walk out of the door with nothing," and struggle to replace their ID because, among other reasons, their abusers control their documents and finances. *See* Ex. 13 (Hawkins Decl.) ¶¶ 7, 6–14.

HB 156 will also disproportionately impact young voters who are less likely to have unexpired, accurate state-issued ID. *See, e.g.*, Ex. 18 at 3. These burdens are even more exacerbated for certain communities of young voters. Ex. 29 (describing special barriers to obtaining ID for young voters who are homeless or aging out of the juvenile justice or child welfare systems).

## ARGUMENT

To obtain a preliminary injunction, the movant must show (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm; (3) that the harm outweighs any harm to the non-moving party; and (4) an injunction is in the public interest. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013). All four factors favor the Plaintiff.

## I. Plaintiff is likely to prove HB 156's DPOC requirements are unconstitutional.

In *Fish v. Schwab (*"*Fish II*"*)*, the Tenth Circuit found that a similar, but *less strict* DPOC law was an unconstitutional burden on the right to vote. 957 F.3d 1105 (10th Cir. 2020). For the same reasons that the Tenth Circuit articulated in *Fish II*—plus additional features of Wyoming's stricter law and unique elections system—Plaintiff's claim is similarly likely to succeed.

**A.  The *Anderson-Burdick* balancing framework applies.**

"The right to vote is 'a fundamental political right, . . . preservative of all other rights.'" *Fish II*, 957 F.3d at 1121 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)). Even so, States retain the authority to regulate the electoral process, both to "ensur[e] that elections are 'fair and honest' and that 'some sort of order . . . accompanies the democratic process" *Id.* at 1122 (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)).

Thus, when a plaintiff challenges a state law that regulates elections, federal courts must distinguish "regulations that properly impose order," which are permissible, "from those that unduly burden it," which violate the First and Fourteenth Amendments to the Constitution. *Id.* To do so, federal courts apply the *Anderson-Burdick* test, which requires courts to "weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Am. Civ. Lib. Union of N.M. v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008) (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008)).

This "sliding scale" test is flexible: The scrutiny a court applies depends on "the severity of the burden imposed on the right to vote in any given case; heavier burdens will require closer scrutiny, lighter burdens will be approved more easily." *Fish II*, 957 F.3d at 1124, 1127. Importantly, "even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019); *accord Fish II*, 957 F.3d at 1124.

**B.  The Tenth Circuit found Kansas's more lenient DPOC law unconstitutional.**

In *Fish II*, the Tenth Circuit considered a challenge to Kansas's 2011 DPOC law. 957 F.3d at 1111. Like Wyoming's HB 156, the Kansas law required prospective registrants to present at least one "form[] of documentation acceptable to prove U.S. citizenship," such as a birth certificate or passport. *Id.* at 1112. Unlike Wyoming's DPOC law, Kansas also allowed an "alternate means

10

to prove citizenship by submission of evidence to the state election board followed by a hearing," as well as other exceptions. *Id.*; *see also supra* at 3–4.

The *Fish* plaintiffs challenged the Kansas law both under the NVRA and as an unconstitutional burden on the right to vote. *Id.* at 1110. Plaintiffs moved for a preliminary injunction on the NVRA claims, which the district court granted, and the Tenth Circuit affirmed. *See Fish v. Kobach ("Fish I")*, 840 F.3d 710 (10th Cir. 2016). Unfortunately, by the time the preliminary injunction was issued, "31,089 applicants [had already been] prevented from registering to vote because of the DPOC requirement." *Fish II*, 957 F.3d at 1127.

After a trial, the district court found that Kansas's law violated the First and Fourteenth Amendments as well as the NVRA. *Id.* at 1116–17. On appeal, the Tenth Circuit agreed. Applying *Anderson-Burdick*, the Tenth Circuit found that the burden imposed by the law was "significant and require[d] heightened scrutiny." *Id.* at 1128. As a result, the State needed to show that its legitimate interests "ma[d]e it necessary to burden the plaintiff[s'] rights." *Id.* at 1133 (quoting *Anderson*, 460 U.S. at 789). Kansas could not do so. At most, it could point to only a few dozen noncitizens who had registered or attempted to register in the state over the past two decades. *Id.* at 1134. The Tenth Circuit found this "incredibly slight evidence" insufficient to justify the burdens the DPOC law imposed, rendering it unconstitutional. *Id.*; *see also id.* at 1133–36.

**C. HB 156 is an unconstitutional burden on citizens' right to vote.**

Applying *Anderson-Burdick* requires the same result here as in *Fish II*. "HB 156 will prevent eligible Wyoming residents from registering and voting; the affected populations are large, and Wyoming residents without DPOC will be forced to spend considerable effort, time, and money to obtain the required documents." Ex. 6 (Mayer Decl.) ¶ 40. As in Kansas, there is no meaningful evidence of the election integrity "problem" Wyoming claims it aims to solve. Plus,

11

Wyoming's law is so irrationally crafted that even if noncitizens were voting, HB 156 would not stop them.

### i. HB 156 will severely burden Wyomingites' right to vote.

Concrete evidence foretells the impact of HB 156's DPOC requirements in Wyoming: Similar laws passed in other states imposed a "significant" burden on the right to vote. *Fish II*, 957 F.3d at 1128; Ex. 6 (Mayer Decl.) ¶¶ 31–34. Tens of thousands of voters were excluded after Arizona and Kansas passed similar (albeit *less* stringent) laws. *See Fish II*, 957 F.3d at 1128; *Mi Familia Vota*, 719 F. Supp. 3d at 1011. And in the first elections held after New Hampshire's DPOC law went into effect, 25 to 30 percent of voters in some towns were turned away for failure to provide DPOC. Ex. 10; Ex. 6 (Mayer Decl.) ¶ 34.

As Secretary Gray frequently boasts, HB 156 is *more restrictive* than these other laws. *See* Ex. 6 (Mayer Decl.) ¶ 33; *supra* at 3 (citing Ex. 8). *See supra* at 3–5. This includes the law that the Tenth Circuit struck down    ` in *Fish II*. That Kansas law allowed a wider range of documents as "proof" than HB 156. Kan. Stat. Ann. § 25-2309(l). It also allowed voters who had changed their name to submit an affidavit instead of additional documentation. *Id.* § 25-2309(q). Most critically, Kansas offered a safety valve for those who lack the required documents. As the Tenth Circuit explained, Kansas's DPOC law "provide[d] an alternate means to prove citizenship" by submitting other evidence to the state election board. *Fish II*, 957 F.3d at 1112; *see* Kan. Stat. Ann. § 25-2309(m) ("If an applicant is a . . . citizen but does not have any of the documentation listed" they "may submit any evidence that" they "believes demonstrates" their citizenship). *Even with these safeguards*, the Tenth Circuit found Kansas's law imposed a "significant" burden on the right to vote. *Id.* at 1128. HB 156 provides none of these safeguards, making the burden it imposes far more severe.

Wyoming's DPOC law will also have an outsized impact because it will be exacerbated by hurdles to voting that already exist in the state. *See Burdick*, 504 U.S. at 434–37 (considering the state's election system as a whole when assessing the impact of a challenged law). Even before HB 156, Wyoming's registration system was among the most burdensome in the nation. Wyoming is one of just eight states that does not allow online voter registration. Ex. 30. An applicant must go in person to their county clerk's office (which may be dozens of miles away), to the polls on election day, or submit a notarized application by mail including a photocopy of their ID to the clerk. *See* Wyo. Stat. Ann. §§ 22-3-104, 22-3-117. In part because of its cumbersome registration process, a nonpartisan academic study ranked Wyoming's election system the nation's eleventh worst in terms of the time and effort required to cast a ballot. *See* Ex. 31. In 2022, Wyoming's registration rate ranked 47th among the 50 states. Ex. 32.

Nor is registration—or, under HB 156, providing DPOC—a one-time hurdle. Because of Wyoming's aggressive voter purge law, which cancels a voter's registration if she "fail[s] to vote in *any* general election," tens of thousands of voters are regularly purged from the rolls. Wyo. Stat. Ann. § 22-3-115 (emphasis added); Ex. 19. Following low turnout in 2022, Wyoming purged roughly 28% of its voters—more than 80,000 people. Ex. 19; *see also* Ex. 6 (Mayer Decl.) ¶ 14(d) (estimating an additional 107,000 voters were removed from 2023 to 2025). All must register again—and, now, present DPOC—in order to vote. Fueled by Wyoming's purge law, "the overall number of people who would be required to provide DPOC over the course of a decade will easily be in the hundreds of thousands." Ex. 6 (Mayer Decl.) ¶ 14(e).

Inevitably, many will need to attempt to re-register at the polls, either due to the lack of viable alternatives or because they do not realize their registrations have been canceled. *See* Ex. 6 (Mayer Decl.) ¶¶ 14, 27; Ex. 20 (DeSarro Decl.) ¶ 12. When they attempt to do so, many will learn

about the DPOC requirements for the first time. *See id.* For some, it will simply be too late. Indeed, satisfying the DPOC requirement even once—and even with advance notice—can be daunting for all of the reasons already described. *See supra* at 5–6. As a result of all of these factors, for some number of eligible Wyomingites, it will not be possible to obtain an acceptable form of DPOC in time to be able to vote. *See supra* at 5–9; *see also* Ex. 6 (Mayer Decl.) ¶¶ 19–26; Ex. 13 (Hawkins Decl.) ¶¶ 7–13.

HB 156 will also burden the voting process itself. As the Wyoming County Clerks' Association warned, the added complication of requiring voters to "produce additional documentation" when registering at the polls will "increase the length of lines and wait times on Election Day." Ex. 33. Longer lines "reduce[] the confidence voters have that their votes are counted, impose additional monetary costs on voters that must stand in line, and may even turn some voters away from voting at all." *Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 663–64 (6th Cir. 2016) (quotations omitted) (alterations in original); *see id.* at 666 (finding unjustified burden under *Anderson-Burdick* framework where the challenged law would, among other things, "increase the time that it takes to vote").

Wyoming's DPOC law will impose even more severe burdens on certain groups. Under *Anderson-Burdick*, election restrictions merit higher scrutiny when they limit "participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983); *see id.* at 792–93 (explaining that restrictions that posed a "particular burden" on such groups were "especially difficult for the State to justify"); *accord League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216–17 (N.D. Fla. 2018) ("Disparate impact matters under *Anderson-Burdick*.").

Women, in particular, will face special burdens under HB 156, since a significant

percentage change their names upon marriage or divorce, and may face more burdensome requirements as a result. Ex. 6 (Mayer Decl.) ¶ 18. Indeed, the recent experience in New Hampshire confirms that women face a heightened risk of being denied the opportunity to vote when a DPOC law is imposed. *See supra* at 4. HB 156's DPOC requirement will also disproportionately burden survivors of domestic violence, who are also more likely to be women. Ex. 13 (Hawkins Decl.) ¶¶ 13–14. Young voters also face heightened burdens because they are less likely to have DPOC in the first place and less likely to have access to the underlying documents they need to obtain it. *See supra* at 9.

HB 156 also imposes heightened burdens on Wyoming's Hispanic citizens—both because of the logistical hurdles it creates and because of the threat that it will chill them from exercising their right to vote. *See supra* at 8–9. This is not theoretical. When Arizona passed its DPOC law, non-white voters were disproportionately impacted. Although only 28.8% of eligible voters were non-white, non-white voters comprised nearly half (46.7%) of the voters who were barred from voting in state elections because they did not present DPOC. *See Mi Familia Vota*, 719 F. Supp. 3d at 948 n.5, *vacated in part by Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025); *see Mi Familia Vota*, 129 F.4th at 729 (remanding in part because district court did not properly weigh law's disparate impact on non-white voters).

HB 156 also creates outsized hurdles for several other communities, many of which already face barriers to the franchise. People who lack stable housing often lack the requisite documents. *See* Ex. 14 (Teague Decl.) ¶ 4–5; Ex. 13 (Hawkins Decl.) ¶¶ 6–7, 11. And because Wyoming allows driver's license suspensions for failure to pay fines and fees, a person may lack a "valid" form of DPOC simply because of their poverty. *See* Wyo. Stat. Ann. § 31-9-305; *see also Bullock v. Carter*, 405 U.S. 134, 144 (1972) (finding a filing fee unconstitutional in part because of the

"obvious likelihood that [its effects] would fall more heavily on the less affluent segment of the community"). Transgender citizens frequently lack ID that matches their legal name, such that they may have difficulties complying with the new law. *See* Ex. 34. And because Wyoming restricts DPOC to "valid" ID, people with certain disabilities (like epilepsy), whose licenses may be suspended for medical reasons, will need another form of DPOC to register. *See* Wyo. Stat. Ann. § 31-7-123.

Ultimately—like in every other state that has implemented a DPOC requirement—a significant number of qualified *citizens* will be excluded from the franchise as a result of HB 156 if it is allowed to go into effect. *See* Ex. 6 (Mayer Decl.) ¶ 14(e). Indeed, all available evidence indicates that the impact in Wyoming will be even worse. *See supra* at 3–7. And the fact that Wyoming's DPOC requirement "falls with unequal weight" on certain groups of voters is further reason to find it cannot survive constitutional scrutiny. *Bullock*, 405 U.S. at 144.

### ii. *The State cannot justify HB 156's burden on the right to vote.*

After weighing the impact of Kansas's less stringent DPOC law, the Tenth Circuit found that it imposed a "significant" burden that "require[d] heightened scrutiny." *Fish II*, 957 F.3d at 1129. Here, the burden that HB 156 imposes triggers *at least* the heightened scrutiny applied in *Fish II*. This Court therefore must examine "whether the concrete evidence demonstrates that '[Wyoming's] interests make it necessary to burden [voters'] rights." *Id.* at 1133. They do not. Wyoming does not have a voter fraud problem, involving noncitizens or otherwise.

HB 156's proponents contended that a DPOC requirement is necessary to prevent noncitizens from voting. *See, e.g.*, Ex. 2 at 1–2, 14–15, 26. "[N]o concrete evidence" supports these concerns. *Fish II*, 957 F.3d at 1132. None of the bill's proponents identified more than *one* example of a noncitizen voting in Wyoming—which, as described above, HB 156 would not have prevented. *See supra* at 2. This "incredibly slight evidence" of noncitizen voting in Wyoming is

not "sufficiently weighty . . . to justify the burdens imposed on voters." *Fish II*, 957 F.3d at 1134;
*see id.* (finding inadequate evidence to justify Kansas's DPOC law where, at most, only 67
noncitizens had registered or attempted to register over the last 19 years).

The absence of evidence that noncitizens vote in Wyoming is no surprise. As Governor
Gordan confirmed when he declined to sign HB 156, Wyoming has an "excellent track record with
election integrity and security[.]" Ex. 5 (Gov. Gordon letter); *accord* Ex. 6 (Mayer Decl.) ¶ 28
("There is simply no evidence at all of material numbers of noncitizens voting in Wyoming
elections."); *see also id.* ¶¶ 28–29. Wyoming has ample pre-existing protections in place. Both its
Constitution, *see* Wyo. Const. art. VI, § 5, and its criminal laws prohibit non-qualified electors
from voting, and violating this law is punishable by up to a year in prison and a $5,000 fine. Wyo.
Stat. Ann. § 22-26-106(a)(i), (c). The evidence demonstrates these existing safeguards work.
According to a representative of the County Clerks Association of Wyoming, a total of five
noncitizens tried to vote in the 2024 election, and all were turned away. Ex. 2 at 87:12–15. Nor is
there any incentive for a noncitizen to vote where doing so risks not only jail time and fines, but
also deportation.[8]

Wyoming's purported concern about noncitizen voting is further belied by the rarity of
DPOC laws across the country. The vast majority of states administer their elections without a
DPOC requirement. Yet there is still no evidence that noncitizens are voting in meaningful
numbers anywhere. *See* Ex. 35 (collecting available data showing noncitizen voting is exceedingly
rare); Heritage Foundation, Election Fraud Map, https://electionfraud.heritage.org/search (last
visited May 23, 2025) (showing only 98 cases nationwide involving noncitizen voting since 1982);

---

[8] It is a federal crime "for any alien to vote in any [federal] election." 18 U.S.C. § 611(a). A
noncitizen who violates this law faces both jail time and serious immigration consequences,
including deportation, for any violation. *See* 8 U.S.C. § 1227(a)(6).

*see also Fish II*, 957 F.3d at 1134 (noting "weak" evidence of noncitizen registration around the country based on "misleading and false assertions"). It is implausible that a DPOC requirement is "necessary"—particularly in a state where only 3.6% of people are foreign-born, the fourth-lowest rate in the nation. *See* Exs. 21, 26; *Fish II*, 957 F.3d at 1143; *see also People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1149 (N.D. Ala. 2020) (finding state interest in voting restriction "marginal at best" where only 12 states had adopted anything similar).

Lacking any evidence of a meaningful problem with voter fraud, HB 156's proponents argued the bill was necessary to build confidence in the electoral system. *See* Ex. 1 at 62:7–11 (Representative Bear asserting the possibility of noncitizen voting "leads to a situation where our constituents lose confidence in the system"); Ex. 2 at 25:8–10 (Secretary Gray citing "widespread agreement" that DPOC requirements are "need[ed]"). This interest does not justify HB 156's significant burdens on the right to vote, either. "[S]afeguarding voter confidence" is "a legitimate interest" in the abstract. *Fish II*, 957 F.3d at 1133. But, like the court found in *Fish II*, HB 156 is more likely to have the opposite effect. *See id.* at 1134–35. Like Kansas's DPOC requirement, HB 156 will rarely (if ever) prevent noncitizens from voting, but it will disenfranchise eligible citizens. *Id.*; *see also* Ex. 6 (Mayer Decl.) ¶ 7 ("The number of Wyoming residents unable to register, or who must bear significant monetary and time costs, because of the DPOC requirement is virtually certain to be orders of magnitude greater than the number of noncitizens prevented from voting."). This lopsided outcome will "have the inadvertent effect of eroding, instead of maintaining, confidence in the electoral system." *Fish II*, 957 F.3d at 1134–35 (quoting the district court).

Here, any public concern over non-citizen voting is the result of political rhetoric, of which Secretary Gray has been a prime purveyor. *See, e.g.*, Ex. 33 (Secretary Gray stating in support of the proposed federal SAVE Act, "it is now more important than ever that government at all levels

ensure appropriate safeguards to ensure only U.S. citizens, not illegal aliens, are voting"). Constitutional protections for the right to vote will be swallowed whole if politicians can engage in baseless fearmongering divorced from facts and then use the public concern they have fomented to justify unnecessary burdens on voters. *See also* Ex. 6 (Mayer Decl.) ¶ 7 ("My overall conclusion is that HB 156 is an ineffective 'solution' to a nonexistent problem, which does nothing but prevent a material number of otherwise eligible Wyoming residents from registering and voting.").

### iii.    *HB 156 does not further the state's purported interest.*

Even if Wyoming had a meaningful problem with noncitizens voting in its elections, HB 156's DPOC requirement would not address it. To start, HB 156 does nothing to address noncitizens voting with *fraudulent* DPOC. In the *singular* case that Secretary Gray and other HB 156 proponents repeatedly invoked to justify its DPOC requirements, a noncitizen used a fraudulent birth certificate to acquire an otherwise valid Wyoming driver's license, which he then used to register to vote. *See supra* at 2. HB 156 does nothing to prevent that scenario.

But HB 156 suffers a textual problem too: It does not actually exclude noncitizens from voting. Many of the documents that HB 156 deems "proof" of citizenship can be held by noncitizens as well. *See* Ex. 6 (Mayer Decl.) ¶ 38. For example, HB 156's list of acceptable forms of DPOC includes "a valid Wyoming driver's license" or "a valid identification card," "provided that the license or identification card does not contain any indication that the person is not a United States citizen." Wyo. Stat. Ann. § 22-1-102(a)(lvi)(A) (eff. July 1, 2025). But any such IDs dated before January 2026 (when Wyoming will begin to denote citizenship on IDs) will provide no information about whether its holder is a citizen. *Id.* HB 156 also allows prospective voters to "prove" their citizenship by using Real ID cards issued by other states. Wyo. Stat. Ann. § 22-1-102(a)(lvi)(C) (eff. July 1, 2025). But the Real ID Act allows States to issue Real ID cards to both citizens *and* non-citizens with lawful status and does not require any markings to indicate

citizenship. *See* 49 U.S.C. § 30301 note § 202(c)(2)(B); *see also* Ex. 6 (Mayer Decl.) ¶ 38.[9] In addition, HB 156 lists "a selective service registration acknowledgment card" as acceptable DPOC. *Id.* § 22-1-102(a)(lvi)(G) (eff. July 1, 2025). Noncitizens can have that card too. Indeed, almost all male noncitizens between ages 18 and 25 are required to register with the Selective Service. *See* 50 U.S.C. § 3802(a) (excluding only nonimmigrants under 8 U.S.C. § 1101(a)(15)); *see also* Ex. 6 (Mayer Decl.) ¶ 38.

At the same time, HB 156 arbitrarily *excludes* certain documents on grounds totally unrelated to citizenship. Specifically, HB 156 requires a Wyoming driver's license to be "valid" to serve as DPOC. But a license's validity has nothing to do with a person's qualifications to vote. A Wyomingite's driver's license may be invalid because it has expired (Wyo. Stat. Ann. § 31-7-119(a)); because the holder has not paid traffic-related fines and fees, (Wyo. Stat. Ann. § 31-9-305); or because its holder has a seizure disorder that renders them medically unable to drive (Wyo. Stat. Ann. § 31-7-123. None of these renders someone ineligible to vote—yet under HB 156, they would render a person's license unusable as DPOC.

Ultimately, by including documents that do not prove citizenship while excluding others for irrelevant reasons, HB 156 reveals itself as a meaningless set of restrictions that needlessly burden voters. As a result, it "does not pass muster under any level of scrutiny." *Priorities USA v. State*, 591 S.W.3d 448, 455 (Mo. 2020); *see id.* (finding that, "[a]lthough the State has an interest in combatting voter fraud," a restriction was unconstitutional because it was "not a reasonable means to accomplish that goal"); *see also Fish II*, 957 F.3d at 1124 (noting even minimal burdens must be justified by "relevant" State interests) (quoting *Crawford*, 553 U.S. at 191).

---

[9] "Only five states currently issue a form of identification that specifically documents U.S. citizenship," but it is not even clear whether these "enhanced driver's licenses" would qualify as DPOC under HB 156 since they are not actually Real IDs. Ex. 6 (Mayer Decl.) ¶ 39.

II.    **Absent an injunction, Plaintiff and its members will suffer irreparable harm.**

Unless this Court enjoins HB 156's DPOC requirement, Wyoming will begin denying voter registration to otherwise eligible citizens who lack DPOC on July 1, 2025. As a result, both Plaintiff Equality State Policy Center and its members and constituents will suffer irreparable harm.

Equality State Policy Center is a non-profit organization comprised of approximately twenty social justice, conservation, and labor organizations in Wyoming. *See* Ex. 20 (DeSarro Decl.) ¶ 4. Each member organization pays dues to Equality State Policy Center, which works to advance their shared mission of working toward fair elections and transparent government on behalf of the entire coalition. *See* Ex. 20 (DeSarro Decl.) ¶¶ 6–7. To advance this mission, Equality State Policy Center focuses much of its work on helping qualified Wyomingites register to vote and successfully participate in Wyoming elections. Ex. 20 (DeSarro Decl.) ¶ 4. HB 156's DPOC requirement strikes at the heart of this work and will directly hinder Equality State Policy Center's ability to advance its mission. It will be required to, among other things, redevelop its existing voter education materials and intensify its efforts to educate voters through tabling in the community, offering education sessions, and fielding questions from its member organizations and people in the community. Ex. 20 (DeSarro Decl.) ¶ 18.

Because it will need to divert significant resources to prioritize and adapt its voter education and outreach activities specifically to address the significant burdens imposed by the new DPOC law, Equality State Policy Center will not be able to pursue its other programs. In particular, Equality State Policy Center is one of the few voter education organizations in Wyoming with Spanish-speaking staff, and its one bilingual staff member is responsible for both voter education among Spanish-speaking Wyomingites and broader campaigns like the Chair Project, which works to build civic leadership and engagement in Wyoming's Hispanic

community, RUN Wyoming, which encourages people to run for office, and SHAPE Wyoming, which teachers citizens to engage with their legislators regarding their values and issues. *See* Ex. 20 (DeSarro Decl.) ¶ 14. That staff member will be required to abandon some of these efforts to focus on basic voter education around HB 156, particularly by translating new voter education materials into Spanish and communicating with Spanish-speakers about the law. *See* Ex. 20 (DeSarro Decl.) ¶¶ 14, 17. The setbacks to Equality State Policy Center's voter registration efforts and the resources it must divert to address them constitute irreparable harm. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

HB 156 is already impacting Equality State Policy Center's ability to carry out its mission and successfully execute its pre-planned programs. Equality State Policy Center has already had to pause its largest voter education initiative, VOTE Wyoming, because it must first collect accurate information about how HB156 will be implemented. Ex. 20 (DeSarro Decl.) ¶ 18. These losses are irreparable. In Equality State Policy Center's experience, effective voter education must be repeated consistently over the long term. But for HB 156, the organization would already have begun those efforts in advance of the 2026 elections. Ex. 20 (DeSarro Decl.) ¶ 22. But Equality State Policy Center must develop new voter registration information to explain the law before it can even conduct any meaningful education or outreach. Ex. 20 (DeSarro Decl.) ¶ 18. These missed opportunities to advance core programming cannot be remedied, even by an ultimate victory in this case. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (explaining irreparable harm exists "when 'the district court cannot remedy [the injury] following a final determination on the merits'" (alterations in original) (quoting *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980))).

HB 156 also threatens Equality State Policy Center's constituents with irreparable harm by

burdening—and in some cases entirely denying—their fundamental right to vote. Equality State Policy Center's member organizations have individual members who are qualified to vote, but do not have the documentation that HB 156 requires. *See* Ex. 20 (DeSarro Decl.) ¶ 10. For members that do have DPOC, some will likely lack access to it when they need it to register for reasons outside of their control. *See* Ex. 20 (DeSarro Decl.) ¶ 11; Ex. 13 (Hawkins Decl.) ¶¶ 7–13. For example, several labor organizations in the Equality State Policy Center's coalition have members who travel frequently and may not have consistent access to their vital documents. Ex. 20 (DeSarro Decl.) ¶ 11. And survivors of domestic violence and sexual assault, served by the Wyoming Coalition Against Violence and Sexual Assault, an Equality State Policy Center member, typically lack identification documents when they seek emergency shelter. Ex. 13 (Hawkins Decl.) ¶¶ 7, 14. Although "[v]oting is an opportunity for survivors to reclaim power and influence the systems that impact their safety and recovery," and is thus "a critical part of health and civic participation for survivors," the shelters "do not have the capacity to help survivors navigate HB 156." *Id.* ¶¶ 17, 15; *see also id.* ¶ 15 ("No realistic safety net exists to ensure that survivors can register to vote."). As both the results of DPOC laws passed in other states and ample evidence foretell, these citizens are at risk of losing their right to register to vote and ultimately, to cast their ballots. *See supra* at 3–7.

The DPOC requirement will also likely have a chilling effect on these members: Once they are rejected for lacking DPOC, they will be discouraged from applying to register again. And the DPOC requirement is particularly likely to have a chilling effect on eligible Hispanic voters who fear that registering may draw scrutiny and retaliation. *See* Ex. 20 (DeSarro Decl.) ¶ 14.

This harm strongly supports an injunction. As the Tenth Circuit explained when it affirmed the district court's grant of a preliminary injunction against Kansas's DPOC law, "there can be no

'do-over' or redress of a denial of the right to vote after an election." *Fish I*, 840 F.3d at 752. Accordingly, "denial of that right weighs heavily in determining whether plaintiffs would be irreparable harmed absent an injunction." *Id.*; *see also id.* at 752–53 (affirming district court's conclusion that plaintiffs faced irreparable harm in part because "the DPOC requirement ha[d] a chilling effect . . . discouraging otherwise qualified citizens, once rejected, from reapplying.").

### III.    The balance of harms and public interest weigh in favor of injunctive relief.

The third and fourth factors in the preliminary injunction analysis—the balance of harms and the public interest—also support a preliminary injunction. *See Hobby Lobby*, 723 F.3d at 1128 (setting forth these factors). The Court must "'balance the competing claims of injury and consider the effect of granting or withholding the requested relief,' paying particular regard to the public consequences of deploying an injunction." *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. Of Trs.*, 680 F. Supp. 3d 1250, 1267 (D. Wyo. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

Here, the balance tips sharply in Plaintiff's favor. On one side, Plaintiff and its members and constituents face irreparable harm absent preliminary relief. On the other side, if an injunction issues, Defendants face no injury at all: They would merely be restrained from enforcing an unconstitutional statute. *See also Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012) ("[W]hen the law that voters wish to enact is likely unconstitutional, their interests do not outweigh [plaintiff's] in having his constitutional rights protected." (citation omitted)). Defendants would also not suffer any administrative burden, since the injunction would merely preserve the status quo before the challenged law takes effect.

The public interest also strongly favors an injunction. As the Tenth Circuit has consistently held, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024) (quoting *Hobby Lobby*, 723 F.3d

at 1145 (10th Cir. 2013)). This is particularly true when the right at issue is the most fundamental of all—the right to vote. As the district court explained when it enjoined Kansas's DPOC law, "[T]he public interest is best served by allowing qualified voters to register to vote, and to have their votes counted." *Fish v. Kobach*, No. 16-2105-JAR, 2016 WL 3000356, at *7 (D. Kan. May 25, 2016). For the same reason, enjoining Wyoming's DPOC law protects the public interest.

## CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin HB 156's DPOC requirement as set forth in the Motion.

Dated: May 23, 2025                    Respectfully submitted,

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost*
Katie Chamblee-Ryan*
Daniel Cohen*
Nicole Wittstein*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20002
efrost@elias.law
kchambleeryan@elias.law
dcohen@elias.law
nwittstein@elias.law
(202) 968-4490

Darold W. Killmer, No. 8-6643
Reid Allison*
Maddie Lipps*
**Killmer Lane, LLP**
1543 Champa St., Suite 400
Denver, CO 80202
dkillmer@killmerlane.com
(303) 571-1000

*Attorneys for Plaintiff*
*Equality State Policy Center*
*Admitted Pro Hac Vice

## **CERTIFICATE OF COMPLIANCE**

This brief complies with Wyoming Local Civil Rule 7.1(B) because it contains 25 pages, not including the cover page, table of contents, signature block, certificate of service and this certificate.

This 23rd day of May, 2025.

/s/ Elisabeth C. Frost
Elisabeth C. Frost

## CERTIFICATE OF SERVICE

I certify that on the 23rd day of May, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States District Court for the District of Wyoming by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Elisabeth C. Frost
Elisabeth C. Frost