# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

EQUALITY STATE POLICY CENTER,

        Plaintiff,

   v.

CHUCK GRAY, in his official capacity as
Wyoming Secretary of State, *et al*.,

        Defendants.

Case No. 25-cv-00117-SWS

---

## BRIEF OF *AMICI CURIAE* THE ARIZONA STATE LEGISLATURE, STATE OF MONTANA, STATE OF KANSAS, 22 OTHER STATES, & GUAM

---

AUSTIN KNUDSEN
Montana Attorney General
Christian B. Corrigan*
*Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
christian.corrigan@mt.gov
*Attorneys for The State of Montana*

John G. Knepper (WSB# 7-4608)
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
(307) 632-2842
John@KnepperLLC.com
*Attorney for Amici Curiae*

KRIS W. KOBACH
Kansas Attorney General
OFFICE OF THE ATTORNEY GENERAL
120 S.W. 10th St.
Topeka, KS 66601
(785) 296-2218
connie.deckard@ag.ks.gov
*Attorney for the State of Kansas*

Kory Langhofer (AZ Bar No. 024722)*
Thomas Basile, (AZ Bar. No. 031150)*
STATECRAFT PLLC
649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com
*Attorneys for the Arizona Legislature*

*pro hac vice* application forthcoming

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ......................................................................................1

INTERESTS OF THE *AMICI* STATES .............................................................4

ARGUMENT ...........................................................................................6

I. There is no evidence that H.B. 156 substantially burdens any discrete class of eligible voters. .................................................................................6

II. H.B. 156 advances vital state interest in preventing unlawful voting and fortifying public confidence in elections. ......................................................13

CONCLUSION ........................................................................................16

ADDITIONAL SIGNATORIES ......................................................................18

CERTIFICATE OF COMPLIANCE ..................................................................19

CERTIFICATE OF SERVICE .......................................................................19

# TABLE OF AUTHORITIES

Cases

*Abbott v. Perez*,
 585 U.S. 579, 602 (2018) ........................................................................ 5
*Am. Civil Liberties Union of N.M. v. Santillanes*,
 546 F.3d 1313 (10th Cir. 2008) ............................................ 7, 9, 10, 14
*Arizona v. Inter Tribal Council of Ariz., Inc.*,
 570 U.S. 1 (2013) ................................................................................. 10
*Brakebill v. Jaeger*,
 932 F.3d 671, 679-80 (8th Cir. 2019) .................................................... 7
*Brnovich v. Democratic Nat'l Comm.*,
 594 U.S. 647, 686 (2021) ................................................... 4, 6, 12, 14
*Burdick v. Takushi*,
 504 U.S. 428, 433 (1992) ................................................................. 4, 5
*Common Cause/Georgia v. Billups*,
 554 F.3d 1340 (11th Cir. 2009) ............................................................. 9
*Crawford v. Marion Cnty. Election Bd.*,
 553 U.S. 181, 198 (2006) ............................................ 6, 8, 10, 13, 15, 16
*Dudum v. Arntz*,
 640 F.3d 1098, 1114 (9th Cir. 2011) ................................................... 15
*Election Integrity Project Cal., Inc. v. Weber*,
 113 F.4th 1072, 1091 (9th Cir. 2024) .................................................... 5
*Fish v. Schwab*,
 957 F.3d 1105, 1130 (10th Cir. 2020) ....................................... 2, 5, 8, 9
*Frank v. Walker*,
 768 F.3d 744, 748 (7th Cir. 2014) .......................................................... 7
*Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*,
 992 F.3d 1299, 1334 (11th Cir. 2021) .................................................. 14
*Gonzalez v. Arizona*,
 2006 WL 8431038 at *7 (D. Ariz. Oct. 12, 2006) ............................ 3, 11
*Ind. Democratic Party v. Rokita*,
 458 F. Supp. 2d 775, 822-23 (S.D. Ind. 2006) .................................... 10
*Lee v. Va. State Bd. of Elections*,
 843 F.3d 592, 606-07 (4th Cir. 2016) ................................................... 7
*Luft v. Evers*,
 963 F.3d 665 (7th Cir. 2020) ................................................................. 7
*Mi Familia Vota v. Fontes*,
 129 F.4th 691 (9th Cir. 2025) .............................................................. 10

*Mi Familia Vota v. Fontes*,
  719 F. Supp. 3d 929, 1008, 1011 (D. Ariz. 2024) ..............................................3, 12
*One Wisconsin Inst., Inc. v. Thomsen*,
  198 F. Supp. 3d 896, 936 (W.D. Wis. 2016) ........................................................7
*Thompson v. DeWine*,
  959 F.3d 804, 812 (6th Cir. 2020)......................................................................4
*Timmons v. Twin Cities Area New Party*,
  520 U.S. 351, 364 (1997).................................................................................16
*Vote.Org v. Callanen*,
  89 F.4th 459, 489 (5th Cir. 2023) .......................................................................5
*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442, 451 (2008).................................................................................4

Statutes

52 U.S.C. § 20501 ...............................................................................................3
Ariz. Rev. Stat. § 16-166(F)................................................................................10
Wyo. Const. art. VI, § 2 .......................................................................................1

Other Authorities

*Building Confidence in U.S. Elections: Report of the Commission on Federal Election Reform,*
  18 (Sept. 2005) at
  https://www.eac.gov/sites/default/files/eac_assets/1/6/Exhibit%20M.PDF..........16
Jack Citrin, et al.,
  *The Effects of Voter ID Notification on Voter Turnout: Results from a Large-Scale Field Experiment,*
  13 Election L.J. 228, 238 (2014)........................................................................15
Kyle Endres & Costa Panagopoulos,
  *Photo Identification Laws and Perceptions of Electoral Fraud,*
  8 Research & Politics 3 (2021) ...........................................................................15
Ray Christensen & Thomas J. Schultz,
  *Identifying Election Fraud Using Orphan and Low Propensity Voters,*
  42 Am. Politics Research 311, 313 (2014) ..........................................................13

# INTRODUCTION

Wyoming's constitutional government—like that of virtually every State—is constructed on the premise that only "citizen[s] of the United States" may participate in its elections. Wyo. Const. art. VI, § 2. To ensure that this constitutional guarantee is enforced in election administration, the Wyoming Legislature has required new registrants to provide documentary proof of citizenship and afforded a range of means (including a valid driver's license, valid U.S. passport, or birth certificate) by which they may do so. *See* 2025 Wyoming Laws ch. 172 (H.B. 156). Wyoming follows four other States—Arizona, Kansas, Georgia, and Alabama—that have taken similar steps to ensure that only United States citizens are registered to vote.

Proclaiming Wyoming to be in a "crisis of democracy," the Plaintiff asserts that this modest measure—which simply extends to the voting context a commonsense safeguard that already applies in numerous routine transactions, from boarding an airplane to obtaining a driver's license—will have a "devastating disenfranchising effect." Compl. ¶¶ 7, 9. Plaintiff now asks the Court to nullify a policy determination that Wyoming's elected representatives developed in a deliberative, democratic process—in other words, to thwart democracy in the name of democracy.

This provocative proposition, it turns out, teeters on an untenably brittle factual foundation. Given the vehemence of Plaintiff's rhetorical hyperventilation, the Court might expect its motion for a preliminary injunction to be replete with the testimony

of actual Wyomingites who could and would register to vote but for H.B. 156's mandate.

Instead, the Plaintiff constructs its argument on an admixture of conclusory characterizations, sweeping speculation, and demographic generalizations. But supposition and conjecture cannot sustain a federal court's invalidation of a duly enacted state law, particularly in the realm of elections. As Tenth Circuit precedent (on which Plaintiffs themselves rely) confirms, injunctions must be premised on specific findings that a significant, quantifiable number of otherwise eligible citizens have been disenfranchised, or at least significantly burdened, because of the challenged law. *See Fish v. Schwab*, 957 F.3d 1105, 1130 (10th Cir. 2020). The Plaintiff's inability to muster such a showing defeats the motion. And even if the Plaintiff could demonstrate an articulable "burden" resulting from H.B. 156, the statute fits squarely within Wyoming's recognized governmental interests in preemptively insulating its electoral structures from unlawful votes by noncitizens and fortifying public confidence in the outcomes they produce. Indeed, preserving the integrity of elections is one of the most important obligations a constitutional republic has to its citizens. Every vote cast by a noncitizen effectively cancels out a vote cast by a United States citizen. *See Hall v. Dist. of Columbia Bd. of Elections*, -- F.4th -- , 2025 WL 1717330, at *4 (D.C. Cir. Jun. 20, 2025) (recognizing that "granting the

franchise to noncitizens will expand the . . . electorate and reduce the voting power of each U.S. citizen voter.").

Finally, while Plaintiff is correct that Arizona's first-in-the-nation documentary proof of citizenship requirement is instructive, the analogy discredits—rather than buttresses—the Plaintiff's theory here. Notwithstanding Plaintiff's and their expert's baffling assertion that the Arizona law was found to disenfranchise eligible citizens, two different judges—in two different proceedings spanning nearly two decades— found *zero* confirmed instances of known citizens being excluded from the voter rolls. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 1008 (D. Ariz. 2024) (finding, after a nine-day trial, that "Plaintiffs offered no witness testimony or other 'concrete evidence' to corroborate that the Voting Laws' [documentary proof of citizenship] Requirements will in fact impede any qualified voter from registering to vote or staying on the voter rolls."), *aff'd in part, vacated in part on other grounds*, 129 F.4th 691 (9th Cir. 2025);[1] *Gonzalez v. Arizona*, 2006 WL 8431038, at *7 (D. Ariz. Oct. 12, 2006) (although plaintiffs had presented high-level evidence at preliminary injunction stage that some eligible individuals may be affected by Arizona's new proof of citizenship and voter ID laws, "it is not clear what percentage of these individuals

---

[1] Although certain aspects of Arizona's law were deemed preempted by the federal National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq.* ("NVRA"), as applied to voting in elections for federal office, the Plaintiff acknowledges that the relevant NVRA provisions do not apply to Wyoming.

wish to vote but are *actually* unable to obtain identification"). While it is true that approximately 19,000 registrants have not complied with Arizona's proof of citizenship requirement, no court ever purported to determine the citizenship status of these individuals, and certainly never concluded that any of them are, in fact, United States citizens.

This Court should adopt the well-reasoned conclusion of its Arizona counterpart and affirm that Wyoming's "interests in preventing non-citizens from voting and promoting public confidence in [its] elections outweighs the limited burden voters might encounter when required to provide [documentary proof of citizenship]." *Mi Familia Vota*, 719 F. Supp. 3d at 1011.

## INTEREST OF THE *AMICI* STATES

The Constitution entrusts to the States "broad power," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (citation omitted), to preemptively protect their electoral systems from fraud, illegal votes by ineligible individuals, and other unlawful activity, "without waiting for it to occur and be detected within [their] own borders." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021); *see also Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (recognizing that state governments "must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and

honest and if some sort of order, rather than chaos, is to accompany the democratic processes."" (citation omitted)).

Two foundational constitutional values undergird this allocation of authority. The first is federalism—*i.e.*, a recognition that each State is best positioned to craft bespoke legislative solutions tailored to its particularized circumstances, exigencies, and policy preferences. *See generally Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020) ("[T]he federal Constitution provides States—not federal judges—the ability to choose among many permissible options when designing elections. And because that's where the decision-making authority is, federal courts don't lightly tamper with election regulations."); *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1091 (9th Cir. 2024) ("State-by-state and intra-state variation in the administration of elections is a feature—not a bug—of our federal system."). The second is a recognition that legislatively-ordained policy directives are themselves manifestations of a democratic process and hence carry their own democratic legitimacy. *See generally Vote.Org v. Callanen*, 89 F.4th 459, 489 (5th Cir. 2023) ("We must give weight to a state legislature's judgment when it has created 'evenhanded restrictions that protect the integrity and reliability of the electoral process.'"). The upshot is that improvidently issued injunctions "barring the State from conducting [its] elections pursuant to a statute enacted by the Legislature . . . seriously and irreparably harm the State." *Abbott v. Perez*, 585 U.S. 579, 602 (2018).

The *Amici* States are concerned that the injunction Plaintiff seeks would inflict just such an improper incursion into States' sovereign authority to corroborate and enforce undisputedly valid voting qualifications, such as citizenship. Plaintiff frames its voting rights claim under the "*Anderson-Burdick* balancing test"—which "weigh[s] 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Fish*, 957 F.3d at 1122 (quoting *Burdick*, 504 U.S. at 434)). But Plaintiff's arguments misconceive both sides of the *Anderson-Burdick* ledger—diluting the "burden" facet with generalizations and hypotheticals, while discounting the States' significant interest in proactively preventing unlawful registrations by ineligible individuals. If adopted by the Court, Plaintiff's theory would improperly constrain States' constitutional prerogative to secure their elections.

ARGUMENT

## I. There Is No Evidence That H.B. 156 Substantially Burdens Any Discrete Class of Eligible Voters

Plaintiff has failed to demonstrate that H.B. 156 inflicts a significant (let alone "severe") burden on either eligible registrants as a whole or any identifiable segment of prospective registrants. The amount of time it takes to retrieve one of any number of documents that a prospective registrant possesses is usually negligible. The *Anderson-Burdick* framework takes as its premise the reality that compliance with

virtually any regulatory safeguard will demand *some* quantum time or effort by voters. But such strictures become constitutionally suspect only if they "represent a significant increase over the usual burdens of voting." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2006) (plurality op.); *see also Brnovich*, 594 U.S. at 669 (recognizing in Voting Rights Act context that "voting necessarily requires some effort and compliance with some rules" and that "[m]ere inconvenience cannot be enough" to impugn a facially neutral statute's validity). In offering eligible registrants a broad menu of commonly held documents for corroborating their citizenship, H.B. 156 is, both conceptually and in its practical operation, substantively identical to voter ID laws that *Crawford* and its progeny have almost uniformly sustained. *See, e.g.*, *Am. Civil Liberties Union of N.M. v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 606–07 (4th Cir. 2016); *Frank v. Walker*, 768 F.3d 744, 748 (7th Cir. 2014); *Brakebill v. Jaeger*, 932 F.3d 671, 679–80 (8th Cir. 2019).

Indeed, Wyoming's voting regime, which permits eligible individuals to register to vote as late as Election Day itself, is in some respects more liberal than those of other states. Although Plaintiff strains to recast this flexibility as an encumbrance by conjuring a specter of long lines and confusion at polling places [Mot. at 14], "[t]he specific burdens on voters who plan to register on election day are still slight. With a little advanced planning, even a voter who lacks access to standard

methods for proving [citizenship] can register to vote on election day." *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 936 (W.D. Wis. 2016), *aff'd in relevant part, vacated in part, rev'd in part sub nom. Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020) (evaluating proof of residence requirement).[2]

Perhaps recognizing the dearth of credible evidence that H.B. 156 exerts widespread burdens on unregistered but eligible individuals, Plaintiff leans heavily on an alternative avenue to satisfy the first prong of *Anderson-Burdick*. As interpreted by the Tenth Circuit, the Supreme Court's framework permits challenges predicated on alleged "burden[s] imposed on specific categories of voters." *Fish*, 957 F.3d at 1126. To that end, the Plaintiff rattles off a laundry list of sundry demographics and population subsets—including "women," "Hispanic citizens," "young voters," "survivors of domestic violence and sexual assault," "people who lack stable housing," "transgender citizens," "adoptees," and "people with certain disabilities"— whom they allege would bear acute burdens in complying with H.B. 156. *See* Compl. ¶¶ 191–208, Mot. at 7–8, 15–16.

This assertion dissipates under scrutiny. To begin with, the intuitive likelihood that there exists some eligible individual, somewhere in Wyoming, who lacks ready

---

[2] In support of its insistence that "voters do not always receive notice that their registration has been canceled" [Mot. at 7], Plaintiff cites a single second-hand anecdote [Mot. Ex. 20, ¶ 12]. It makes no attempt to argue that undisclosed registration cancellations occur on a significant scale or are countenanced by Wyoming law.

access to proof of citizenship does not evince a constitutionally cognizable "burden." *See Crawford*, 553 U.S. at 199–200 (that a "burden may not be justified as to a few voters" does not establish a statute's facial invalidity); *One Wisconsin*, 198 F. Supp. 3d at 935 ("anecdotal evidence" is insufficient to establish a severe burden); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 716 F. Supp. 3d 1236, 1243 (N.D. Fla. 2024) (rejecting argument that the court "should focus only on the severity of the burden imposed upon the specific voters who face the highest burden based on their own unique set of circumstances. If that were the law, then individual voters would be able to invalidate reasonable voting laws based solely on their unique circumstances.").

Rather, even plaintiffs who frame their *Anderson-Burdick* claims by reference to certain classes of voters still must adduce a significant, quantifiable number of identifiable individuals who wish to but are unable to register to vote because of the challenged law. *See Fish*, 957 F.3d at 1127 (concluding a significant burden existed because the district court had found "that 31,089 applicants were prevented from registering to vote because of the [proof of citizenship] requirement"); *Santillanes*, 546 F.3d at 1323 (isolated instances of potential disenfranchisement that "arise out of 'life's vagaries' . . . do not amount to a substantial burden on a person's right to vote" (citation omitted)). Even putting aside questions of causation (which remain a gaping evidentiary gap in its claim), Plaintiff seemingly is unable to posit how many eligible

and unregistered Wyomingites actually lack any compliant documentary proof of citizenship in the first place.[3]

Perhaps most revealingly, the Plaintiff—which purports to represent and work closely with allegedly affected communities—is unable to muster even a single affidavit or declaration by an actual, real-life individual who is eligible and wishes to become a Wyoming voter but cannot feasibly prove his or her citizenship. This conspicuous omission itself should extinguish the claim. *See Santillanes*, 546 F.3d 1319 (noting that "Plaintiffs cannot identify a single individual who would not vote . . . because of the [photo ID] measure."); *Billups*, 554 F.3d at 1354 ("[T]he inability to locate a single voter who would bear a significant burden 'provides significant support for a conclusion that the Photo ID requirement does not unduly burden the right to vote.'" (citation omitted)); *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 822–23 (S.D. Ind. 2006) ("Despite apocalyptic assertions of wholesale voter disenfranchisement, Plaintiffs have produced not a single piece of evidence of any identifiable registered voter who would be prevented from voting pursuant to [the

---

[3] Dr. Mayer's declaration (at ¶ 16) cites a 2016 survey that "estimated" that "nearly 6% [of registered voters in Wyoming] lacked both a passport and a birth certificate." But passports and birth certificates are not the only permissible methods of proving citizenship under H.B. 156. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009) (pointing out that plaintiffs' data "fail to account for other forms of [voter] identification that are acceptable under the statute").

challenged law] because of his or her inability to obtain the necessary photo identification."), *aff'd sub nom. Crawford*, 553 U.S. 181.

The long-running litigation engulfing Arizona's proof of citizenship requirement illuminates the flaws in the Plaintiff's theory of "burden." In 2004, the Arizona electorate approved a statute requiring all new registrants to provide documentary proof of citizenship as a condition of registering to vote. *See* Ariz. Rev. Stat. § 16-166(F). The specific part of the Arizona law dealing with applicants using the then non-conforming federal form was deemed preempted by the NVRA as applied to voting in federal elections until the Arizona instructions on the federal form could be changed accordingly. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013); *Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025). But no court has ever found that the statute unconstitutionally burdens voting rights, and it remains an enforceable (and enforced) prerequisite to voting in Arizona state and local elections.

That is not, however, for lack of trying by a litany of political and nonprofit groups not unlike the Plaintiff here. Shortly after the law's adoption, a federal district court refused a request to enjoin it, finding scant evidence that it was obstructing any otherwise eligible registrants. *See Gonzalez*, 2006 WL 8431038, at *7, *aff'd*, 485 F.3d 1041, 1050 (9th Cir. 2007) (declarations averring that obtaining required

documentation would be a "burden" were insufficient).[4] Other plaintiffs fared no better during a second round of litigation in 2023. Despite nearly 18 years' worth of data at their disposal and a nine-day trial in which to prove their claims, the plaintiffs were unable to identify even a single individual who was disenfranchised by the proof of citizenship law. Rejecting the plaintiffs' *Anderson-Burdick* claim, the district court pointedly found that they had been "unable to provide evidence quantifying the number of Arizonans qualified to vote that may be unable to provide *any* form of [proof of citizenship] or that have been or will be deterred from registering to vote because of" that requirement. *Mi Familia Vota*, 719 F. Supp. 3d at 1003.

It is true that (at the time of the decision in *Mi Familia Vota*) approximately 19,000 Arizona registrants had not supplied proof of citizenship and thus were ineligible to vote in state or local elections. Plaintiff states that these individuals were "disproportionately minorities" and imply that they were wrongfully excluded from the voter rolls. Dr. Mayer's declaration exhibits an even greater liberality with the record in *Mi Familia Vota* and expressly asserts (at ¶ 31) that the Arizona statistic "show[s] clearly that the [proof of citizenship] requirements prevented eligible citizens from voting."

---

[4] After "significant discovery and motions practice extending over a year and a half," the *Gonzalez* plaintiffs were eventually able to locate exactly one individual who may have met the criteria. *Gonzalez v. Arizona*, 2008 WL 11395512, at *1, *17 (D. Ariz. Aug. 20, 2008).

That is simply inaccurate. While the *Mi Familia Vota* court noted that Arizona's so-called "federal only" voters were not affirmatively proved to be non-citizens, *see* 719 F. Supp. 3d at 1011, it also never purported to find that any or all of them were, in fact, U.S. citizens, and certainly never found that these individuals were *unable* to comply with the law. To the contrary, it pointed out that the plaintiffs "have not estimated the number of these voters that wholly *lack*" proof of citizenship, adding that "even assuming some Federal-Only Voters do not possess [proof of citizenship], the evidence does not reliably illustrate the likelihood that voters will encounter obstacles to obtaining this information." *Id.* at 1008. The court also found the allegations of impermissible disparate impact unpersuasive, concluding instead that any racial discrepancies in compliance rates were "small in absolute terms," *id.* at 1016 (quoting *Brnovich*, 594 U.S. at 680), and citing an absence of "quantifiable evidence regarding the rate at which minority voters both lack *and* are unable to afford" documentary proof of citizenship. *Id.* at 1017.

The Arizona proceedings aptly underscore the factual deficiencies that debilitate Plaintiff's request for a preliminary injunction. At bottom, Plaintiff's factual record relies on a smattering of anecdotes conjoined with generic characterizations of various groups to serve as a springboard for the haphazard inferential leap that H.B. 156 will proximately cause the disenfranchisement of a significant (yet notably unspecified) number of otherwise eligible Wyoming residents who wish to vote. As

*Crawford* and *Schwab* teach, that kind of evidentiary alchemy does not enable a court to find a constitutionally significant "burden" under *Anderson-Burdick*.

## II.     H.B. 156 Advances Vital State Interests in Preventing Unlawful Voting and Fortifying Public Confidence in Elections

Plaintiff's motion also adopts an artificially constricted conception of States' vital interests in preventing fraud, preventing other forms of unlawful voting, and preserving voter confidence in the integrity of elections. Plaintiff harps on the paucity of documented voter fraud, illegal noncitizen voting, or similar wrongdoing in recent Wyoming elections. That argument, though, elides at least three distinctions.

First, both courts and experts have acknowledged that election crimes evade easy detection, and reported rates hence do not necessarily reflect actual incidence. Stated another way, the absence of evidence is not always evidence of absence. *See Mi Familia Vota*, 719 F. Supp. 3d at 966 (noting that even plaintiffs' expert witness had agreed "that voter fraud can be difficult to detect"); Ray Christensen & Thomas J. Schultz, *Identifying Election Fraud Using Orphan and Low Propensity Voters*, 42 AM. POLITICS RESEARCH 311, 313 (2014) ("The difficulties in discovery or measuring electoral fraud are well known."). Voting by noncitizens is a paradigmatic example of this. It is exceedingly difficult to identify someone as a noncitizen once they are on the voter rolls. And no proof-of-citizenship process occurs at the time of voting. So once a noncitizen successfully registers to vote, he will in all likelihood be able to vote illegally for the rest of his life without the crime ever being detected.

14

Second, the lexicon of voter "fraud" obscures that unintentional violations—for example, a registration form signed by a longtime permanent resident who subjectively but mistakenly believes she is a naturalized citizen—also corrode election security, even though they may not be investigated, charged or prosecuted as voter "fraud" or a similar offense. *See Mi Familia Vota*, 719 F. Supp. 3d at 1011 ("The State's interests in preventing voter fraud and unintentional non-citizen voting are both legitimate, as both forms of non-citizen voting can undermine the integrity of Arizona's elections."). An even more common form of unintentional registration by noncitizens occurs regularly at DMVs, when they are asked at the end of the driver's license application process if they would like to register to vote. Some assume that because a government official is offering them the opportunity to register, it must be permissible to do so. Requiring that paper representations of one's qualifications be corroborated with common forms of documentary proof necessarily curtails the risk of good faith, but still illicit, registration and voting by ineligible individuals.

Third, the Supreme Court has explicitly cautioned that the magnitude of a State's interest in policing election-related wrongdoing is not denoted by the prevalence of extant fraud. To the contrary, "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich*, 594 U.S. at 686; *see also Santillanes*, 546 F.3d at 1323 (holding in voter ID context that "[i]n requiring the City to present

evidence of past instances of voting fraud, the district court imposed too high a burden on the City"); *Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*, 992 F.3d 1299, 1334 (11th Cir. 2021) (noting that "deterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud"). Although H.B. 156 may not be fail-safe in preventing non-citizen registrations, it need not be precisely aligned to the contours of the problem it addresses. *See Dudum v. Arntz*, 640 F.3d 1098, 1114 (9th Cir. 2011) (in the absence of a "severe" burden on voting rights, the government "is *not* required to show that its system is narrowly tailored—that is, is the best one to achieve its purposes").

In addition, the States' interest in constructing guardrails around election processes transcends such laws' deterrent capabilities. The Supreme Court has expressly recognized public confidence in elections as a freestanding governmental interest that is independent of (albeit related to) the regulatory objective of deterring and detecting actual fraud. *See Crawford*, 553 U.S. at 197. And political science research fortifies this commonsense observation with empirical support. A 2017 study sought to examine the effects of voter ID laws by sending randomly selected Virginia residents' informational postcards. The researchers concluded that educating registrants on the state's photo ID requirements "likely reduced perceptions of electoral fraud." Kyle Endres & Costas Panagopoulos, *Photo Identification Laws and Perceptions of Electoral Fraud*, 8 RESEARCH & POLITICS 3 (2021), *available at*

https://tinyurl.com/27wkzfhs. Another study found that awareness of voter ID laws does not deter electoral participation and may actually encourage it. *See* Jack Citrin, *et al.*, *The Effects of Voter ID Notification on Voter Turnout: Results from a Large-Scale Field Experiment*, 13 ELECTION L. J. 228, 238 (2014) (noting that it is "possible that notification of voter ID laws elevated turnout by bolstering confidence in the integrity of the electoral system") ; *see also Building Confidence in U.S. Elections: Report of the Commission on Federal Election Reform* at 18 (Sept. 2005) ("The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters."), *available at* https://www.eac.gov/sites/default/files/eac_assets/1/6/Exhibit%20M.PDF.

To be sure, the constitutional *bona fides* of any given election integrity law do not pivot on its capacity to induce quantitively observable effects on public sentiment. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997) (courts do not "require elaborate, empirical verification of the weightiness of the State's asserted justifications" for neutral voting laws). But the intuitively and factually sound maxim that "public confidence in the integrity of the electoral process . . . encourages citizen participation in the democratic process," *Crawford*, 553 U.S. at 197, and thus is intrinsically an important State interest, must underpin the Court's assessment of Wyoming's neutral and commonsense measure to ensure that only U.S. citizens can participate in its elections.

## CONCLUSION

For the foregoing reasons, the Court should deny the Plaintiff's Motion for a Preliminary Injunction.

Dated: June 27, 2025

AUSTIN KNUDSEN
Montana Attorney General

*/s/Christian B. Corrigan*
Christian B. Corrigan*
 *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
christian.corrigan@mt.gov
*Attorneys for The State of Montana*

KRIS W. KOBACH
Kansas Attorney General
OFFICE OF THE ATTORNEY GENERAL
120 S.W. 10th St.
Topeka, KS 66601
(785) 296-2218
connie.deckard@ag.ks.gov
*Attorney for the State of Kansas*

Respectfully submitted,

*/s/ John G. Knepper*
John G. Knepper (WSB# 7-4608)
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
(307) 632-2842
John@KnepperLLC.com
*Attorney for Amici Curiae*

*/s/Thomas Basile*
Kory Langhofer*
Thomas Basile*
STATECRAFT PLLC
649 North Fourth Ave., First Floor Phoeni
Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com
*Attorneys for The Arizona Legislature*

*pro hac vice* application forthcoming

# ADDITIONAL SIGNATORIES

STEVE MARSHALL
Attorney General
*State of Alabama*

ANDREW BAILEY
Attorney General
*State of Missouri*

TREG TAYLOR
Attorney General
*State of Alaska*

MICHAEL T. HILGERS
Attorney General
*State of Nebraska*

TIM GRIFFIN
Attorney General
*State of Arkansas*

JOHN M. FORMELLA
Attorney General
*State of New Hampshire*

JAMES UTHMEIER
Attorney General
*State of Florida*

DREW WRIGLEY
Attorney General
*State of North Dakota*

CHRIS CARR
Attorney General
*State of Georgia*

DAVE YOST
Attorney General
*State of Ohio*

DOUGLAS MOYLAN
Attorney General
*Territory of Guam*

GENTNER DRUMMOND
Attorney General
*State of Oklahoma*

RAÚL LABRADOR
Attorney General
*State of Idaho*

ALAN WILSON
Attorney General
*State of South Carolina*

THEODORE E. ROKITA
Attorney General
*State of Indiana*

MARTY JACKLEY
Attorney General
*State of South Dakota*

BRENNA BIRD
Attorney General
*State of Iowa*

JONATHAN SKRMETTI
Attorney General
*State of Tennessee*

LIZ MURRILL
Attorney General
*State of Louisiana*

KEN PAXTON
Attorney General
*State of Texas*

DEREK BROWN
Attorney General
*State of Utah*

JOHN B. MCCUSKEY
Attorney General
*State of West Virginia*

JASON MIYARES
Attorney General
*State of Virginia*

## CERTIFICATE OF COMPLIANCE

This brief complies with Wyoming Local Civil Rule 7.1(B) because it contains 18 pages, not including the cover page, table of contents, signature block, certificate of service and this certificate.

*/s/ John G. Knepper* _____

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June, 2025, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

*/s/ John G. Knepper* _____