Darold W. Killmer, No. 8-6643
Reid Allison*
Madison Lips*
**KILLMER LANE, LLP**
1543 Champa St., Suite 400
Denver, CO 80202
dkillmer@killmerlane.com, rallison@killmerlane.com, mlips@killmerlane.com
Tel: (303) 571-1000

Elisabeth C. Frost*
Katie Chamblee-Ryan*
Daniel Cohen*
Nicole Wittstein*
Julianna Astarita*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
efrost@elias.law, kchambleeryan@elias.law, dcohen@elias.law, nwittstein@elias.law, jastarita@elias.law
Tel: (202) 968-4490

*Admitted pro hac vice*
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **EQUALITY STATE POLICY CENTER,** | ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| **CHUCK GRAY**, in his official capacity as Wyoming Secretary of State, *et al.*, | ) Civil Action No. 25-cv-00117-SWS ) ) |
| Defendants. | ) ) |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO AMICUS BRIEF OF THE IMMIGRATION REFORM LAW INSTITUTE

Nothing that the Immigration Reform Law Institute ("IRLI") argues in its amicus brief (Doc. 105) changes the fact that a preliminary injunction should issue in this case. To start, IRLI seems to think that the preliminary injunction motion is about a provision that is not currently before the Court. IRLI's brief specifically addresses § 22-3-102(a)(i), which "direct[s] the clerk to prohibit registration *if an applicant's identification or proof of residence indicates that the*

*applicant is not a citizen*, unless the form is accompanied by acceptable proof of U.S. citizenship." Doc. 105 at 2 (quoting H.B. 156, 68th Leg., Gen. Sess. § 1 (2025) (amending Wyo. Stat. Ann. § 22-3-102(a)(i))) (emphasis added). Based on this misunderstanding, IRLI argues (for example) that "HB 156 does not prevent registration or voting by any eligible voter; it merely provides a mechanism for verifying the veracity of an applicant's attestation of being a United States citizen." Doc. 105 at 14. But the preliminary injunction motion concerns the DPOC requirement in HB 156, codified as Wyo. Stat. Ann. §§ 22-1-102(a)(lvi), 22-3-103(a), which absolutely *does* prevent registration by eligible Wyomingites if they fail to provide one of the limited forms of DPOC now required by that law.

Beyond this, IRLI's primary contribution is an inapposite civics lesson on congressional power. It lectures that "States—not Congress—have authority over setting and regulating voter qualifications." Doc. 105 at 3; *see id.* at 3–6. And it emphasizes a concurrence by Justice Thomas (not joined by any other members of the Court) "stress[ing] that Congress lacks the power [to] 'dictate what evidence a State may consider in deciding whether [voter] qualifications have been met.'" *Id.* at 6 (quoting *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 781 (2018) (Thomas, J., concurring)). Indeed, in the first six pages of its brief, IRLI mentions "Congress" ten times. *See id.* at 3–6.

This case, however, has nothing to do with congressional power. Nor does Plaintiff challenge Wyoming's requirement that voters must be U.S. citizens. And Plaintiff does not argue that Wyoming's voting laws are preempted by any act of Congress. IRLI is simply briefing the wrong issues in the wrong case. Plaintiff seeks relief from Wyoming's violation of the *U.S. Constitution*—the "supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. IRLI's paean to state's rights

cannot invert our constitutional order, and nothing in the lead section of its amicus brief provides any reason to conclude that HB 156 complies with the First and Fourteenth Amendments.

IRLI also takes issue with certain of Plaintiff's arguments regarding whether HB 156 imposes an unconstitutional burden.[1] For example, IRLI disputes Plaintiff's observation that many of the documents HB 156 accepts as DPOC do not actually say anything about a person's citizenship. Doc. 105. This claim is "misleading," IRLI says, because Wyoming can use data from its Department of Transportation to check what proof of lawful status the prospective registrant submitted with her license or State ID application and thereby confirm whether or not the person is a citizen. *Id.* at 10. But Wyoming now claims the very reason it needs a DPOC requirement is that clerks cannot always access the Department of Transportation's data to confirm citizenship for people who register on election day. Doc. 65 at 2–3. And IRLI ignores the other documents the law accepts as DPOC that do not prove citizenship. Doc. 16 at 19–20. IRLI also ignores that Secretary Gray has already conceded that many of the approved forms of "DPOC" do not prove citizenship (but argues it does not matter). Doc. 65 at 18.

As to the problem of *Fish II*, IRLI alternates between ignoring this binding precedent and attempting to distinguish it. IRLI asks this Court to look to the Supreme Court's opinion in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), and a Tenth Circuit case decided shortly after it, *The American Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008), where those courts found that the State could justify a voter ID law without evidencing specific instances of fraud. *See* Doc. 105 at 8. In IRLI's view, these cases mean that a State can impose *any* burden based on the threat of fraud, whether plausible or not. Neither case says that. In *Crawford*, the Court did not require the State to show specific instances of fraud both

---

[1] Plaintiff has addressed the bulk of these arguments in other briefing.

because the burden the law imposed was minimal and because there existed "flagrant examples of such fraud in other parts of the country [that] have been documented throughout this Nation's history by respected historians and journalists." 553 U.S. at 195. Addressing a similar law, *Santillanes* followed the same approach. *See* 546 F.3d at 1323.[2] But in *Fish v. Schwab* ("*Fish II*") (explicitly addressing these cases), the Tenth Circuit explained that the DPOC law at issue imposed a higher burden on the right to vote and could not be justified by the state's "incredibly slight evidence of fraud." *Fish II*, 957 F.3d 1105, 1134 (10th Cir. 2020). Here, the law at issue is stricter than the DPOC law in *Fish II* (by the Secretary's own repeated admissions, as well as its plain text). *See* Doc. 16 at 3–5, 10–11; Doc. 73 at 3–4. *Fish II* governs here.

IRLI contends that this case is different because Wyoming law gives voters who lack DPOC a provisional ballot and until the close of business the next day to submit the required proof, whereas in *Fish II*, Kansas did not allow voters to submit provisional ballots. Doc. 105 at 8–9; Wyo. Stat. Ann. § 22-3-104(g). But Kansas offered a far more protective safety valve: eligible voters without DPOC could submit *any* "satisfactory evidence" that may prove their citizenship to the state election board (this still was not enough to render the DPOC requirement constitutional). *Fish II*, 957 F.3d at 1112; *see* Doc. 16 at 12. Wyoming offers zero recourse to citizens who lack DPOC, and given the time it takes to obtain it, *id.* at 7, the "grace period" for proving their citizenship is an illusion—particularly because voters will learn about the DPOC requirements for the first time when they attempt to register at the polls, *see* Doc. 16 at 13–14.

In *Crawford*, where the Supreme Court relied heavily on Indiana's grace period for submitting voter ID in finding the law constitutional, the law allowed voters who lacked ID to cast

---

[2] The Secretary has presented no such "flagrant examples" of noncitizen voting, whether documented by "respected journalists and historians" or anyone else.

4

provisional ballots that would be counted if the voter presented a photo ID *or signed an affidavit* at the circuit clerk's office *within 10 days*. 553 U.S. at 186; *see also Fish II*, 957 F.3d at 1128–1129 (discussing just that). The voter ID law itself was also significantly more flexible than HB 156's DPOC law, accepting *any* photo ID issued by the State of Indiana or the federal government, so long as it included the voter's name, a photograph, and an expiration date. P.L. 109-2005 (eff. July 1, 2005, codified at Ind. Code § 3-5-2-40.5).

Finally, IRLI argues that Plaintiff lacks organizational standing. Doc. 105 at 13–14. Organizational standing is only one basis for standing that Plaintiff asserts; it also asserts associational standing, but IRLI does not address that basis at all. Regardless, Plaintiff's organizational standing is secured by decades of precedent.[3] IRLI acknowledges that an organization has standing when a challenged law frustrates its mission—but misses that Plaintiff's standing is based on exactly this. *Id.* at 13. Helping people register to vote and successfully participate in elections is core to Plaintiff's mission. Doc. 16-21 ¶¶ 4, 9. Wyoming's DPOC law hinders Plaintiff's ability to do that work. *Id.* ¶¶ 18, 22. And the Supreme Court has long held that organizations have standing in precisely these circumstances. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) (explaining that organizations have standing to challenge actions that "perceptibly impair[] [their] ability to" carry out their core work) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Here, because of HB 156, Plaintiff has already had to (for example) suspend its voter education program and delay registration efforts it would otherwise be undertaking now. Doc. 16-21 ¶¶ 18, 20–22. This is more than enough to establish Plaintiff's standing under decades of precedent. *See, e.g.*, *League of United Latin Am.*

---

[3] So, too, for Plaintiff's associational standing, but because IRLI does not challenge that basis for standing, Plaintiff does not expand on it here.

*Citizens v. Exec. Off. of the Pres.*, Nos. 25-0946, 25-0952, 25-0955, 2025 WL 1187730, at *31 (D.D.C. Apr. 24, 2025) (finding that plaintiff organizations had shown a substantial likelihood that they had standing at the preliminary injunction stage where an Executive Order imposing, among other things, a DPOC requirement, "would directly interfere with their core activities, including providing voter registration services throughout the nation"); *see also League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding that a DPOC requirement would "unquestionably make it more difficult for [a pro-voting organization] to accomplish their primary mission of registering voters").

Ignoring this, IRLI argues that Plaintiff's standing cannot be based on diversion of resources in favor of increased voter education efforts because Plaintiff already engages in voter education. Doc. 105 at 14. In support, IRLI relies entirely on *Food & Drug Administration v. Alliance for Hippocratic Medicine*. But *Alliance for Hippocratic Medicine* does not say what IRLI claims it does. There, the Court held that an organization could not "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. The Court contrasted the circumstances before it with those in *Havens,* where the challenged actions made it more difficult for the plaintiff organization to carry out its work, affirming that these circumstances that *do* confirm standing. *Id*. at 395.[4]

Here, Plaintiff does not complain that it must spend resources *advocating against HB 156*, but rather that HB 156 makes one of its core mission-critical activities—helping people register and vote—significantly more difficult. And because helping people register and vote—and informing its dues-paying member organizations about voting requirements, as it is obliged to

---

[4] IRLI further ignores that Plaintiff's diversions of resources allegations are not limited to voter education. *See* Doc. 16-21 ¶¶ 18, 20–22.

do—will be more resource-intensive under the DPOC law, Plaintiff will need to divert resources to this effort from other core priorities. Doc. 16-21 ¶¶ 8, 10–17, 19. Established precedent supports Plaintiff's standing in these circumstances, and *Alliance for Hippocratic Medicine* does nothing to change that. *See, e.g.*, *League of United Latin Am. Citizens*, 2025 WL 1187730, at *23 (explaining that *Alliance for Hippocratic Medicine* is "consistent" with precedent holding that an organization has standing when it must "divert resources toward providing additional *direct services* designed to offset the harmful effects of the challenged conduct").

Dated: July 9, 2025

Respectfully submitted,

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost*
Katie Chamblee-Ryan*
Daniel Cohen*
Nicole Wittstein*
Julianna Astarita*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
efrost@elias.law
kchambleeryan@elias.law
dcohen@elias.law
nwittstein@elias.law
jastarita@elias.law
(202) 968-4490

Darold W. Killmer, No. 8-6643
Reid Allison*
Madison Lipps*
**KILLMER LANE, LLP**
1543 Champa St., Suite 400
Denver, CO 80202
dkillmer@killmerlane.com
rallison@killmerlane.com
mlips@killmerlane.com
(303) 571-1000

*Attorneys for Plaintiff*
*Equality State Policy Center*
*\*Admitted Pro Hac Vice*

7

**CERTIFICATE OF SERVICE**

      I certify that on the 9th day of July, 2025, I electronically filed the foregoing notice with the Clerk of the Court for the United States District Court for the District of Wyoming by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

                                            */s/ Elisabeth C. Frost*
                                            Elisabeth C. Frost