Marci Crank Bramlet, WSB # 7 - 5164
**ROBINSON BRAMLET LLC**
400 E. 1st Street, Suite 202
Casper, WY 82601
Phone: (307) 733-7703
Fax: (307) 201-5546
marci@jrmcb.com

Danielle Lang*
Daniel S. Lenz*
Kate Hamilton*
Lucas Della Ventura*
**CAMPAIGN LEGAL CENTER**
1101 14th St. NW, Suite 400
Washington, DC, 20005
Phone: (202) 736-2200
Fax:    (202) 736-2222
dlang@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
ldellaventura@campaignlegalcenter.org

*Counsel of Record for Amicus Curiae*
*League of Women Voters of Wyoming*

*Application to appear *pro hac vice* forthcoming

# UNITED STATES DISTRICT COURT

# DISTRICT OF WYOMING

| | |
|---|---|
| EQUALITY STATE POLICY CENTER, | Case No. 25-cv-00117-SWS |
| *Plaintiff*, | **BRIEF OF *AMICUS CURIAE* LEAGUE OF WOMEN VOTERS OF WYOMING IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CHUCK GRAY, in his official capacity as Wyoming Secretary of State, et al., | |
| *Defendants*. | |

## TABLE OF CONTENTS

STATEMENT OF INTEREST.................................................................................1

INTRODUCTION ..............................................................................................2

ARGUMENT .....................................................................................................2

    I.    The *Anderson-Burdick* framework requires careful balancing, not reflexive deference to purported state interests.............................................2

        a.  The *Anderson-Burdick* framework requires courts to carefully examine whether a state voting regulation improperly impinges on the fundamental right to vote. ...............................................3

        b.  Secretary Gray and the United States improperly attempt to narrow the *Anderson-Burdick* test................................................7

    II.   Secretary Gray's arguments fail to grapple with either the burdens imposed or the lack of tailoring. ...........................................10

        a.  HB 156 significantly burdens the right to vote. ..................10

        b.  Wyoming's Aggressive Purge Program Compounds the Burden of DPOC on Wyomingites. ........................................15

        c.  HB 156 is not tailored to any of the state's purported interests. ...........17

CONCLUSION...............................................................................................20

# TABLE OF AUTHORITIES

**Cases**
**Page**

*ACLU of New Mexico v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008) ...............................................4

*Anderson v. Celebrezze*, 460 U.S. 780 (1983).........................................................................8

*Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021) ...............................................9

*Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999)....................................6

*Burdick v. Takushi*, 504 U.S. 428 (1992) .............................................................................3, 4, 19

*Campbell v. Davidson*, 233 F.3d 1229 (10th Cir. 2000)...............................................................5, 6

*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) .....................3, 4, 5, 6, 7, 9, 10

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) ......................................................3, 4, 5, 6, 7, 12

*Hall v. Beals*, 396 U.S. 45 (1969) ...........................................................................................4

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966)..............................................4

*Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018)...........................................................15

*Navajo Nation v. San Juan County*, 929 F.3d 1270 (10th Cir. 2019)............................................5

*Northeast Ohio Coalition for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) ........7, 8

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) ...............................................7

*Purcell v. Gonzalez*, 549 U.S. 1 (2006)...............................................................................4, 14

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) .................................................6

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012).....................................................20

*Utah Republican Party v. Cox*, 892 F.3d 1066 (10th Cir. 2018) ...............................................8

*Wesberry v. Sanders*, 376 U.S. 1 (1964) .............................................................................4

**Statutes and Codes**

52 U.S.C. § 20507(d)(1) .....................................................................................................15

Ariz. Rev. Stat. § 16-166(F)(1), (J) (2004) ............................................................................19

W.S. 22-1-102(a)(xxxix)(A) (2024) ......................................................................................11

W.S. 22-26-106 ..................................................................................................................17

W.S. 22-3-103(v) (2024)......................................................................................................11

W.S. 22-3-115 ....................................................................................................................15

**Other Authorities**

Bay Area News Grp., *Can California's Real ID Be Used as Proof of U.S. Citizenship?*,
    Mercury News (Jan. 29, 2025), https://perma.cc/LXJ8-8AF3................................................20

Beth Reinhard, *How Pam Bondi boosted Trump's election fraud claims in a key swing state*, Washington Post (Dec. 16, 2024), https://www.washingtonpost.com/politics/2024 /12/16/pam-bond-attorney-general-2020-pennsylvania/..........................................................9

Campaign Legal Center, *Documentary Proof of Citizenship Bills* (Feb. 28, 2025), https://campaignlegal.org/document/depth-explainer-documentary-proof-citizenship-dpoc-bills.............................................................................................................18

Chuck Gray, *Wyoming needs protections ensuring only U.S. citizens can vote*, Laramie Boomerang (Aug. 7, 2024), https://www.wyomingnews.com/laramieboomerang/opinion/guest_ column/gray-wyoming-needs-protections-ensuring-only-u-s-citizens-can-vote/article_ b6e3ff2e-5410-11ef-b8be-6321fe7798ec.html ......................................................................18

Garry Rayno, *Checklist Purge Removes Almost 250,000 N.H. Voters*, InDepthNH (Sep. 24, 2022), https://indepthnh.org/2022/09/24/checklist-purge-removes-almost-250000-n-h-voters/.......................................................................................................16

Kevin Morris & Cora Henry, *Millions of Americans Don't Have Documents Proving Their Citizenship Readily Available*, Brennan Ctr. For Just. (June 11, 2024), https://www.brennancenter.org/our-work/analysis-opinion/millions-americans -dont-have-documents-proving-their-citizenship-readily.   ................................................16

Leo Wolfson, *Gordon Issues Order To Stop Voting By Non-Citizens, Chuck Gray Says It's Not Enough*, Cowboy State Daily (Sept. 20, 2024), https://cowboystatedaily.com/2024/09/20/gordon-issues-order-to-stop-voting-by-non-citizens-chuck-gray-says-its-not-enough/........................................................................18

Mia Maldano, *After biennial cleanup, 144,000 individuals removed from Idaho voter rolls, Idaho Capital Sun* (Mar. 21, 2025), https://idahocapitalsun.com/briefs/after-biennial-cleanup-144000-individuals-removed-from-idaho-voter-rolls/. ............................16

National Immigration Law Center, *REAL ID Act: Frequently Asked Questions* (July 9, 2025), https://www.nilc.org/resources/real-id-act-frequently-asked-questions/. .......20

*Number of Voters and Voter Registration as a Share of the Voter Population*, KFF, https://perma.cc/8TYH-5CE4 (last visited July 9, 2025)......................................................17

REAL ID Act § 202(c)(2)(B)...................................................................................................20

*Registering to Vote in Wyoming: Acceptable Identification for Registering to Vote*, Wyoming Secretary of State (last accessed July 9, 2025), https://sos.wyo.gov/elections/state/registeringtovote.aspx ......................................................11

Sean Morales-Doyle, *Noncitizen Voting is Vanishingly Rare*, Brennan Ctr. for Just. (Apr. 12, 2025), https://www.brennancenter.org/our-work/analysis-opinion/ noncitizens-are-not-voting-federal-or-state-elections-heres-why.........................................18

*University of Wyoming Enrollment Summary Spring 2025*, https://www.uwyo.edu/oia/_files/enrollment/spring-2025-beg-of-semester.pdf....................12

*Voter Registration List Maintenance*, National Conference of State Legislatures, https://www.ncsl.org/elections-and-campaigns/voter-registration-list-maintenance (last updated June 19, 2025). ...............................................................................15

*Voter Registration Statistics*, Wyoming Secretary of State, https://sos.wyo.gov/Elections
/VRStats.aspx (last visited July 9, 2025). ..........................................................................15, 16

*Wyoming AARP Says Photo IDs to Vote Would Alienate Many Senior Voters*,
Cowboy State Daily (Jan. 2, 2025), https://cowboystatedaily.com/2025/01/02/
wyoming-aarp-says-photo-ids-to-vote-would-alienate-many-senior-voters ...........................13

*Wyoming Community Colleges at a Glance 2024-25*, https://www.wacct.org/wp-
content/uploads/WACCT-Community-Colleges-At-A-Glance-2024-25.pdf.........................12

## STATEMENT OF INTEREST

The League of Women Voters of Wyoming ("LWVWY" or "the League") is a nonpartisan, grassroots, nonprofit organization dedicated to encouraging informed and active participation in government, including through civic education, get out the vote efforts, voter registration promotion, and advocacy for voters' rights in Wyoming.

LWVWY is the Wyoming affiliate of the League of Women Voters ("LWV") which was founded in 1920 as an outgrowth of the struggle for voting rights for women. LWV has more than 500,000 members and supporters, and is organized in more than 750 communities in all 50 states and the District of Columbia. Fifty years before LWV's founding, Wyoming became the first state in the Union to unconditionally and permanently guarantee women the right to vote and hold office when the territory's legislature insisted that it would rather "stay out of the Union a hundred years rather than come in without the women."

Since LWVWY's establishment in 1957, the League has grown to include five local League chapters including Casper, Cheyenne, Laramie, Campbell County, Fremont County, and at-large members in Carbon, Big Horn, Park, Sheridan, and Teton Counties. LWVWY seeks to build on Wyoming's trailblazing legacy today by ensuring that all voters—including those from traditionally underrepresented or underserved communities, such as first-time voters, non-college youth, new citizens, communities of color, the elderly, and low-income Americans—have the opportunity and information they need to exercise their right to vote. LWVWY is participating as *amicus* to ensure all eligible Wyomingites can register to vote and cast a ballot.

## INTRODUCTION

Defying the U.S. Constitution's longstanding protection of the fundamental right to vote, the Wyoming legislature adopted HB 156 which, for the first time, requires every voter in

Wyoming to provide documentation ostensibly to prove their citizenship. The legislature did so despite failing to substantiate the widespread noncitizen voting "threat" they discussed or identifying a single case of noncitizen voting that would be addressed by HB 156. The overwhelming evidence and facts show that individuals who are not U.S. citizens do not, and have not, voted in appreciable numbers anywhere in the United States. As with documentary proof of citizenship ("DPOC") requirements in other states, this is a poorly made solution in search of a problem, one that this Court must carefully review to ensure its compliance with the constitutionally protected right to vote. Based on the current record, HB 156 fails this test, because it places significant burdens on and threatens to disenfranchise eligible Wyoming voters, especially those Wyomingites that face the highest burdens in exercising their suffrage rights, and is not tailored to provide any meaningful benefits to Wyoming's electoral system. HB 156, particularly in the context of Wyoming's other voting laws and practices, imposes these burdens while simultaneously failing to address those justifications the state claims to pursue. Accordingly, LWVWY urges this Court to grant Plaintiff's Motion for Preliminary Injunction and all other appropriate equitable remedies.

## ARGUMENT

I.    **The *Anderson-Burdick* framework requires careful balancing, not reflexive deference to purported state interests.**

The parties and amici agree that this Court should analyze HB 156 under the *Anderson-Burdick* framework. *See* ECF No. 16 at 15; ECF No. 65 at 12-13; ECF No. 82-1 at 5; ECF No. 63-1 at 10-11, ECF 105 at 13. Properly understood, that framework requires federal courts to consider state restrictions on the right to vote carefully, mindful of the burden imposed on that right, the state's purported justification for the restriction, and the basis of such a justification. Under binding Tenth Circuit and Supreme Court precedent, the test does not permit courts to

blithely accept states' explanations, particularly those untethered to the actual regulation, but requires a more searching examination. Secretary Gray's suggestion, echoed by the United States, that this Court may apply rational basis scrutiny, or something similar, to burdens on the right to vote does not properly reflect the legal test required in this case. Given that the fundamental right is at stake, even those burdens which are not severe receive meaningful scrutiny.

> a.  **The *Anderson-Burdick* framework requires courts to carefully examine whether a state voting regulation improperly impinges on the fundamental right to vote.**

The Supreme Court's *Anderson-Burdick* framework, which all parties agree applies, is well-known. Federal courts reviewing challenges to state election laws shall:

> weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). As the Tenth Circuit recognized in *Fish*, *Anderson-Burdick* is a balancing (or "sliding scale") test and, thus, eschews bright lines and requires courts to engage in "an analytical process that parallels [their] work in ordinary litigation." *Fish v. Schwab*, 957 F.3d 1105, 1122 (10th Cir. 2020); *id.* at 1124 ("We, and our sister circuits and commentators, have referred to this as a 'sliding scale' test.") (citations omitted). To reach this "hard judgment," courts must "identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008)

(plurality opinion of Stevens, J.)[1]; *accord ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008).

The *Anderson-Burdick* framework demands this level of analytical rigor because on one side of the scale sits the right to vote, which is "preservative of other basic civil and political rights." *Hall v. Beals*, 396 U.S. 45, 50 (1969) (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)); *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966) ("For it is enough to say that once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). As the Court stated in *Burdick*, "[i]t is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" 504 U.S. at 433 (quoting *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (recognizing "plaintiffs' strong interest in exercising the 'fundamental political right' to vote" (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."). As such, even burdens which appear "slight" on first blush are subject to scrutiny. *Fish*, 957 F.3d at 1124; *accord Crawford*, 553 U.S. at 191. Phrased another way, given that these cases implicate the fundamental right to vote, "[t]he Judiciary is obliged to train a skeptical eye on *any* qualification of that right." *Crawford*, 553 U.S at 210 (Souter, J., dissenting) (emphasis added).

---

[1] *See Santillanes*, 546 F.3d at 1321 ("Following *Crawford*, it appears that Justice Stevens's plurality opinion controls, a position advocated by the Plaintiffs in the present case because it is the narrowest majority position."); *id.* at 1321-25 (citing only Justice Stevens's opinion).

The Tenth Circuit has applied the *Anderson-Burdick* framework to various election restrictions. In *Fish*, the court affirmed a district court's permanent injunction against Kansas's documentary proof of citizenship requirement. 957 F.3d at 1111. The court held that, given the level of disenfranchisement resulting from Kansas's DPOC requirement and the lack of a "safety valve" (i.e. the ability to cast a provisional ballot and have it be counted by presenting an affidavit),[2] the law created a "significant" burden on the right to vote. *Id.* at 1127-29. The court balanced those burdens on the state's interests in "protecting the integrity of the electoral process, ensuring the accuracy of voter rolls, and preventing vote fraud." *Id.* at 1132. Ultimately, the court held that such interests largely overlap and, while "legitimate in the abstract," did not justify the restriction on the right to vote. *Id.* at 1133.

In *Navajo Nation v. San Juan County*, the Tenth Circuit considered a challenge to the county's school board districting plan, which included districts containing "substantially unequal populations." 929 F.3d 1270, 1282 (10th Cir. 2019).[3] Here too, the court rejected the purported justification—the county's "school-community philosophy," geography, and sparse population, finding that, *inter alia*, the county had failed to demonstrate the "the extent to which the unequal districts are a necessary result" of those factors. *Id.* at 1284-1285. The court of appeals has likewise applied the *Anderson-Burdick* framework to scrutinize, and ultimately invalidate, a Colorado law requiring unaffiliated candidates to be registered to vote. *Campbell v. Davidson*, 233 F.3d 1229, 1230-31 (10th Cir. 2000). Although the relevant statute only required that the

---

[2] The court specifically rejected the state's argument that the availability of a "byzantine" procedure by which a voter could meet with the Kansas Secretary of State or other officials, made the law less burdensome. *Fish*, 957 F.3d at 1130.

[3] In *Navajo Nation*, the parties disputed whether the *Anderson-Burdick* framework or strict scrutiny should apply. *Id.* at 1283. The court of appeals declined to resolve that dispute since it found that the plan failed under *Anderson-Burdick*'s sliding scale analysis. *Id.*

prospective candidate be a registered voter (and Mr. Campbell was a resident of Colorado), the court nonetheless found the law failed under *Anderson-Burdick* because it did "little to 'winnow out' chosen candidates" and therefore did not advance the state's regulatory interest in maintaining control over who could appear on the ballot. *Id.* at 1233. In other words, the court held that even a relatively slight burden cannot pass muster if it does not meaningfully serve an important state interest. *Cf. Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 195 (1999) ("The ease with which qualified voters may register to vote, however, does not lift the burden on speech at petition circulation time.").

These cases demonstrate the task courts face when considering constitutional challenges to state election laws. This includes, most importantly, an obligation to look beyond the state's proffered interest and examine both the bases of the interest and the extent to which the restriction on the right to vote furthers that interest. As explained in the controlling opinion in *Crawford*, "a State may not burden the right to vote merely by invoking abstract interests, be they legitimate, . . . or even compelling, but must make a particular, factual showing that threats to its interests outweigh the particular impediments it has imposed." *Crawford*, 553 U.S. at 209 (plurality op.). Justice Souter, in dissent, agreed: "whatever the claim, the Court has long made a careful, ground-level appraisal both of the practical burdens on the right to vote and of the State's reasons for imposing those precise burdens." *Id.* at 210 (Souter, J., dissenting). So while the *Anderson-Burdick* framework is flexible, *Fish*, 957 F.3d at 1124, and accounts for the state's interest in enacting "reasonable regulations of parties, elections, and ballots to reduce election and campaign-related disorder," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997), courts must nonetheless examine all such regulations carefully, mindful both of the burdens imposed and state's actual interest justifying any such burden.

        b.      **Secretary Gray and the United States improperly attempt to narrow the *Anderson-Burdick* test.**

The careful balancing and scrutiny required under *Anderson-Burdick* for state laws restricting the right to vote is nowhere to be found in Secretary Gray's opposition to the Motion for a Preliminary Injunction. Instead, the Secretary claims that, in the absence of a severe burden, this Court should apply something "similar or identical to rational-basis scrutiny." ECF No. 65 at 8. This proposition finds no purchase in the law. As the Tenth Circuit held in *Fish*, "*Anderson-Burdick* scrutiny is required even when the burden imposed by a voter-identification law has some relationship to voter qualifications and even when the burden imposed may appear slight." 957 F.3d at 1124. The court recognized that the standard is flexible and the level of scrutiny depends on the nature of the burden, and specifically rejected the notion that only severe burdens warrant a closer look. *Id.* at 1125. Instead, only those laws that *do not burden* the constitutional right to vote *at all* may avoid scrutiny altogether and are therefore subject to rational basis review. *See Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) (per curiam) ("[A]a rational basis standard applies to state regulations that do not burden the fundamental right to vote."). Moreover, as the Supreme Court held in *Crawford*, "even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications," which is why courts must "identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule." 553 U.S. at 189 (plurality op.). The Tenth Circuit has accordingly rejected the precise binary framework that the Secretary proposes. *Fish*, 957 F.3d at 1124; *see also Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016). The level of scrutiny, instead, should "wax and wane with the severity of the burden imposed on the right to vote in any given case." *Fish*, 957 F.3d at 1124

The Secretary does not seriously contend, nor can he, that HB 156 imposes no additional burden on the right to vote, arguing instead it amounts to a "minor inconvenience" and that the number of voters without the required documentation will be "vanishingly small." ECF No. 65 at 10, 13. This is plainly not the case, and the new requirements of HB 156 create a substantial threat of disenfranchisement that amounts to a severe burden, as detailed by Plaintiff and described *infra*. These burdens are exacerbated by various elements of Wyoming election law that make voting more difficult and increase the risk of disenfranchisement. *See infra* Section II.a-b. But even in circumstances in which a state law does impose a lesser burden, a searching inquiry is required, and courts examine both the stated justifications for the regulation as well as the regulation's relationship to the burdens imposed. This inquiry properly includes an investigation into the grounds of the state's justifications. And in a case like this, where the burden is more severe, the inquiry must be more involved. *Anderson*, 460 U.S. at 789 ("[T]he Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights."); *see also Utah Republican Party v. Cox*, 892 F.3d 1066, 1115 (10th Cir. 2018); *Ne. Ohio Coal. for Homeless*, 696 F.3d at 597. Here, Secretary Gray has made no showing of instances of voting by noncitizens, nor would HB 156 seriously address any such concerns. To the contrary, HB 156 is untethered in various ways to the illusive "problems" it purports to solve. *See infra* Section II(c).

The United States, in its weak defense of restrictive state DPOC requirements "to secure the voting process" in its Statement of Interests, ECF No. 82-1 at 2, also misrepresents the level of inquiry required under *Anderson-Burdick*, claiming that "[a]lmost every voting rule will impose *some* burden, but slight inconveniences, including the processes necessary to acquire

photo identification to register or vote, do not delegitimize the State's interest in preventing fraud or seriously hinder the ability to vote." *Id.* at 7. It cites *Brnovich* and *Crawford*, but neither case supports this proposition. *Brnovich*, of course, dealt with the scope of the Voting Rights Act, not a constitutional challenge to state voting rules, so its relevance is limited. And the actual language of the opinion only emphasizes that, even in that analysis, "the size of the burden imposed by a challenged voting rule is highly relevant." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 669 (2021). The same was true in *Crawford*, where the plurality repeatedly emphasized the importance of assessing the size of burden on the right to vote. 553 U.S. at 197-198 (plurality op.). The size of the burden and the extent a law actually furthers state interests are fact-specific inquiries that cannot be blithely cast aside by an assumption that *all* documentation requirements pass muster.

The United States skips that step entirely and baldly claims that requirements to present documentation to register or vote (or obtain and present identification) will always be minimal, such that the Court need not look too carefully at the state's justifications. It repeats this fundamental error later in its brief, when it makes the conclusory statement that "requiring documentary proof of citizenship to register to vote is a valid method for a State to achieve its interests in preventing fraud and safeguarding voter confidence in elections."[4] ECF No. 82-1 at

---

[4] The United States, in defending Wyoming's interest in "safeguarding voter confidence," quotes *Doe v. Reed* in stating that "alleged fraud, even if unproven, 'drives honest citizens out of the democratic process and breeds distrust of our government.'" ECF No. 82-1 at 7-8 (quoting *Doe v. Reed*, 561 U.S. 186, 197 (2010) (citation omitted)). However, the United States fails to acknowledge that Secretary Gray's unsubstantiated and repeated allegations of election fraud, in addition to the Attorney General's and President's unproven allegations of voter fraud undermine its stated interests. *See infra* note 17; Beth Reinhard, *How Pam Bondi boosted Trump's election fraud claims in a key swing state*, Washington Post (Dec. 16, 2024), https://www.washingtonpost.com/politics/2024/12/16/pam-bond-attorney-general-2020-pennsylvania/.

8. This assumes far too much. As the Secretary admits, *Anderson-Burdick* is a "highly fact specific inquiry[,]" ECF No. 65 at 9 (quoting *Libertarian Party v. Herrera*, 506 F.3d 1303, 1308 (10th Cir. 2007)). This requires examination on both sides of the ledger particularly where, as here, the record establishes a substantial or severe burden on the right to vote. The United States, however, would have this Court jump to the conclusion it wants first, and avoid the rigorous inquiry and "hard judgment" the Constitution demands. *Crawford*, 553 U.S. at 190 (plurality op.).

## II.    Secretary Gray's arguments fail to grapple with either the burdens imposed by HB 156 or its lack of tailoring.

The documentary proof of citizenship requirement imposed by HB 156 creates significant new burdens on Wyomingites' right to vote. Wyoming's students, low-income, older, and disabled residents will face the largest obstacles complying with the new law, but HB 156 will make voting in Wyoming more difficult across the board and compound the difficulties created by Wyoming's already punitive registration laws. The result is a burdensome new requirement that is not remotely tailored to any state interest—real or imagined—and that accordingly fails the *Anderson-Burdick* test.

### a.    HB 156 significantly burdens the right to vote.

HB 156 imposes new and significant burdens on the right to vote that require meaningful scrutiny. Secretary Gray attempts to cast the new requirement as a mere continuation of the prior regime of Wyoming election law. But by imposing a new documentary proof of citizenship requirement, HB 156 creates inconsistencies in the law and removes certain categories of IDs on which Wyoming voters rely to register and vote. As a result, many eligible Wyomingites will find it burdensome or even impossible to comply, even if they were able to meet the state's previous identification requirements. These burdens will not be distributed evenly, but will rather

fall disproportionately on historically disenfranchised groups like student voters, low income and elderly voters, and voters with disabilities. As an organization that engages and empowers eligible voters across Wyoming, LWVWY is intimately familiar with the obstacles those communities already face in accessing the ballot and how HB 156 will compound those difficulties.

Secretary Gray minimizes the impact of the DPOC requirement, claiming that the list of acceptable DPOC under HB 156 "closely aligns with the list of documents . . . required to show identification for registering to vote and voting" prior to HB 156. ECF No. 65 at 3. But the types of documents sufficient under prior law but insufficient under HB 156 are hardly "minor exceptions." *Cf.* ECF No. 65 at 5-6. Prior to HB 156, Wyomingites were required to present "acceptable identification" to register to vote. *See* W.S. 22-3-103(v) (2024); W.S. 22-1-102(a)(xxxix)(A) (2024). The list of "acceptable identification" for registration, however, includes documents which are not sufficient DPOC under HB 156, namely: "Photo Identification Card[s] issued by the University of Wyoming, a Wyoming Community College, or a Wyoming Public School"; "Identification Card[s] issued to a Dependent of a member of the United States Armed Forces"; "Voter's Registration Card[s] from another State or County"; and "Any other form of identification issued by an official agency of the United States or a State." *Compare Registering to Vote in Wyoming: Acceptable Identification for Registering to Vote*, Wyoming Secretary of State, https://sos.wyo.gov/elections/state/registeringtovote.aspx (last accessed July 9, 2025), *with* W.S. 22-1-102(a)(xxxix)(A) (2024).

Comparing these two lists, Secretary Gray concludes that "the number of people who would have the necessary documents required to vote under current law but not under HB 156 is difficult to imagine." ECF No. 65 at 13. This reflects a willful failure of imagination. Under HB

156, U.S. citizens who could formerly register in Wyoming with a student ID, state or federal employment ID, military ID, or ID cards issued to military dependents can no longer rely on those documents to register to vote. HB 156 therefore imposes a significant burden on the populations who would otherwise rely on those forms of ID, such as students and low-income, elderly, and disabled voters. The court must "specifically consider" these "limited number of persons on whom the burdens" imposed by HB 156 "will be somewhat heavier." *Fish*, 957 F.3d at 1127 (citation modified).

By eliminating the ability to register and vote using student IDs, for example, HB 156 imposes a new burden on Wyoming's students. This population is not "vanishingly small," ECF No. 65 at 13; it includes the state's approximately 35,000 University of Wyoming and Wyoming Community College students, as well as eligible voters still in high school.[5] And despite Secretary Gray's implications, it is hardly far-fetched that Wyoming students would *need* to rely on their ID in order to register. Students are more likely than the average population to be away from home, increasing the likelihood that they hold a non-REAL ID out-of-state driver's license or lack access to important documents like a birth certificate.

Students nationwide face challenges voting for similar reasons, such as navigating residency rules and requesting mail-in ballots. Recognizing these unique obstacles, LWVWY has specifically targeted young Wyomingites in its efforts to increase voter registrations about the state. To that end, it has won and spent two grants on a voter registration campaign that targeted younger voters through a social media campaign using micro-influencers located across

---

[5] *See University of Wyoming Enrollment Summary Spring 2025*, https://www.uwyo.edu/oia/_files/enrollment/spring-2025-beg-of-semester.pdf; *Wyoming Community Colleges at a Glance 2024-25*, https://www.wacct.org/wp-content/uploads/WACCT-Community-Colleges-At-A-Glance-2024-25.pdf.

Wyoming. HB 156 frustrates this work by adding to the burdens that Wyoming's student voters must overcome.

The same goes for low-income Wyomingites. LWVWY supports voter-registration events for eligible voters in affordable housing, who disproportionately include members of families on the lower income spectrum, immigrants, and single parent households. By requiring potentially expensive DPOC, HB 156 compounds the difficulties these individuals face in registering to vote. Nearly 6% of registered voters in Wyoming lack both a passport and a birth certificate, and these rates are even higher for low-income citizens and those without a high-school diploma. ECF No. 16-7 at 7. These Wyoming residents will face significant cost to obtain the requisite documents. "A Wyoming birth certificate costs at least $25 . . . [a] U.S. passport costs $165 for an initial application and $130 for renewal…[and] a replacement certificate of naturalization costs $555." *Id* at 8. The time costs of obtaining DPOC are equally significant: Individuals may have to navigate a complex bureaucracy including state, county, and municipal agencies, find notaries and "credible witnesses," make photocopies, and submit to weekslong wait times. *Id.* at 9-10.

These hurdles will also disproportionately affect older Wyoming residents and those with disabilities, who are less likely to drive or have state-issued IDs.[6] In particular, people who have disabilities, are homebound, or are living in nursing homes are likely to lack the documentation required to vote under HB 156. And while these voters could previously register and vote using

---

[6] *See Wyoming AARP Says Photo IDs to Vote Would Alienate Many Senior Voters*, Cowboy State Daily (Jan. 2, 2025), https://cowboystatedaily.com/2025/01/02/wyoming-aarp-says-photo-ids-to-vote-would-alienate-many-senior-voters.

"Any [] form of identification issued by an official agency of the United States or a State"[7] to confirm their identity, they will no longer be able to do so.

HB 156 will make voting in Wyoming more difficult across the board. Even before HB 156 and its new and confounding DPOC requirements, Wyoming had one of the most cumbersome registration processes in the country, as one of only eight states that does not allow online voter registration. ECF No. 16-31. The time it takes to obtain DPOC will frustrate one of the few voter-friendly aspects of Wyoming's registration process: same-day registration. As LWVWY knows well, most voters do not think about the documents they need to vote until right before (or on) Election Day. As a result, many voters who realize they lack the requisite documentation shortly before Election Day will not be able to vote at all, since obtaining DPOC can take weeks. It will also deter eligible voters from registering: LWVWY has found that voters are often reticent to share highly personal information (like a certificate of naturalization) and view additional requirements as a challenge to their legitimacy and truthfulness.

Finally, HB 156 will create voter confusion (rather than instill confidence in elections) by creating two overlapping but not identical lists of documents—one for identification and one for DPOC—that voters need for different reasons while registering and voting. Currently, the Secretary of State's webpage, "Registering to Vote in Wyoming," details "Acceptable Identification for Registering to Vote," listing each form of documentation that was previously sufficient to register and vote in Wyoming.[8] It then has a list of "Proof of United States

---

[7] *Registering to Vote in Wyoming: Acceptable Identification for Registering to Vote, Wyoming Secretary of State* (last accessed July 9, 2025), https:sos.wyo.gov/elections/state/registeringtovote.aspx.

[8] *Registering to Vote in Wyoming: Acceptable Identification for Registering to Vote, Wyoming Secretary of State* (last accessed July 9, 2025), https:sos.wyo.gov/elections/state/registeringtovote.aspx.

Citizenship for Registering to Vote" ("Proof of United States citizenship may be satisfied by any of the following") listing the forms of DPOC deemed acceptable by HB 156. As detailed above, these lists contain many of the same documents but with critical exceptions, like student IDs and "any [] form of identification issued by an official agency of the United States or a State," which are proof of identification but *not* DPOC. For voters trying to figure out which type of document is necessary when, this system is hardly clearcut. Confusion in the face of conflicting requirements could easily cause eligible voters to throw up their hands and avoid the polls altogether. *See Purcell v. Gonzalez*, 549 U.S. at 4-5 (noting that "voter confusion" can create "incentive to remain away from the polls"). In all, Wyoming residents will face significant burdens obtaining the requisite documentation to comply with HB 156, with those impacts felt most acutely in communities that already struggle to participate in the democratic process. And in a state where registration is already difficult, HB 156 adds formidable new obstacles.

> **b.    Wyoming's Aggressive Purge Program Compounds the Burden of DPOC on Wyomingites.**

Wyoming has exploited its exemption from the National Voter Registration Act ("NVRA") to create the most aggressive voter removal process in the nation, which compounds the burden imposed by HB 156 and its DPOC requirement. The NVRA generally restricts states from removing eligible voters on the basis of inactivity alone. 52 U.S.C. § 20507(d)(1); *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 775 (2018). Unbound from this requirement, Wyoming law requires county clerks to cancel the registration of any registrant who fails to vote in a single general election, including a midterm. W.S. 22-3-115. As a result, tens of thousands of Wyoming voters are purged from the voter rolls each election cycle and required to register anew to vote. Each of these voters will now be required to present DPOC to re-register.

Wyoming's process for removing "inactive" voters from the rolls is the quickest and most aggressive in the nation.[9] After the 2022 midterm elections, for example, county clerks purged over 86,000 voters from the state's voter rolls, representing approximately 28% of those registered as Wyoming voters.[10] This makes Wyoming an outlier, even among states exempt from the NVRA. For example, Idaho, which has biennial purges, and New Hampshire, which previously had decennial purges, and are also exempt, purged approximately 12% and 22%, respectively, of the voters on their rolls.[11] From 2017 to present, the number of Wyoming voters the state purged has ranged from approximately 21,000 after presidential elections to more than 86,000 after midterms.[12] While a small percentage of removals reflects voters who are deceased or otherwise disqualified, most of the fluctuation in removals accounts for voters who have failed to vote in just *one* general election.

With HB 156's introduction of DPOC for voter registration, every two years, approximately 7% to more than 25% of formerly registered Wyoming voters, purged from the rolls for missing a single election, could have to provide DPOC in order to re-register and vote.[13] Many of these voters, having previously registered on election day without needing DPOC, will not have the requisite documents on hand to vote. And those struggling to meet the associated

---

[9] *Voter Registration List Maintenance*, National Conference of State Legislatures, https://www.ncsl.org/elections-and-campaigns/voter-registration-list-maintenance (last updated June 19, 2025).

[10] *Voter Registration Statistics*, Wyoming Secretary of State, https://sos.wyo.gov/Elections/VRStats.aspx (last visited July 9, 2025).

[11] Mia Maldano, *After biennial cleanup, 144,000 individuals removed from Idaho voter rolls, Idaho Capital Sun* (Mar. 21, 2025), https://idahocapitalsun.com/briefs/after-biennial-cleanup-144000-individuals-removed-from-idaho-voter-rolls/; Garry Rayno, *Checklist Purge Removes Almost 250,000 N.H. Voters*, InDepthNH (Sep. 24, 2022), https://indepthnh.org/2022/09/24/checklist-purge-removes-almost-250000-n-h-voters/.

[12] *See Voter Registration Statistics*, *supra* note 10.

[13] *See id.*

burdens of providing DPOC will miss out on elections in which they seek to participate. Some that are unable to attain the requisite documents may never be able to re-register and vote in Wyoming.[14] Others may be dissuaded from registering in the first place by the prospect of not only having to produce and share sensitive documents to register, but also having to reproduce those documents to re-register every time they sit out a general election. Thus, HB 156 condemns many Wyoming citizens to an endless cycle of having to demonstrate proof of citizenship in their state of residence. The League's experience with Wyoming indicates an additional burden will dissuade or prevent many from registering to vote.

This endless cycle of disenfranchisement is only possible because Wyoming is not subject to the safeguards of the NVRA. Congress exempted Wyoming and five other states because they had either no voter-registration requirements or, like Wyoming, offered same-day registration, meaning they had eliminated a significant obstacle to voting. Wyoming has since taken advantage of its exempt status to erect new barriers to participation, like removing voters for inactivity and the DPOC requirement in HB 156. Since at least 2014, Wyoming has remained in the bottom half of U.S. states in terms of registered voters as a share of the voter population in Wyoming, falling as low as 49th in November of 2014 and remaining in the bottom 10 states as recently as November 2024.[15] Organizations like LWVWY, though deeply committed to empowering Wyomingites, are thwarted in any attempts to close this gap: Wyoming is one of

---

[14] Kevin Morris & Cora Henry, *Millions of Americans Don't Have Documents Proving Their Citizenship Readily Available*, Brennan Ctr. For Just. (June 11, 2024), https://www.brennancenter.org/our-work/analysis-opinion/millions-americans-dont-have-documents-proving-their-citizenship-readily.

[15] *Number of Voters and Voter Registration as a Share of the Voter Population*, KFF, https://perma.cc/8TYH-5CE4 (last visited July 9, 2025); *see also* ECF No. 16 at 13.

only two states that bans third-party voter registration. HB 156 further cements Wyoming's place as a restrictive outlier in American democracy.

**c.**      **HB 156 is not tailored to any of the state's purported interests.**

Instead of offering a valid explanation of the state interest purportedly justifying the burdens imposed by HB 156 on all Wyoming voters, or how these new burdens further those interests, Secretary Gray offers a  nonsensical hypothetical, imagining a person who is not a citizen of the United States, but is able (and intends) to vote in-person on election day at a polling location that does not have access to Wyoming's Statewide Voter Registration System (WyoReg),and thwarts Wyoming's registration requirements and verifications in order to unlawfully cast their vote in an election. ECF No. 65 at 2-3; W.S. 22-26-106.

This hypothetical fails. Voting by non-citizens is not a substantial issue,[16] (although Secretary Gray has nonetheless repeatedly raised it as a specter threatening Wyoming elections[17]). Unsurprisingly, Secretary Gray is unable to provide any actual proof of widespread

---

[16] Sean Morales-Doyle, *Noncitizen Voting is Vanishingly Rare*, Brennan Ctr. For Just. (Sep. 17, 2024), https://www.brennancenter.org/our-work/research-reports/noncitizen-voting-vanishingly-rare.; Campaign Legal Center, *Documentary Proof of Citizenship Bills* (Feb. 28, 2025), https://campaignlegal.org/document/depth-explainer-documentary-proof-citizenship-dpoc-bills.

[17] *See* Chuck Gray, *Wyoming needs protections ensuring only U.S. citizens can vote*, Laramie Boomerang (Aug. 7, 2024),
 https://www.wyomingnews.com/laramieboomerang/opinion/guest_column/gray-wyoming-needs-protections-ensuring-only-u-s-citizens-can-vote/article_b6e3ff2e-5410-11ef-b8be-6321fe7798ec.html ("Chief among the institutions being threatened by the endless waves of illegal immigration are our elections. Widespread reports have discussed voter registration forms being circulated to illegal aliens by federal agencies in the Biden administration. Without a verifiable process of proving citizenship at the time of registration, Wyoming is vulnerable to these attacks on our elections"); Leo Wolfson, *Gordon Issues Order To Stop Voting By Non-Citizens, Chuck Gray Says It's Not Enough*, Cowboy State Daily (Sept. 20, 2024), https://cowboystatedaily.com/2024/09/20/gordon-issues-order-to-stop-voting-by-non-citizens-chuck-gray-says-its-not-enough/ ("Gray has brought up multiple times the instance of an alleged illegal immigrant who was removed from the voter rolls in Campbell County as an example of

18

non-citizen voting in the state. Second, nothing about HB 156 would solve this far-fetched hypothetical problem. Under HB 156, a noncitizen could still comply and cast a ballot because driver's licenses are available to citizens and noncitizens alike and most do not have any indicator of citizenship. Moreover, the hypothetical Secretary Gray presents only demonstrates the ways HB 156 is a poor fix for an insubstantial problem. Although the Secretary wrongly asks this Court to apply rational basis, the tailoring of HB 156 could not pass muster under any meaningful review, for at least three independent reasons.

*First*, HB 156 is over-inclusive because it is not limited to individuals for whom the State lacks proof of citizenship. As Secretary Gray admits, WyoReg provides verification of citizenship for many residents. Yet, HB 156's restrictions apply not to in-person same day registrations, where WyoReg is not necessarily available, but to all registrations. HB 156 thereby places the heavy burden of DPOC on all registrants—not just those voters who register on election day—to address the baroque hypothetical the Secretary imagines. Moreover, it requires Wyomingites to provide DPOC to the State *each time* they miss an election. No doubt Wyoming's voter registration system has (or could have) the capacity to keep a record that a voter previously provided DPOC after they have been purged to eliminate this nonsensical burden. Thus, even if one assumes, without evidence, that the Secretary's concern is legitimate, HB 156's design does not pass constitutional muster. *See Burdick*, 504 U.S. at 434.

*Second*, HB 156 is also over-inclusive because, as the Secretary concedes, there are less burdensome and more appropriately tailored mechanisms to address his hypothetical issue. This includes expanding "real-time access" to WyoReg to all counties on election day or increasing

how the problem is relevant to Wyoming.") Notably, this is the same individual who was able to secure a valid Wyoming driver's license. ECF No. 16 at 2.

the rate of processing of some or all registration applications. ECF No. 65 at 3. But instead of imposing the burden on the government, HB 156 imposes the burden of verifying identification on all Wyoming voters. There are other ways the state could actually address Secretary Gray's hypothetical, including by accepting driver's license ID numbers that can be matched with state databases as is the practice in Arizona. Ariz. Rev. Stat. § 16-166(F)(1), (J) (2004). HB 156, however, tramples over more tailored approaches and burdens more voters than is conceivably necessary.

*Third*, HB 156 simultaneously manages to be underinclusive in addressing the hypothetical "vulnerability," similarly demonstrating how the burden is untethered to even the purported justification. As noted above, under HB 156, a non-citizen could still use their driver's license as proof of citizenship. Even when SF 33 becomes effective in 2026, and Wyoming begins labeling driver's licenses given to noncitizens, it will take years before all existing licenses expire and are replaced. Similarly, a selective service registration acknowledgment card or a valid out-of-state ID that is consistent with the REAL ID Act, which are also available to noncitizens, are accepted as DPOC under HB 156.[18] Given that HB 156 accepts numerous documents that assuredly do not prove citizenship, there is no rationale for excluding student identification or other governmental identification from the list of acceptable documents. An out-of-state REAL ID driver's license no more proves citizenship than a University of Wyoming student identification.[19] Secretary Gray offers no explanation of why some previously accepted

---

[18] National Immigration Law Center, *REAL ID Act: Frequently Asked Questions* (July 9, 2025), https://www.nilc.org/resources/real-id-act-frequently-asked-questions/.

[19] REAL ID Act § 202(c)(2)(B) (codified at 49 U.S.C. § 30301 (note)) (permitting issuance to citizens and lawful residents); *see also United States v. Alabama*, 691 F.3d 1269, 1299 (11th Cir. 2012) (noting REAL ID Act does not "require that states verify the citizenship" of a "driver's license or identification card" applicant); Bay Area News Grp., *Can California's Real ID Be*

identifications were singled out for elimination, and others were not: actual proof of citizenship was plainly not the criteria.

Finally, the only instance of noncitizen voting proponents of HB 156 referenced in committee involved the use of a fraudulent birth certificate to obtain a driver's license, which HB 156 does nothing to address. *See* ECF No. 16 at 2. HB 156's under-inclusivity highlights the senselessness of the burdens imposed by its DPOC scheme. States may not impose any verification system they like without regard for the right to vote. For example, DNA testing could hypothetically verify identity, but at an incredible cost and burden to citizens to address a nonexistent problem. Rather than being what Secretary Gray has dubbed the most restrictive, "ironclad" DPOC requirement in the nation, HB 156 is yet another unreasonable, needless, and poorly tailored DPOC bill that imposes a significant burden on citizens' most sacred fundamental right under the First and Fourteenth Amendments.

## CONCLUSION

For the foregoing reasons, *amicus curiae* the League of Women Voters of Wyoming respectfully requests that the Court grant Plaintiff's Motion for Preliminary Injunction.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

---

*Used as Proof of U.S. Citizenship?*, Mercury News (Jan. 29, 2025), https://perma.cc/LXJ8-8AF3(explaining REAL IDs are available to non-citizens and cannot be used as proof of citizenship).

RESPECTFULLY SUBMITTED this 11th day of July 2025.

Marci Crank Bramlet, WSB # 7 - 5164
**ROBINSON BRAMLET LLC**
400 E. 1st Street, Suite 202
Casper, WY 82601
Phone: (307) 733-7703
Fax: (307) 201-5546
marci@jrmcb.com

*/s/ Danielle Lang*

Danielle Lang*
Daniel S. Lenz*
Kate Hamilton*
Lucas Della Ventura*
**CAMPAIGN LEGAL CENTER**
1101 14th St. NW, Suite 400
Washington, DC, 20005
Phone: (202) 736-2200
Fax:      (202) 736-2222
dlang@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
ldellaventura@campaignlegalcenter.org

*Counsel of Record for Amicus Curiae*
*League of Women Voters of Wyoming*

*Application to appear *pro hac vice* forthcoming

22