Darold W. Killmer, No. 8-6643
Reid Allison*
Madison Lips*
**KILLMER LANE, LLP**
1543 Champa St., Suite 400
Denver, CO 80202
dkillmer@killmerlane.com
rallison@killmerlane.com
mlips@killmerlane.com
Tel: (303) 571-1000

Elisabeth C. Frost*
Katie Chamblee-Ryan*
Daniel Cohen*
Nicole Wittstein*
Julianna D. Astarita*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
efrost@elias.law
kchambleeryan@elias.law
dcohen@elias.law,
nwittstein@elias.law
jastarita@elias.law
Tel: (202) 968-4490

*Admitted pro hac vice*
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **EQUALITY STATE POLICY CENTER**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **CHUCK GRAY**, in his official capacity as | ) | Civil Action No. 25-cv-00117-SWS |
| Wyoming Secretary of State; *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF EQUALITY STATE POLICY CENTER'S RESPONSE IN OPPOSITION TO DEFENDANT SECRETARY OF STATE'S MOTION TO DISMISS

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

I.    Plaintiff has sufficiently alleged organizational standing. ................................... 5

    A.    Plaintiff has alleged a concrete and particularized injury. ....................... 6

    B.    Plaintiff's alleged injuries are imminent. ................................................ 12

II.   Plaintiff has sufficiently alleged associational standing. ................................... 15

    A.    Plaintiff has standing on behalf of its constituents, its member organizations, and those organizations' members and constituents. ............................................. 15

    B.    Plaintiff need not identify individual voters by name to plead associational standing. ............................................................................................... 19

    C.    The Secretary's remaining arguments are meritless. ............................. 21

CONCLUSION ................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Alpharetta,*
   770 F.2d 1575 (11th Cir. 1985) ........................................................................ 21

*Arcia v. Fla. Sec'y of State,*
   772 F.3d 1335 (11th Cir. 2014) ........................................................................ 10

*Brakebill v. Jaeger,*
   932 F.3d 671 (8th Cir. 2019) ........................................................................... 17

*Center for Bio. Diversity v. Swift Beef Co.,*
   No. 19-cv-01464-NYW, 2020 WL 2914868 (D. Colo. June 2, 2020) ................................. 22

*Citizens Project v. City of Colorado Springs,*
   No. 1:22-CV-01365-SKC-MDB, 2024 WL 3345229 (D. Colo. July 9, 2024).............. 10, 11

*Coll v. First Am. Title Ins. Co.,*
   642 F.3d 876 (10th Cir. 2011) ................................................................ 5, 13, 23

*Colo. Taxpayers Un., Inc. v. Romer,*
   963 F.2d 1394 (10th Cir. 1992) ........................................................................ 15

*Common Cause Ind. v. Lawson,*
   937 F.3d 944 (7th Cir. 2019) ...................................................................... 10, 11

*Common Cause of Colo. v. Buescher,*
   750 F. Supp. 2d 1259 (D. Colo. 2010)................................................................. 6

*Common Cause/Georgia v. Billups,*
   554 F.3d 1340 (11th Cir. 2019) ........................................................................ 16

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019)......................................................................................... 4

*Fair Elections Ohio v. Husted,*
   770 F.3d 456 (6th Cir. 2014) ...................................................................... 10, 11

*Fair Fight Action, Inc. v. Raffensperger,*
   413 F. Supp. 3d 1251 (N.D. Ga. 2019) .............................................................. 11

*Fish v. Kobach,*
   840 F.3d 710 (10th Cir. 2016) ........................................................................ 14

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) ............................................................. 16

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ......................................................... 11, 7

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024).................................................................... *passim*

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990)............................................................................. 21

*Ga. State Conf. of N.A.A.C.P. v. Kemp*,
    841 F. Supp. 2d 1320 (N.D. Ga. 2012)................................................ 11

*Greater Indianapolis Chapter of N.A.A.C.P. v. Ballard*,
    741 F. Supp. 2d 925 (S.D. Ind. 2010)................................................. 20

*Green Party of Tennessee v. Hargett*,
    194 F. Supp. 3d 691 (M.D. Tenn. 2016).............................................. 17

*Harper v. Va. State Bd. of Elections*,
    383 U.S. 663 (1966)............................................................................. 17

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)................................................................... 8, 9, 11

*Heideman v. South Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) ........................................................... 12

*Hunt v. Wash. State Apple Advertising Comm'n*,
    432 U.S. 333 (1977)............................................................................. 15

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    110 F.4th 295 (1st Cir. 2024)............................................................... 15

*In re Navy Chaplaincy*,
    697 F.3d 1171 (D.C. Cir. 2012) ........................................................... 22

*Inclusive Louisiana v. St. James Par.*,
    134 F.4th 297 (5th Cir. 2025) .............................................................. 20

*Initiative & Referendum Inst. v. Walker*,
    450 F.3d 1082 (10th Cir. 2006) ............................................................. 5

*La Union Del Pueblo Entero v. Abbott*,
    753 F. Supp. 3d 515 (W.D. Tex. 2024) .................................................................... 10

*League of United Latin Am. Citizens v. Exec. Off. of the Pres.*,
    Nos. 25-0946, 25-0952, 25-0955, 2025 WL 1187730 (D.D.C. Apr. 25, 2025) .......... *passim*

*League of Women Voters of Mo. v. Ashcroft*,
    336 F. Supp. 3d 998 (W.D. Mo. 2018) .................................................................... 12

*League of Women Voters of S.C. v. Andino*,
    497 F. Supp. 3d 59 (D.S.C. 2020)............................................................................ 6

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..................................................................................... 9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................................................. 4, 13

*March for Our Lives Idaho v. McGrane*,
    697 F. Supp. 3d 1029 (D. Idaho 2023) .................................................................... 21

*March for Our Lives Idaho v. McGrane*,
    749 F. Supp. 3d 1128 (D. Idaho 2024) ................................................................. 9, 10

*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) ................................................................................. 21

*Nat'l All. for the Mentally Ill, St. Johns Inc. v. Bd. of Cnty. Comm'rs of St. Johns Cnty.*,
    376 F.3d 1292 (11th Cir. 2004) ............................................................................. 21

*Nat'l Council of La Raza v. Cegavske*,
    800 F.3d 1032 (9th Cir. 2015) ............................................................................... 21

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
    116 F.4th 488 (5th Cir. 2024) ............................................................................... 19

*Ne. Ohio Coal. for the Homeless v. Brunner*,
    652 F. Supp. 2d 871 (S.D. Ohio 2009) .................................................................... 17

*New York State Club Association, Inc. v. City of New York*,
    487 U.S. 1 (1988)........................................................................................... 15, 19

*One Wisconsin Inst., Inc. v. Nichol*,
    186 F. Supp. 3d 958 (W.D. Wis. 2016) .................................................................... 16

*People First of Ala. v. Merrill*,
    467 F. Supp. 3d 1179 (N.D. Ala. 2020) ........................................................ 16

*People First of Ala. v. Merrill*,
    487 F. Supp. 3d 1237 (N.D. Ala. 2020) ........................................................ 17

*People for the Ethical Treatment of Animals, Inc. v. Perdue*,
    464 F. Supp. 3d 300 (D.D.C. 2020) ................................................................ 5

*Petrella v. Brownback*,
    697 F.3d 1285 (10th Cir. 2012) ...................................................................... 5

*Plant Based Foods Association v. Stitt*,
    739 F. Supp. 3d 966 (W.D. Okla. 2024) ...................................................... 10

*Ranchers-Cattlemen Action L. Fund v. U.S. Dep't of Agric.*,
    573 F. Supp. 3d 324 (D.D.C. 2021) .............................................................. 20

*Sierra Club v. Energy Future Holdings Corp.*,
    921 F. Supp. 2d 674 (W.D. Tex. 2013) ........................................................ 20

*Speech First, Inc. v. Shrum*,
    92 F.4th 947 (10th Cir. 2024) ................................................................ 19, 20

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) ............................................................................ 19, 20, 21

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ...................................................................................... 18

*Tyler v. Hennepin County*,
    598 U.S. 631 (2023) .................................................................................. 5, 13

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...................................................................................... 21

**Statutes**

Wyo. Stat. Ann. § 22-3-103(a) (eff. July 1, 2025) .......................................... 2

**Federal Rules**

Fed. R. Civ. P. 12 ................................................................................................ 4

## INTRODUCTION

Plaintiff has standing to challenge HB 156's DPOC requirements on two separate and independent grounds—based on (1) the injuries that it will suffer as an organization as a result of the law, and (2) the injuries that its members and constituents (and its member organizations' members and constituents) will suffer to their voting rights. These theories of standing are well-recognized and, repeatedly, federal courts have found allegations like Plaintiff's by similar organizations in similar cases more than adequate to satisfy Article III.

Nevertheless, Defendant Secretary of State Chuck Gray moves to dismiss on standing grounds. *See generally* Doc. 67 ("Mem."). His central argument is that the Supreme Court's decision in *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), foreclosed organizational standing on the basis that Plaintiff asserts here. But the Secretary misapprehends that decision and attempts to rewrite Plaintiff's actual allegations. And he ignores the raft of federal court decisions—including post-*Hippocratic Medicine*—that reject his arguments and find standing based on allegations nearly identical to those Plaintiff makes here. This includes a decision issued only months ago, where a federal court in the District of Columbia found that civic organizations like Plaintiff had standing to challenge a documentary proof of citizenship (DPOC) requirement in an Executive Order. *See League of United Latin Am. Citizens v. Exec. Off. of the Pres.*, Nos. 25-0946, 25-0952, 25-0955, 2025 WL 1187730, at *31 (D.D.C. Apr. 25, 2025) ("*LULAC*"). The Secretary's attack on Plaintiff's associational standing is similarly meritless. Once again, the Secretary misreads the cases he cites in his effort to defeat standing. But Plaintiff's standing is well grounded in precedent and amply supported by its detailed allegations.

The Court should deny the motion to dismiss.

## FACTUAL BACKGROUND

On May 9, 2025, Plaintiff Equality State Policy Center filed its complaint alleging that the new documentary proof of citizenship ("DPOC") requirement enacted by the Wyoming Legislature in HB 156 (2025) is unconstitutional. *See generally* Doc. 1 ("Compl."). Specifically, Plaintiff alleges that HB 156's DPOC requirements violate the First and Fourteenth Amendments to the U.S. Constitution because they impose unjustifiable burdens on the fundamental right to vote and are unconstitutionally vague. Plaintiff seeks an order from this Court declaring the DPOC requirement unconstitutional and enjoining its enforcement.[1]

Plaintiff is a nonprofit organization composed of social justice, conservation, and labor organizations in Wyoming, many with individual members who are qualified to vote in the state. *Id.* ¶ 18. Plaintiff's mission is to advance fair elections and transparent government, including by making the franchise accessible to all of Wyoming's eligible citizens. *Id.* ¶¶ 12, 18. To advance its mission, Plaintiff devotes substantial resources to helping qualified citizens register to vote and participate in the state's elections through a variety of programs, including voter outreach and mobilization, some of which is specifically geared toward increasing civic participation among Wyoming's historically marginalized communities. *Id.* ¶ 19.

HB 156's DPOC requirement "severely threatens" Plaintiff's efforts to increase voter registration and voter turnout in Wyoming, which are critical to Plaintiff's mission of "mak[ing]

---

[1] HB 156's DPOC requirement will prohibit anyone from registering to vote in Wyoming unless they first show one of the following "proofs" of citizenship: a valid Wyoming driver's license or identification card; a valid tribal identification card from a federally recognized Indian tribe; a valid state ID that is consistent with the REAL ID Act; a valid U.S. passport; a certificate of U.S. citizenship; a certificate of naturalization; a U.S. military draft record or a selective service registration acknowledgment card; a consular report of birth abroad issued by the U.S. Department of State; or "[a]n original or certified copy of a birth certificate in the United States bearing an official seal." Wyo. Stat. Ann. §§ 22-1-102(a)(lvi), 22-3-103(a) (eff. July 1, 2025). Compl. ¶ 29.

Wyoming's democracy accessible to all its citizens, including those who have been historically underrepresented." *Id.* ¶¶ 12, 20, 23 "[B]ecause HB 156 makes registration more onerous," Plaintiff must "redirect significant resources to increase its voter registration education efforts . . . simply to prevent the registration rate from severely backsliding." *Id.* ¶¶ 22–24. This will require both "fielding questions from its members and constituents" about compliance with the new DPOC requirements and "additional and new work and programs." *Id.* ¶¶ 22–23; *see also* Doc. 16-21 ¶ 13 ("DeSarro Decl."); Compl. ¶ 23 (explaining that communicating HB 156's new DPOC requirements to voters "will require consistent attention, a massive amount of work, new tactics, and significantly more funding," and Plaintiff's existing resources will be insufficient). As a result, other mission-critical work will suffer. *See, e.g.*, Compl. ¶ 22 (explaining that resulting resource diversion will mean Plaintiff will have to pause its ongoing Vote Wyoming Campaign); *see also* DeSarro Decl. ¶ 18.

HB 156's DPOC requirements will also directly impede Plaintiff's mission-critical work to increase voting among Wyoming's Hispanic communities, where eligible voters fear "that registering to vote might make their family members targets for retaliation." Compl. ¶¶ 20, 23, 25, 168–90; *see also* DeSarro Decl. ¶ 14. To combat HB 156's chilling effect on these voters, Plaintiff will have to divert extremely limited resources to educating the Hispanic community about how to comply with the law. Compl. ¶¶ 20, 23, 25, 168–90. The consequent drain on Plaintiff's resources will mean it must sacrifice other mission-central initiatives designed to empower Wyoming's diverse communities and promote civic participation, like its Chair Project, "which was created to increase representation for underrepresented groups," and its SHAPE Wyoming initiative, which "trains citizens on how to advocate on their values and issues with their elected officials." *Id.* ¶ 25.

HB 156's DPOC requirements also directly injure Plaintiff's member organizations and constituents, as well as its member organizations' individual members and constituents. The qualified voters who compose the memberships and constituencies that Plaintiff and its member organizations serve will be required to comply with the DPOC requirement—potentially repeatedly, because of Wyoming's aggressive approach to purging voters from the rolls after each general election in which they fail to vote (as Plaintiff has noted, after the 2022 general election, Wyoming purged approximately 28% from its rolls), and HB 156's mandate that prospective voters submit DPOC *again* every single time they re-register. *Id.* ¶¶ 48–55. In addition, many of Plaintiff's member organizations have members and constituents—"including laborers, women who are victims of domestic violence, and others"—who will be particularly burdened by HB 156's DPOC requirement and may be prevented from registering altogether. *Id.* ¶¶ 6, 21, 204; *see also* Doc. 16-14 ¶¶ 3–5 (describing injuries to Plaintiff member organization Wyoming Coalition Against Domestic Violence and Sexual Assault and its constituency).

On June 27, 2025, Secretary Gray filed his motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiff lacks standing to sue, either on its own behalf or on behalf of its members. Docs. 66, 67. Plaintiff now files this response.

## LEGAL STANDARD

To establish standing, a plaintiff must show (1) it has suffered or imminently will suffer an "injury that is concrete, particularized, and actual or imminent," (2) that is "fairly traceable" to the challenged action, and (3) is "likely to be redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and standing allegations, like all other factual allegations, must be accepted as true and

construed in the plaintiff's favor, *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 892 (10th Cir. 2011). The same is true of statements made in affidavits. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006); *see also People for the Ethical Treatment of Animals, Inc. v. Perdue*, 464 F. Supp. 3d 300, 307 (D.D.C. 2020) (explaining that, when considering a 12(b)(1) motion raising a facial attack on standing, "the court may consider the complaint standing alone or the complaint supplemented by the undisputed facts evidenced in the record," but "[i]n either case, the [c]ourt must treat the undisputed facts within or outside the pleadings as true" (quotations omitted)). Furthermore, a plaintiff "need not definitively prove [its] injury" at this stage. *Tyler v. Hennepin County*, 598 U.S. 631, 637 (2023) (citing *Lujan*, 504 U.S. at 561). It need only "plausibly plead[] on the face of [the] complaint" facts supporting standing. *Id.*; *see also Petrella v. Brownback*, 697 F.3d 1285, 1292 (10th Cir. 2012) (noting that, when standing is challenged at the motion-to-dismiss stage, the plaintiff's "burden in establishing standing is lightened considerably").

## ARGUMENT

The Secretary's arguments that Plaintiff lacks standing must be rejected. Plaintiff has standing on two independent grounds: organizational and associational harm. The Secretary's arguments to the contrary rest on a misapprehension of the law and selective reading of the allegations in the Complaint.

### I.   Plaintiff has sufficiently alleged organizational standing.

The requirements to establish organizational standing are the same as those for individual standing: the organization must show (1) injury-in-fact, (2) causation, and (3) redressability. *Hippocratic Med.*, 602 U.S. at 393–94. Here, Secretary Gray contends that Plaintiff fails to show an injury-in-fact. *See generally* Mem. His argument rests on a misapprehension of case law and a mischaracterization of Plaintiff's allegations.

### A. Plaintiff has alleged a concrete and particularized injury.

For more than forty years, the Supreme Court has recognized that an organization suffers a concrete and particularized injury when a law "directly affect[s] and interfere[s] with" the organization's "core" activities. *Hippocratic Med.*, 602 U.S. at 395 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Plaintiff has alleged precisely this kind of injury.

HB 156's DPOC requirement directly affects and interferes with Plaintiff's ability to help qualified citizens register and vote, efforts central to Plaintiff's mission of "mak[ing] Wyoming's democracy accessible to all its citizens, including those who have been historically underrepresented," Compl. ¶¶ 12, 20. Because the DPOC requirement "makes registration more onerous," *id.* ¶ 23, Plaintiff's "voter registration education and encouragement efforts" will require significantly more resources, *id.*, as will fulfilling its obligations to its member organizations, which rely on Plaintiff to help their constituencies successfully register and vote, *id.* ¶¶ 18, 21; *see also* DeSarro Decl. ¶¶ 16–20 (alleging additional ways the DPOC requirement hinders Plaintiff's core work and will require it to divert its resources away from other high-priority projects to mitigate the law's effects).

Federal courts routinely find that organizations like Plaintiff have standing based on these exact types of injuries. *See, e.g.*, *LULAC*, 2025 WL 1187730, at *31 (holding organizations had standing to challenge a DPOC requirement because it would "unquestionably make it more difficult for [the organizations] to accomplish their primary mission[s] of registering voters"); *League of Women Voters of S.C. v. Andino*, 497 F. Supp. 3d 59, 76 (D.S.C. 2020) (holding organization had standing to challenge election requirement that would impede its ability to provide services essential to its mission, including voter education); *Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1270–71 (D. Colo. 2010) (holding organization had standing where it "had to divert substantial resources . . . to counteract the actual and threatened effects" of

a voter purge law); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008) (holding plaintiffs had standing when their "ability to conduct specific projects," including voter registration drives and voter education projects, "will be frustrated" by the enforcement of the challenged election law).

Ignoring Plaintiff's actual allegations—which squarely establish standing under decades of precedent—Secretary Gray recasts them in an effort to put them at odds with the Supreme Court's opinion in *Hippocratic Medicine.* In the Secretary's telling, Plaintiff contends merely that HB 156's DPOC requirement "will require it to increase its educational efforts." Mem. at 5. He pairs this retelling with a misapprehension of *Hippocratic Medicine* itself, claiming that the case stands for the proposition that "increased educational efforts or advocacy efforts are not a concrete, particularized injury that establishes standing." *Id*. Thus, he argues, *Hippocratic Medicine* rejected "the same claimed basis for standing asserted by the Plaintiff—that is, a claimed injury comprising the diversion of resources to do extra work to inform members and the public about the government action they were challenging." *Id*.

Secretary Gray's version of *Hippocratic Medicine* both misunderstands the case and how it relates to Plaintiff's allegations. The plaintiffs in *Hippocratic Medicine* were doctors and medical associations who disliked that the FDA made it easier for *others* to take mifepristone, a drug that terminates pregnancies. *Hippocratic Med.*, 602 U.S. at 385. They argued they had standing to challenge the FDA's regulation of mifepristone "based on their incurring costs *to oppose FDA's actions.*" *Id.* at 394 (emphasis added). The Court rejected this theory, finding it insufficient to establish standing. *Id.* at 394. But in doing so, the Court expressly reaffirmed its decades-old decision in *Havens Realty Corp. v. Coleman*, in which it held that an organization does have standing to sue when a law or practice "directly affect[s] and interfere[s]" with the organization's

"core . . . activities," and it distinguished the *Hippocratic Medicine* plaintiffs' allegations from those of the plaintiff organization in *Havens*. *Hippocratic Med.*, 602 U.S. at 395.

Specifically, *Hippocratic Medicine* held that an organization "cannot spend its way into standing simply by expending money *to gather information and advocate against the defendant's action*." *Id.* (emphasis added). But where an organization can show that the defendant's conduct "perceptibly impair[s]" the organization's ability to carry out its "core . . . activities," Article III is satisfied. *Id.* Thus, in *Havens*, the Court held that the plaintiff organization, a non-profit with the mission of advancing equal opportunity in housing, made this showing where it alleged that the defendant's practices "frustrated the organization's counseling and referral services, with a consequent drain on resources," *Havens*, 455 U.S. at 369, including by requiring it "to devote significant resources to identify and counteract" the defendant's detrimental activities, *id*. at 379. The Court held: "If, as broadly alleged," defendant's challenged activities did "perceptibly impair[]" the plaintiff organization's "ability to provide counseling and referral services" then "there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id*.

The problem that the *Hippocratic Medicine* plaintiffs had was that they did not provide services or assistance to anyone—whether in the form of counseling, education, or even voter registration efforts—that the defendant's actions perceptibly impaired. Instead, the *Hippocratic Medicine* plaintiffs' injury was self-imposed as they spent to oppose the defendant's actions, not to ameliorate harm to the organization's core activities from those actions. *See Hippocratic Med.*, 602 U.S. at 395. In short, *Hippocratic Medicine* changed nothing about the theory of standing

Plaintiff actually asserts—not that it has diverted resources *in order to challenge* HB 156's DPOC requirement, but rather that the DPOC requirement "impede[s] [its] core work of encouraging voters to register and participate in their democracy." Compl. ¶ 23; *see also Hippocratic Med.*, 602 U.S. at 395; *Havens*, 455 U.S. at 379.

Since the Court decided *Hippocratic Medicine*, courts have repeatedly applied it to find that organizations like Plaintiff have standing to challenge election laws that impede their missions in a similar way as Plaintiff alleges here. This includes a decision issued by a federal district court just a few months ago in *LULAC v. Executive Office of the President*, where the court held that plaintiff organizations had standing on a nearly identical basis as Plaintiff asserts here: that "implementing a documentary-proof-of-citizenship requirement would 'unquestionably make it more difficult for [the organizations] to accomplish their primary mission[s] of registering voters," in part because it would require the organizations to "update educational information they provide to prospective voters, much of which they have translated into multiple languages," and "invest additional resources in training their staff and volunteers." 2025 WL 1187730, at *31 (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)); *accord* Compl. ¶ 22 (alleging Plaintiff will need to "redevelop[] its existing voter education materials" including "translating the materials into Spanish"). Similarly, in *March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128 (D. Idaho 2024), the court found that a student-led organization had standing to challenge a new voter identification law. *Id.* at 1138. In doing so, the court squarely addressed *Hippocratic Medicine*, but found it inapposite. *Id.* at 1138–39. The court explained that, unlike the *Hippocratic Medicine* plaintiffs, the plaintiff organization in *March for Our Lives* was not an "issue-advocacy organization seeking to challenge and advocate against" the voter ID law. *Id.* at 1138. Rather, it was "in the 'business' of educating and registering voters" and the challenged law

"increased its costs for its core activities of educating and registering voters," requiring it to "divert[] [its] time, talent, and resources." *Id.*; *accord* Compl. ¶ 23 (alleging Plaintiff will have to divert staff time and resources to additional voter registration and education activities, to the detriment of its other planned programs).[2]

The few cases the Secretary cites are inapposite. In *Plant Based Foods Association v. Stitt*, 739 F. Supp. 3d 966, 975–76 (W.D. Okla. 2024), the court found that the plaintiff organization could not establish standing based on the resources it had spent to *oppose the law* and educate "its members and the public about the negative ramifications of the law." *Id.* at 975–76. But Plaintiff does not aim to educate voters about why the DPOC requirement is objectionable; it aims to educate them about how to *comply* with it in order to facilitate Plaintiff's ultimate mission of enfranchising the eligible electorate. *Compare, e.g.*, Compl. ¶ 25 (alleging that Plaintiff "must dedicate its time to helping citizens navigate the DPOC law so that they can exercise their right to vote"), *with LULAC*, 2025 WL 1187730, at *31 (finding organizational plaintiffs had standing based in part on their need to education voters about a new DPOC requirement). Secretary Gray's reliance on *Citizens Project v. City of Colorado Springs*, No. 1:22-CV-01365-SKC-MDB, 2024 WL 3345229 (D. Colo. July 9, 2024), and *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th

---

[2] Other courts—both before and after *Hippocratic Medicine*—have reached the same conclusion with the same reasoning. *See, e.g.*, *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (explaining "a voting law can injure an organization enough to give it standing 'by compelling [it] to devote resources' to combatting the effects of [a] law that [harms] organization's mission (citations omitted)); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014) (holding organizations engaged in voter registration as part of core mission had standing to challenge program designed to remove non-citizens from the rolls because they diverted resources to addressing problematic misidentification of noncitizens that impeded core mission of getting out the vote); *La Union Del Pueblo Entero v. Abbott*, 753 F. Supp. 4d 515, 562 (W.D. Tex. 2024) (distinguishing *Hippocratic Medicine* and finding a plaintiff organization had standing because its injury was "a perceptible impairment of one of Plaintiff's core services—voter assistance— resulting from violations of a federal law").

Cir. 2014), is also misplaced. In *Citizens Project*, the plaintiff organizations challenged a law that had been in place since before those organizations existed. 2024 WL 3345229, at *5. The court found that the organizations did not have standing because they could not show that they altered their practices *in response to* the law. *Id.* The same was true in *Fair Elections Ohio*. 770 F.3d at 459.

Finally, the Secretary's contention that an organization only has standing when it diverts resources to entirely *new* work outside of its core mission is contrary to *Havens* and has been repeatedly rejected by federal courts. *Cf. Havens*, 455 U.S. at 379 (concluding that organization had standing based only on its allegations that defendants' actions "perceptibly impaired" its core activities); *see also, e.g.*, *Lawson*, 937 F.3d at 951, 953–55 (rejecting state's argument that engaging in more work within an organization's mission cannot constitute an injury); *Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1165–66 (holding organization had injury-in-fact when it "anticipate[d] that it [would] expend many more hours than it otherwise would have conducting follow-up work with registration applicants"); *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1267 (N.D. Ga. 2019) ("Even though Plaintiffs all have promoting voting and voter education as part of their missions, they each allege that they have had to, or will have to, redistribute resources from existing programs to ones specifically designed to address Defendants' challenged practices."); *Ga. State Conf. of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320, 1336 (N.D. Ga. 2012) (holding expenditure of additional resources on efforts to assist individuals with voter registration constituted injury in fact).

In sum, Plaintiff has more than satisfactorily alleged an injury-in-fact at this stage based on harms to itself as an organization. The Secretary's arguments to the contrary should be rejected.

**B.**     **Plaintiff's alleged injuries are imminent.**

The Secretary's argument that Plaintiff has failed to allege an imminent injury, Mem. at 8–10, is also not well founded. As explained, Plaintiff has plausibly alleged that HB 156 will frustrate its ability to do its core work to increase voter registration and turnout by making registration more onerous. To attempt to mitigate these injurious effects, Plaintiff will have to divert limited resources away from other critical efforts. Indeed, Plaintiff alleged that it has had to cancel or postpone other initiatives, including its SHAPE Wyoming and RUN Wyoming projects, for precisely this reason. Compl. ¶ 25; DeSarro Decl. ¶¶ 14, 16–17. Moreover, Plaintiff alleged that, even at the time of filing, it was *already* handling an influx of inquiries, especially from Hispanic Wyomingites, about how they can comply with the new DPOC requirements. Compl. ¶ 22, DeSarro Decl. ¶ 14.

These injuries were "certainly impending" at the time the complaint was filed, and are now happening, with HB 156 having gone into effect on July 1, 2025. *See LULAC*, 2025 WL 1187730, at *28 (finding, in plaintiffs' challenge to an Executive Order demanding that a federal agency implement a DPOC requirement, plaintiff's injuries were "sufficiently imminent" to support standing). As of that date, any prospective voter who seeks to register without an acceptable form of DPOC will have their registration rejected. Courts "routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases). And a plaintiff that has shown irreparable harm has also necessarily shown that the injury it faces is imminent. *Cf. Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (recognizing that to show irreparable harm, the party seeking an injunction must show that the anticipated injury is "of such *imminence* that there is a clear and present need for equitable relief").

Secretary Gray's contentions that Plaintiff's allegations are "self-serving," and that Plaintiff's statements that it "will need" to ramp up its voter education efforts but "likely" lacks the resources to do so demonstrate that its injuries are "speculative and subjective," Mem. at 8–9, ignore that at the pleading stage, the Court must accept the Plaintiff's factual allegations as true and make all inferences in the Plaintiff's favor, including when assessing standing. *Coll*, 642 F.3d at 892. Nor is Plaintiff required to definitively *prove* its injury at this stage. *Tyler*, 598 U.S. at 637 (citing *Lujan*, 504 U.S. at 561). Under all of the precedent already discussed, Plaintiff's allegations are more than enough to satisfy Article III at this stage.

As for the Secretary's assertion that voters may not rely on Plaintiff's services and may instead rely on the State for information about the DPOC requirement, Mem. at 9, it cannot defeat Plaintiff's standing for at least two reasons. First, it asks the Court to replace Plaintiff's well-pleaded factual allegations with the Secretary's own asserted (and unsubstantiated) facts. At the motion to dismiss stage, this is plainly improper. *Coll*, 642 F.3d at 892. Moreover, Plaintiff has alleged that it is *already* receiving inquiries from voters confused and concerned about how to comply with HB 156's DPOC requirements. Compl. ¶ 20 (explaining that Plaintiff's staff have already been "inundated with questions" about the requirements and impact of HB 156, and that "the Hispanic community, in particular, has already begun to rely on [Plaintiff] to explain the new requirements and help them find ways to meet them"); *see also* Compl. ¶ 22 (explaining that Plaintiff "must divert significant time . . . to fielding questions from its members and constituents about the new law's requirements"). These voters plainly are not obtaining the information they require about how to comply from the State, and Plaintiff has had to respond by diverting resources to meet these needs of its constituents in order to further its mission.

Moreover, the Secretary's contention ignores that all Plaintiff need show is a "perceptibl[e] impair[ment] to its core activities. *Hippocratic Med.*, 602 U.S. at 395. Thus, the fact that some voters may obtain information from the State about how to comply does not mean that Plaintiff need not divert resources to further its mission of enfranchising all Wyomingites. Indeed, as alleged, many of Plaintiff's efforts focus specifically on helping to enfranchise voters who have not traditionally been well-served by the State in this regard. Compl. ¶¶ 19, 20, 179. Thus, in addition to being inappropriate at this stage in the proceedings, the Secretary's allegations once again ignore what Plaintiff has actually alleged.

Finally, the Secretary's contention that Plaintiff's harms are not "imminent" because HB 156's DPOC requirement "would first apply statewide in the 2026 primary election," Mem. at 9, is simply not true. The law took effect on July 1, 2025. The evidence that Secretary Gray himself provided to this Court shows that the clerks continue to register voters every week, even well before any statewide election. Doc. 65-5 ¶ 20. Secretary Gray has made no assertion that the clerks will not enforce the DPOC requirement between the law's effective date and the primary. And, as the Tenth Circuit recognized in *Fish v. Kobach*, would-be voters whose registrations are denied may be chilled from attempting to register again. *Fish v. Kobach ("Fish I")*, 840 F.3d 710, 752–53 (10th Cir. 2016). Here, like in *Fish I*, the risk of cancelled and rejected voter registration applications, along with the DPOC requirement's "chilling effect," which serves to "discourage[e] otherwise qualified citizens" from registering to vote, constitutes irreparable harm, which is by its very nature, imminent. *Id*.

Thus, the Secretary's arguments that Plaintiff has failed to allege an imminent injury in fact must also be rejected.

II.    **Plaintiff has sufficiently alleged associational standing.**

Plaintiff has also adequately pled associational standing, which provides a separate, independent basis for this Court's subject matter jurisdiction. An organization has associational standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit." *Colo. Taxpayers Un., Inc. v. Romer*, 963 F.2d 1394, 1397–98 (10th Cir. 1992).

A.    **Plaintiff has standing on behalf of its constituents, its member organizations, and those organizations' members and constituents.**

Plaintiff's associational standing derives from the individual, qualified voters who are members and constituents of both it and its member organizations. *See New York State Club Association, Inc. v. City of New York*, 487 U.S. 1, 8–9 (1988) (holding that a non-profit corporation, which consisted of "a consortium of 125 private clubs and associations in the State of New York," had associational standing to sue on behalf of its member organizations, whose standing was based on an imminent threat to their individual members (quotations omitted)). An organization can assert associational standing on behalf of both formal, dues-paying members or constituents whose interests the organization represents. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 344–45 (1977) (explaining members need not be formal to confer standing where the organization "provides the means by which [the members] express their collective views and protect their collective interests"); *see also In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 312 (1st Cir. 2024) ("What undergirds the analysis is whether the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy.").

Here, any individual members or constituents of Plaintiff or its member organizations who are qualified voters in Wyoming would have standing to challenge the DPOC requirement. As alleged in the Complaint, Plaintiff Equality State Policy Center is composed of "social justice, conservation, and labor organizations in Wyoming" with "*individual members who are qualified to vote in Wyoming*." Compl. ¶ 18 (emphasis added); *see also id.* ¶ 21 (alleging that individual members of Plaintiff's member organizations are "qualified and eligible to vote in Wyoming" but will be burdened by the DPOC requirement). Because the DPOC requirement will burden each of these individual members' right to vote, each of them has standing to challenge it in court. *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1198 (N.D. Ala. 2020) ("[A] voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote." (citing *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2019)). This is true regardless of whether the individual already has acceptable DPOC under the law.

As the Tenth Circuit has held, the burden of producing the required DPOC to register to vote is, by itself, sufficient to confer standing. *See Fish v. Schwab ("Fish II")*, 957 F.3d 1105, 1120 (10th Cir. 2020) (holding that "the requirement that [an individual] provide DPOC is sufficient to establish standing" to challenge the requirement). This is consistent with a long line of cases finding that a voter has standing to challenge an election law requirement to which she is subject, even if she is ultimately able to comply with the requirement. *See, e.g.*, *Billups*, 554 F.3d at 1351–52 (finding plaintiffs would have standing to challenge a voter ID law "even if [they] possessed an acceptable form of photo identification" because "requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing"); *One Wisconsin Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 965–66 (W.D. Wis. 2016) (finding individual plaintiffs had standing to challenge voter ID law even though

they had the required ID and were already registered to vote); *Green Party of Tennessee v. Hargett*, 194 F. Supp. 3d 691, 697 (M.D. Tenn. 2016) (finding plaintiff had standing to challenge voter ID law where she alleged she is injured "every time she votes because she must either produce a valid form of identification, sign an affidavit, or cast a provisional or absentee ballot"); *Brakebill v. Jaeger*, 932 F.3d 671, 676–77 (8th Cir. 2019) (finding individual plaintiffs had standing to challenge a requirement that a voter provide either an identification or supplemental documentation showing a residential street address, even though all of the plaintiffs had a residential street address); *People First of Ala. v. Merrill*, 487 F. Supp. 3d 1237 (N.D. Ala. 2020) (finding plaintiffs had standing to challenge absentee ballot requirements and ban on curbside voting even though they had not yet been injured since "a voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote" (citing *Billups*, 554 U.S. at 1351–52)); *Ne. Ohio Coal. for the Homeless v. Brunner*, 652 F. Supp. 2d 871, 880 (S.D. Ohio 2009), *modified on reconsideration*, No. C2-06-896, 2009 WL 10663619 (S.D. Ohio July 30, 2009) (agreeing that any voter has standing where "every voter [is] subjected to the challenged barrier, i.e., the requirement that they produce photo identification"); *cf. Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966) (holding that a poll tax violates a voter's rights regardless of whether he can afford to pay it).

Notably, Wyoming's DPOC requirement applies *each time* a person registers, even if the person has satisfied the DPOC requirement before. Compl. ¶ 99 (alleging that HB 156 "requires a voter to provide DPOC every time that they register or re-register"). And because of Wyoming's aggressive voter purge law, voters regularly have to re-register when they are struck from the rolls. *See id.* ¶ 48 (alleging that "[e]ven if a person is able to successfully register in Wyoming, it can be difficult to *stay* registered" because "Wyoming law requires county clerks to regularly purge large

numbers of qualified voters from the voter rolls, requiring thousands of residents who have successfully navigated the registration process once (or more) to do so all over again in order to vote in future elections"); *id.* ¶ 52 (alleging that, following the 2022 general election, Wyoming purged approximately 28% of its voters); *see generally id.* ¶¶ 48–55 (describing how Wyoming's voter purge law intensifies the burden the DPOC requirement imposes). Thus, there is a "substantial risk" that even registered voters who currently have DPOC will need to provide it again to exercise their right to the franchise. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (holding a plaintiff has standing for injunctive relief where there is a "substantial risk" that a harm will occur).

Plaintiff has also alleged that its member organizations "have their own members—including laborers, women who are survivors of domestic violence, and others"—who face particularly weighty burdens under the law. Compl. ¶ 21. And although these members "are qualified and eligible to vote in Wyoming, many do not have or cannot readily access the documents to satisfy HB 156's DPOC requirements." *Id.*; *see also id.* ¶¶ 204–205 (alleging that "women who have fled domestic abuse" and "laborers whose work keeps them on the road for long periods of time" will be particularly burdened by the DPOC requirement). Although voters need not suffer such significant injuries to their rights to be able to sue, these allegations further underscore that Plaintiff has associational standing. *See LULAC*, 2025 WL 1187730, at *32 (concluding that the burden of complying with a DPOC requirement "directly harm[s] the concrete interests of [an organization's] individual members in registering to vote and having their votes

counted in upcoming federal elections"); *see also New York State Club Ass'n, Inc.*, 487 U.S. 1, 8–9 (1988).[3]

### B. Plaintiff need not identify individual voters by name to plead associational standing.

Relying heavily on *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the Secretary nevertheless argues that Plaintiff's allegations are insufficient because they do not *name* particular members or constituents who will be harmed by the DPOC requirement. Mem. at 10. This argument is meritless. At the pleading stage, it is sufficient that the plaintiff plausibly allege that such members exist, and Plaintiff has done so. *See Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 497 n.5 (5th Cir. 2024).

The Court in *Summers* considered "a hitherto unheard of test for organizational standing": whether "there is a statistical probability that some of [the plaintiff organization's] members are threatened with concrete injury." 555 U.S. at 497. The Court rejected this "novel approach" as inconsistent with "[its] prior cases, which . . . required plaintiff-organizations to make specific allegations establishing that at least one *identified* member had suffered or would suffer harm." *Id.* at 498 (emphasis added). In short, as the Tenth Circuit recently explained, "[t]he Court [in *Summers*] was explaining that there needs to be a particular person who is injured, not just a statistical probability that some member would suffer an injury." *Speech First, Inc. v. Shrum*, 92 F.4th 947, 952 (10th Cir. 2024). In other words, by its own terms, *Summers* did not enshrine any new requirement for associational standing; it *rejected* a departure from precedent. *See id.* (noting

---

[3] For all of these reasons, the Secretary's contention that Plaintiff has failed to explain "how [its] specific members will be 'burdened,'" Mem. at 11, is also without merit. In addition, Plaintiff alleged at length all of the ways in which its members and constituents are likely to face significant and even severe burdens in its complaint. Compl. ¶¶ 121–167; 176–182; 192–196; 198–202; 204–209. These detailed allegations are not necessary to establish standing, as the cases above demonstrate, but the Secretary's arguments simply ignore them.

that the *Summers* Court "emphatically rejected" the statistical probability approach to standing "by pejoratively calling it 'novel' and 'hitherto unheard of'"). Moreover, *Summers* was decided at summary judgment, not the pleading stage. 555 U.S. at 492. There was no pre-*Summers* requirement that an organizational plaintiff name an individual member in order to assert organizational standing, and there is no such requirement after *Summers*, either.

Thus, federal courts have repeatedly held post-*Summers* that a plaintiff organization need not name an individual member at the pleading stage to assert associational standing. *See, e.g.*, *Inclusive Louisiana v. St. James Par.*, 134 F.4th 297, 309 n.9 (5th Cir. 2025) ("An organization is not required to specifically name its members to allege that those members have standing to sue"); *Ranchers-Cattlemen Action L. Fund v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 334 (D.D.C. 2021) (finding that an organizational plaintiff's burden at the pleading stage is satisfied by "alleg[ing] facts supporting a plausible inference that an unnamed (but identifiable) member has or will suffer a cognizable harm"); *Sierra Club v. Energy Future Holdings Corp.*, 921 F. Supp. 2d 674, 680 (W.D. Tex. 2013) (rejecting an argument that "the Court lack[ed] subject matter jurisdiction because the Plaintiff fails to identify a single member in its pleadings" because "the Plaintiff is not required to 'name names' in its Complaint"); *Greater Indianapolis Chapter of N.A.A.C.P. v. Ballard*, 741 F. Supp. 2d 925, 932 (S.D. Ind. 2010) ("To 'include at least one member' does not mean that the member who could have brought suit on her own must be . . . named in the complaint."); *see also Speech First, Inc.*, 92 F.4th at 952 (rejecting argument that *Summers* bars associational standing based on pseudonymous members).

This approach is especially appropriate in cases like this one, where Plaintiff is challenging requirements imposed on *all* prospective voters. These circumstances contrast sharply with those in *Summers*, where an organization sought to challenge a proposed action by the National Forest

Service, but could not show that any of its members had any plans to visit the affected areas. 555 U.S. at 494–95. But here, *all qualified voters* in Wyoming are subject to the challenged law. Compl. ¶ 2. Where, as here, "it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a challenged action" and the "defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury," there is "no purpose to be served by requiring an organization to identify [an injured member] by name." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *see also Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025) (finding organization did not need to identify members to establish its standing to challenge citizenship checks that would "apply to any registered voter in Arizona"); *March for Our Lives Idaho v. McGrane*, 697 F. Supp. 3d 1029, 1042 (D. Idaho 2023) (denying motion to dismiss for lack of standing where the plaintiff organization challenged a law that would "require all . . . eligible voters to pay for an identification card if they wish to register to vote" and explaining that, in these circumstances, a plaintiff need not identify a specific member who would be injured).

### C.    The Secretary's remaining arguments are meritless.

The Secretary offers no other plausible argument to defeat Plaintiff's well-pled grounds for associational standing. The Secretary intermittently complains that Plaintiff's allegations are insufficient to confer standing because they are too vague or speculative to establish that the DPOC requirement will actually cause harm. *See, e.g.*, Mem. at 12–14.[4] But the imposition of the DPOC

---

[4] To support this argument, the Secretary cites a series of cases that stand for the uncontroversial point that overly vague allegations cannot confer standing. These cases have no relevance here; all involved paper-thin bases for standing with no resemblance to Plaintiff's robust allegations (moreover, several are about the summary judgment phase, rather than the pleading phase). *See Warth v. Seldin*, 422 U.S. 490, 516–17 (1975) (finding an organizational plaintiff lacked standing where the complaint included *no* allegations that any of its members were impacted in any respect by the challenged zoning ordinance); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990)

requirement alone is sufficient harm for standing purposes. *See supra* at 16–18. Regardless, even for the more serious harms at stake—like exclusion from the franchise—there is nothing speculative about the prediction that Wyoming's DPOC law, which the Secretary boasts is the strictest yet, will have the same exclusionary effects that similar laws have had across the county. *See* Compl. ¶¶ 89–90, 95–120 (allegations describing these effects); *In re Navy Chaplaincy*, 697 F.3d 1171, 1176–77 (D.C. Cir. 2012) ("The prospect of future injury becomes significantly less speculative where, as here, plaintiffs have identified concrete and consistently-implemented policies claimed to produce such injury.").[5]

Secretary Gray also explains—at great length—why declarations Plaintiff submitted in support of its preliminary injunction motion are not "relevant" to the standing inquiry. Mem. at 11–12; *see also* Doc. 16 at 5–6, 8–9, 15–16. This is wrong, but it is also beside the point. Although on a motion to dismiss for lack of standing, courts can and often do properly consider any affidavits submitted by plaintiffs in the record that relate to standing, *see, e.g.*, *Center for Bio. Diversity v. Swift Beef Co.*, No. 19-cv-01464-NYW, 2020 WL 2914868, at *8 (D. Colo. June 2, 2020), this does not mean that a plaintiff is obliged to prove its standing allegations with evidence at the

---

(affirming district court's conclusion at summary judgment that plaintiff had failed to establish standing where the none of the plaintiffs had actually been impacted by the challenged provisions); *Anderson v. City of Alpharetta*, 770 F.2d 1575, 1582–83 (11th Cir. 1985) (per curiam) (finding, at summary judgment, that plaintiff organization had not shown standing because it had provided "*no* factual support" to substantiate its alleged injuries (emphasis added)); *Nat'l All. for the Mentally Ill, St. Johns Inc. v. Bd. of Cnty. Comm'rs of St. Johns Cnty.*, 376 F.3d 1292, 1296 (11th Cir. 2004) (finding plaintiffs lacked standing to challenge decision not to fund a residential treatment facility because they were not qualified to live there).

[5] Plaintiff has also alleged that the comparative strictures of Wyoming's DPOC requirement and specific features of its elections system are likely to worsen those problems, Compl. ¶¶ 121–26; that the process of obtaining the documents accepted as DPOC is especially burdensome in Wyoming, *id.* ¶¶ 127–64; and that, because of the DPOC requirement, certain groups of voters are particularly likely to be excluded from the franchise, *id.* ¶¶ 168–209. And Plaintiff has explained in detail both how and why the DPOC requirement will hinder its core activities. *Id.* ¶¶ 20–25.

pleading stage, where a plaintiff's allegations must be taken as true, *see, e.g.*, *Coll*, 642 F.3d at 892. In other words, at the pleading stage, this analysis—to which the Secretary devotes more than half of his argument on associational standing—is irrelevant.[6]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion to dismiss.

Dated: July 11, 2025

Respectfully submitted,

Darold W. Killmer, No. 8-6643
Reid Allison*
Maddie Lipps*
**KILLMER LANE, LLP**
1543 Champa St., Suite 400
Denver, CO 80202
dkillmer@killmerlane.com
(303) 571-1000

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost*
Katie Chamblee-Ryan*
Daniel Cohen*
Nicole Wittstein*
Julianna D. Astarita*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
efrost@elias.law
kchambleeryan@elias.law
dcohen@elias.law
nwittstein@elias.law
jastarita@elias.law

(202) 968-4490

*Admitted Pro Hac Vice*

*Attorneys for Plaintiff*
*Equality State Policy Center*

---

[6] The Secretary's assessment of Plaintiff's declarations is also incorrect. Although submitted to support Plaintiff's preliminary injunction motion, the declarations also substantiate Plaintiff's standing allegations. *See, e.g.*, DeSarro Decl. ¶¶ 4, 7–22 (detailing how the DPOC requirement frustrates Plaintiff's core work in service of its mission); *id.* ¶ 11 (alleging that qualified voters who are individual members and constituents of Plaintiff's member organizations will be burdened and excluded because of the DPOC requirement). The Secretary's chief quarrel with Plaintiff's declarations is that they do not identify specific individuals who would be harmed by the DPOC requirement. Mem. at 11–14. But as discussed above, this argument lacks merit. *See supra* at 19–21.

## CERTIFICATE OF COMPLIANCE

This brief complies with Wyoming Local Civil Rule 7.1(b)(2)(B) because it contains fewer than 25 pages, not including the cover page, table of contents, table of authorities, signature block, certificate of service, and this certificate.

**DATED** this 11th day of July, 2025.    By:    /s/ *Elisabeth C. Frost*
                                                 Elisabeth C. Frost
                                                 **ELIAS LAW GROUP LLP**
                                                 250 Massachusetts Avenue NW, Suite 400
                                                 Washington, D.C. 20001
                                                 efrost@elias.law
                                                 (303) 571-1000

**CERTIFICATE OF SERVICE**

I certify that on the 11th day of July, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States District Court for the District of Wyoming by using the CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost