**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2025 JUL 22  AM 9: 01

MARGARET BOTKINS,CLERK
CASPER

EQUALITY STATE POLICY CENTER,

      Plaintiff,

v.

CHUCK GRAY, in his official capacity as
Wyoming Secretary of State, *et al.*,

      Defendants.

Case No. 25-CV-117-SWS

---

## ORDER DISMISSING CASE FOR PLAINTIFF'S LACK OF STANDING

This matter comes before the Court on Defendant Chuck Gray's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) and supporting memorandum. (ECF 66, 67.) Plaintiff filed an opposition thereto (ECF 112), and Defendant Gray replied (ECF 128).[1] Having considered the parties' arguments, reviewed the record herein, and being otherwise fully advised, the Court finds Plaintiff lacks standing under Article III of the U.S. Constitution to assert the claims in this lawsuit, and therefore the Court does not have subject-matter jurisdiction over the case. The case must be dismissed without prejudice under Rule 12(b)(1).

### INTRODUCTION

Plaintiff Equality State Policy Center is a nonprofit organization made up of approximately 20 other organizations. (Compl. ¶ 18.) While at least some of Plaintiff's member-organizations have individual members, there is no allegation that Plaintiff itself has any individuals as members. (*See id.*) Plaintiff's laudable "mission is to advance fair elections and transparent government."

---

[1] The Court also considered the amicus briefs from the several amici parties to the extent those submissions addressed Plaintiff's standing to sue.

(*Id.*) Towards that end, Plaintiff "devotes significant resources to helping qualified Wyomingites register to vote and successfully participate in Wyoming elections." (*Id.* ¶ 19.)

Defendant Chuck Gray is the Wyoming Secretary of State and is sued in his official capacity as the chief election officer for the State. (*Id.* ¶ 26.) The county clerks for each Wyoming county are also named as nominal defendants in their official capacities as the chief election officers for their respective counties (*Id.* ¶ 27), but the vast majority of the county clerks take no position on the merits of Plaintiff's claims (ECF 85).[2]

In the Spring of 2025, the Wyoming Legislature passed House Bill 156, which became law without the signature, nor the veto, of the Governor. Plaintiff challenges the constitutionality of HB 156. At its core, HB 156 requires a potential Wyoming voter to display "proof of United States citizenship" and "proof of [Wyoming] residence" in order to register to vote in an election. HB 156 provides that a voter may prove their U.S. citizenship with one of several documents, including, among others, valid driver's licenses or identification cards (provided they do not indicate a lack of U.S. citizenship), a U.S. passport or birth certificate, or a U.S. certificate of naturalization. Wyo. Stat. § 22-1-102(a)(lvi). Plaintiff's complaint in this case focuses on the requirement for potential voters to show documentary proof of citizenship (DPOC) when they register to vote. (*See, e.g.,* Compl. ¶¶ 2-3.) Plaintiff contends HB 156 is far more likely to exclude (disenfranchise) qualified citizens who for various reasons may be unable to provide the necessary documentation than it is to prevent a noncitizen from unlawfully voting in an election. In the instant motion, Defendant Gray argues Plaintiff lacks standing to sue in this case.

---

[2] One county clerk filed her own motion to dismiss, in which the county clerk both joined Defendant Gray's pending motion to dismiss based on standing and sought dismissal on alternative grounds. (ECF 119, 120.) Because the Court is granting Defendant Gray's motion to dismiss, it need not further consider the county clerk's separate, later-filed motion to dismiss.

## STANDARD OF ADJUDICATION FOR DISMISSAL BASED ON STANDING

"Federal courts do not wield plenary jurisdiction over every slight or suit." *Hydro Resources, Inc. v. U.S. E.P.A.*, 608 F.3d 1131, 1144 (10th Cir. 2010) (en banc). "Article III of the Constitution confines the federal judicial power to 'Cases' and 'Controversies.' Under Article III, a case or controversy can exist only if a plaintiff has standing to sue—a bedrock constitutional requirement that this Court has applied to all manner of important disputes." *United States v. Texas*, 599 U.S. 670, 675 (2023). "For a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 379 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). The principle of standing seeks to determine "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Alliance for Hippocratic Medicine*, 602 U.S. at 379 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982)). The standing requirement thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379-80 (quoting *Valley Forge*, 454 U.S. at 473). "Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381. "By limiting who can sue, the standing requirement implements 'the Framers' concept of the proper—and properly limited—role of the courts in a

democratic society.'" *Id.* at 380 (quoting J. Roberts, *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219, 1220 (1993)).

The Tenth Circuit "has repeatedly characterized standing as an element of subject matter jurisdiction." *Hill v. Vanderbilt Cap. Advisors, LLC*, 702 F.3d 1220, 1224-25 (10th Cir. 2012); *see In re Peeples*, 880 F.3d 1207, 1212 (10th Cir. 2018) ("Article III standing is jurisdictional; thus, where the record reveals a colorable standing issue, we have a duty to undertake an independent examination (sua sponte if necessary) of that issue.") (cleaned up). Dismissal of a lawsuit is mandated under Federal Rule of Civil Procedure 12(b)(1) where a court lacks subject matter jurisdiction over the claims. There are two forms of Rule 12(b)(1) challenges: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quotation marks omitted).

Here, Defendant Gray fails to identify whether he is pressing a facial attack against the complaint's allegations or a factual attack beyond the complaint's allegations. (*See* ECF 67.) However, both parties reference and discuss allegations in Plaintiff's complaint (ECF 1) as well as assertions made in a declaration submitted by Jennifer DeSarro, Plaintiff's Executive Director, in support of Plaintiff's separate request for a preliminary injunction (ECF 16-21 (exhibit 20 in support of Plaintiff's motion for preliminary injunction)). (*See* ECF 67 pp. 9-19 (discussing the assertions in the complaint and DeSarro's affidavit); ECF 112 pp. 10-11 (asserting the factual allegations in the complaint and affidavits "must be accepted as true and construed in the plaintiff's favor" at the pleading stage), p. 12 (citing DeSarro's declaration).) As Plaintiff has relied on and Defendant Gray has opposed allegations contained in documents outside the complaint, the Court

will treat the motion to dismiss as a factual challenge and consider the evidence beyond the complaint referenced by the parties.

As the party attempting to invoke federal jurisdiction, the plaintiff bears the burden of demonstrating standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). "Where, as in the present case, there has been no evidentiary hearing, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

> The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party. However, only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true.

*Id.* (internal citations and quotation marks omitted).

To establish Article III standing to sue, the law requires the plaintiff to show three requirements:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "Those specific standing requirements constitute 'an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Alliance for Hippocratic Medicine*, 602 U.S. at 380 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Article III standing is analyzed as of the time the lawsuit is commenced. *Nova Health Systems v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).

## DISCUSSION

As noted above, Plaintiff is an organization. Plaintiff is not a voter and cannot register to vote, and thus Plaintiff is not the object or target of HB 156. HB 156 "neither require[s] nor forbid[s] any action on the part of" Plaintiff. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Summers*, 555 U.S. at 493 (alteration in original) (quoting *Lujan*, 504 U.S. at 562) (cleaned up).

Where the complaining party is an organization, it can satisfy Article III standing in one of two ways. "Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert standing solely as the representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 199 (2023) (quotation marks omitted). In this case, Plaintiff contends it possesses standing under both avenues. (ECF 112 pp. 11-29.)

1. **Plaintiff lacks standing to sue in its own capacity (sometimes called "organizational standing").**

Plaintiff contends HB 156 "directly affect[s] and interfere[s] with" its "core" activities. (ECF 112 p. 12 (quoting *Alliance of Hippocratic Medicine*, 602 U.S. at 395).) It asserts it "devotes significant resources to helping qualified Wyomingites register to vote and successfully participate in Wyoming elections." (Compl. ¶ 19.) Plaintiff also "regularly conducts voter outreach and mobilization programs, including through tabling, webinars, training coalition partners, direct voter education, and creating and distributing educations materials on how to register and vote." (*Id.*) It further "has developed programs geared specifically toward increasing civic participation among Wyoming's Hispanic communities, including through creating and distributing bilingual voter education materials, providing translation services for answering voter questions, and

addressing specific voter concerns relevant to that community, including regarding documentation requirements." (*Id.*)

Plaintiff contends HB 156 "threatens" its organizational mission and has affected its work. (Compl. ¶ 20.) In brief, Plaintiff asserts HB 156 will force Plaintiff to divert significant resources toward:

(1)    Answering questions about HB 156 and redeveloping voter education materials to correctly reflect the new voter registration requirements; and

(2)    Increasing "voter registration education efforts while encouraging many more people to register, simply to prevent the registration rate from severely backsliding."

(*Id.* ¶¶ 20-23; *see* DeSarro Decl. ¶ 10 ("We cannot advance our mission or serve our coalition members without educating voters about HB 156's DPOC requirement").) To meet these issues, Plaintiff says it must divert resources away from:

(1)    Plaintiff's ongoing Vote Wyoming campaign, which Plaintiff "will have to pause;"

(2)    Plaintiff's "tasks related to its core programming," such as planning webinars, offering trainings, and other community outreach; and

(3)    Plaintiff's other programs and initiatives, such as Chair Project and SHAPE Wyoming, some of which "may need to be abandoned altogether so that [Plaintiff] can focus on mitigating the suppressive impact of HB 156."

(Compl. ¶¶ 22, 24, 25; *see* DeSarro Decl. ¶ 13 ("I know that communicating the DPOC requirements to voters will require consistent attention, a massive amount of work, new tactics, and significantly more funding").) Plaintiff concludes, "Instead of undertaking work to expand civic participation, [Plaintiff] must dedicate its time to helping citizens navigate the DPOC law so that they can exercise their right to vote." (Compl. ¶ 25.)

Assuming Plaintiff's assertions to be true, they do not establish its standing to bring this lawsuit in its own capacity. Plaintiff has not shown a concrete injury in fact that is fairly traceable

to HB 156.

Plaintiff's alleged diversion-of-resources injury is the same type of injury claimed in *Alliance for Hippocratic Medicine*, but the U.S. Supreme Court determined this type of alleged injury was not a concrete injury in fact traceable to the challenged governmental conduct sufficient to satisfy Article III standing. 602 U.S. at 393-96. In that case, pro-life medical associations and doctors sought to challenge the U.S. Food and Drug Administration's approval of mifepristone tablets to terminate pregnancies. *Id.* at 375-77. The medical associations argued the FDA's approval of mifepristone "'impaired' their 'ability to provide services and achieve their organizational missions,'" including by causing the associations "to spend 'considerable resources' to the detriment of other spending priorities." *Id.* at 394 (quoting Brief for Respondents at 43, 44.). The Supreme Court concluded this claim "does not work to demonstrate standing" because a plaintiff "must show 'far more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The Supreme Court observed that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing" and "cannot manufacture its own standing in that way." *Id.*

In *Alliance for Hippocratic Medicine*, the medical associations based their organizational standing argument, in part, on the prior decision of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Specifically, the medical associations asserted *Havens* stood for the principle that "standing exists when an organization diverts its resources in response to a defendant's actions." *Alliance for Hippocratic Medicine*, 602 U.S. at 395. The Supreme Court said, "*Havens* does not support such an expansive theory of standing." *Id.* The Supreme Court discussed the limited nature of the *Havens* decision, noting that *Havens* involved a claim for damages where the defendant's

challenged actions had "directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* The Supreme Court concluded, "That is not the kind of injury that the medical associations have alleged here. FDA's actions relaxing regulation of mifepristone have not imposed any similar impediment to the medical associations' advocacy businesses." *Id.*; *see Deep S. Ctr. for Env't Just. v. United States Env't Prot. Agency*, 138 F.4th 310, 319 (5th Cir. 2025) (noting the plaintiff in *Havens* had standing "not because it voluntarily changed its programming or activities in response to the defendants' actions," but because the defendants' actions "directly affected and interfered with [the plaintiff's] core business activities") (quotation marks omitted)); *United States v. Texas*, --- F. 4th ---, 2025 WL 1835540, at *45 (5th Cir. July 3, 2025) (Oldham, J., dissenting) (noting the plaintiff in *Havens* had standing because the *Havens* plaintiff "was the victim because" the plaintiff "itself was injured by the lie" told by the defendant). The Supreme Court said the medical associations' argument that "standing exists when an organization diverts its resources in response to a defendant's actions" was "incorrect." *Id.* at 395.

Here, Plaintiff's claims of injury traceable to HB 156 suffer from the same shortcomings as those in *Alliance for Hippocratic Medicine*. Plaintiff is an "unregulated part[y] who seek[s] to challenge [the Wyoming Legislature's] regulation *of others*." *Alliance for Hippocratic Medicine*, 602 U.S. at 385 (emphasis in original). Neither Plaintiff nor its members can register to vote or are subject to any of the requirements of HB 156. "And [HB 156] has not required the plaintiff[] to do anything or refrain from doing anything." *Id.* Plaintiff has not alleged "the kinds of injuries … that unregulated parties sometimes can assert to demonstrate causation." *Id.*

To be sure, Plaintiff likely will have to alter the education and assistance it provides when educating potential voters on HB 156's new requirements. For example, as stated earlier, Plaintiff

says it "regularly conducts voter outreach and mobilization programs, including through tabling, webinars, training coalition partners, direct voter education, and creating and distributing educational materials on how to register and vote." (Compl. ¶ 19.) While HB 156 likely requires Plaintiff to modify some of the information it promulgates, HB 156 does not prohibit or preclude any of this activity. *See Alliance for Hippocratic Medicine*, 602 U.S. at 395 ("FDA's actions relaxing regulation of mifepristone have not imposed" an "impediment to the medical associations' advocacy businesses"). Indeed, Plaintiff alleges it is already educating Wyomingites on HB 156's requirements as part of its work. (*Id.* ¶ 20 ("the Hispanic community, in particular, has already begun to rely on [Plaintiff] to explain the new requirements and help them find ways to meet them").) Continuing to do something an organization already does, even in a newly modified manner, generally is not a concrete injury sufficient for Article III standing. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 459-60 (6th Cir. 2014) ("it is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already"); *Make the Road New York v. Cuccinelli*, 419 F. Supp. 3d 647, 657 (S.D.N.Y. 2019) (no injury in fact "where a plaintiff was *already* providing the services at issue") (emphasis in original). To the extent potential voters and Plaintiff's member-organizations "have already turned to [Plaintiff] for information about how the law will impact" them, explaining voter registration requirements is already central to Plaintiff's work, according to Plaintiff. (*See* Compl. ¶ 22-24.)

Plaintiff's diversion-of-resources allegations fall short. As the District of Maryland recently discussed, even an allegation that a nonprofit organization has had to divert nearly all its resources to fielding questions about unrelated work due to government agency understaffing does not produce Article III standing.

The States also claim they have been injured because the state service commissions have had to field questions about AmeriCorps programs they do not administer because there are not enough AmeriCorps staff members left to answer their questions. *See* ECF 124, at 4 (citing ECF 5-39, ¶ 49 (R.I. decl.)). This, too, does not satisfy the injury requirement. The Supreme Court recently rejected a similar theory of injury. *See OPM v. Am. Fed'n of Gov't Emps., AFL-CIO*, No. 24A904, – — U.S. —, — S.Ct. —, — L.Ed.2d —, 2025 WL 1035208 (U.S. Apr. 8, 2025). At the district court, a group of nonprofits and unions challenged staff reductions across several federal agencies. *Am. Fed'n of Gov't Emps., AFL-CIO*, – — U.S. at —, — S.Ct. —, 2025 WL 660053, at *3. One of the plaintiff nonprofits, Vote Vets Action Fund ("VoteVets"), challenged a staff reduction of more than 1,000 employees at the Department of Veterans Affairs. *Id.* at —, — – S.Ct. —, 2025 WL 660053, at *11. The district court found that the nonprofit had standing to challenge the staffing terminations based on the nonprofit chairman's statement that, because of the terminations, "[t]he time of VoteVets' staff and consultants has been diverted from VoteVets' regular activities to field and respond to inquiries from veterans and their families and to connect them with case workers in congressional offices." *Id.* at —, — S.Ct. —, 2025 WL 660053, at *12. The district court found standing in part because VoteVets had "been forced to divert 'almost all of [their] resources' in 'counteracting the problem,' depriving the organization of its ability to continue to provide services to its members." *Id.* (alteration in original) (citation omitted). It granted a temporary restraining order and then a preliminary injunction. *Id.*; *see Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-cv-1780, — F.Supp.3d —, 2025 WL 820782, at *8 (N.D. Cal. Mar. 14, 2025). **The Supreme Court stayed the injunction because the allegations of the nonprofits were "insufficient to support the organizations' standing."** *OPM*, — U.S. at —, — S.Ct. —, 2025 WL 1035208, at *1 (citing *Clapper*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264). **Here, the States' alleged injury from having to field questions about impacted programs they do not administer likewise is insufficient to support standing.**

*Maryland v. Corp. for Nat'l & Cmty. Serv.*, --- F. Supp. 3d ---, 2025 WL 1585051, at *21 (D. Md. June 5, 2025) (emphases added).

Further, Plaintiff "anticipates" "additional and new work and programs" will be necessary to "dispel fears of retaliation and surveillance" created by HB 156's voter registration requirements. (Compl. ¶ 23.) But speculative or conjectural injuries such as this fail to establish standing. *See Colorado Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1397 (10th Cir. 1992) ("Appellants' [standing] argument that they were forced to counteract the Governor's activities

through the expenditure of additional funds is purely conjectural."). Actual or imminent injury is necessary for standing. *Alliance for Hippocratic Medicine*, 602 U.S. at 381 ("Moreover, the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon.") (citing *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)). Similarly, Plaintiff's assertion that "[s]ome projects [Plaintiff] has planned may need to be abandoned altogether so that it can focus on mitigating the suppressive impact of HB 156" (Compl. ¶ 25) is not concrete and demonstrable; it is more speculation. Indeed, it "may" never come to pass.

Plaintiff's attempts to distinguish this case from *Alliance for Hippocratic Medicine* are unconvincing. Plaintiff argues that while it provides services and assistance to potential voters, the plaintiffs in *Alliance for Hippocratic Medicine* "did not provide services or assistance to anyone—whether in the form of counseling, education, or even voter registration efforts—that the defendant's actions perceptibly impaired." (ECF 112 p. 14.) But that's not accurate. The medical associations in *Alliance for Hippocratic Medicine* expressly asserted the governmental action caused them to incur costs and divert resources toward "conduct[ing] their own studies on mifepristone **so that the associations can better inform their members and the public about mifepristone's risks**." 602 U.S. at 394 (citing Brief for Respondents at 43) (emphasis added). The medical associations also alleged the governmental action caused them to "'expend considerable time, energy, and resources' … **engaging in public advocacy and public education**." *Id.* (quoting Brief for Respondents at 44) (emphasis added). Thus, the medical associations in *Alliance for Hippocratic Medicine*, like Plaintiff here, provided services or assistance to the organizations' members and the public through education and counseling. And like Plaintiff asserts here, the medical associations in *Alliance for Hippocratic Medicine* asserted the challenged governmental

action directly affected these activities, including by requiring the expenditure of resources on these activities to the detriment of other activities and priorities. *See id.* Yet in *Alliance for Hippocratic Medicine*, the Supreme Court said such did not establish a concrete injury in fact traceable to the challenged governmental action sufficient for Article III standing. So too here.

Plaintiff lacks standing in its own capacity because it has not identified its own concrete injury caused by HB 156 sufficient to give it a "personal stake" in the dispute to make out a "case or controversy" within the meaning of Article III.

### 2.     Plaintiff lacks standing to sue in a representational capacity (sometimes called "associational standing")

Besides suing in its own right, Plaintiff contends it has standing to bring this lawsuit on behalf of its members. (ECF 112 pp. 21-29.) To invoke representational standing,

> an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Students for Fair Admissions*, 600 U.S. at 199 (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

The first element is challenged in this case. (ECF 67 pp. 16-19.) To meet this first element, the U.S. Supreme Court has

> required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm. In *Defenders of Wildlife*, *supra*, at 563, 112 S.Ct. 2130, we held that the organization lacked standing because it failed to "submit affidavits ... showing, through specific facts ... that one or more of [its] members would ... be 'directly' affected" by the allegedly illegal activity.

*Summers*, 555 U.S. at 498.

First up, Plaintiff does not allege it has any individual members who could register to vote; its members are themselves organizations. (*See* Compl. ¶ 18.) Plaintiff has not demonstrated or

asserted that any of its member-organizations would have standing to bring this suit in their own capacity. Nonetheless, the Court agrees with Plaintiff that if any of its members' individual members are shown to have standing for this suit, then Plaintiff would have standing despite being two degrees removed from those individuals. *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9-10 (1988) (finding appellant had standing where the "appellant's member associations would have standing to bring this same suit on behalf of their own individual members").

The problem for Plaintiff is that while it asserts its members have individual members who are potential Wyoming voters, it has not alleged specific facts that, if taken as true, would show "that at least one identified member had suffered or would suffer harm" from HB 156's registration requirements. The Tenth Circuit has approved of the identified member(s) remaining anonymous. *Speech First, Inc. v. Shrum*, 92 F.4th 947, 951 (10th Cir. 2024). But while the individual might remain anonymous, Plaintiff still must identify an individual member and present specific facts showing the particular member would be *directly* injured by the challenged government conduct. Plaintiff contends that "any individual members" who can register to vote in Wyoming "would have standing to challenge the DPOC requirement." (ECF 112 p. 22.) That may be accurate, but without making "specific allegations establishing that at least one identified member had suffered or would suffer harm," Plaintiff has not shown its Article III standing to bring this lawsuit in its representational capacity. *See Producers of Renewables United for Integrity Truth & Transparency v. Env't Prot. Agency*, No. 19-9532, 2022 WL 538185, at *4 n.2 (10th Cir. Feb. 23, 2022) ("Ordinarily, a prerequisite for organizations alleging associational standing is to identify their affected members.") (citing *Summers*, 555 U.S. at 497-99).[3]

---

[3] The exception noted by the Tenth Circuit was where every member of the organization is injured by the governmental action. *Producers of Renewables*, 2022 WL 538185, at *4 n.2. Plaintiff here

Broad, conclusory allegations lacking factual substance do not establish Plaintiff's representational standing, not even at this early motion-to-dismiss stage.

Finally, Plaintiff appears to suggest it has standing to sue on behalf of individuals who are not its members or its members' members, but who are "constituents whose interests the organization represents." (ECF 112 p. 21.) Ostensibly, Plaintiff means every potential Wyoming voter affected by HB 156's requirements. Plaintiff relies on *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977), for this proposition, but Plaintiff reads too much into *Hunt*, which is materially different from this case. In *Hunt*, the Commission was not a "traditional voluntary membership organization" and it had "no members at all." *Id.* at 342. The Supreme Court noted, "If the Commission were a voluntary membership organization [like] a typical trade association its standing to bring this action as the representative of its constituents would be clear under prior decisions of this Court." *Id.* In direct contrast, though, Plaintiff in this lawsuit *is* a "traditional voluntary membership organization." (*See* Compl. ¶ 18 (alleging Plaintiff "is a nonprofit organization currently comprised of a coalition of about twenty" other organizations, with each member-organization "pay[ing] membership dues" to Plaintiff); DeSarro Decl. ¶¶ 4, 7.) Plaintiff has shown no reason why the Court should not apply the traditional requirement from *Summers* that it make specific allegations establishing that at least one identified member, or the identified member of a member, has standing.

Plaintiff's assertions do not sufficiently demonstrate that one of its members, or one of its members' members, would otherwise have standing to sue in their own right. While Plaintiff makes some rather sweeping and conclusory generalizations in its standing argument, the Court "is not bound by conclusory allegations, unwarranted inferences, or legal conclusions" at the

---

has never alleged all its members or all its members' members would otherwise have standing to sue in this case.

pleading stage. *Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994). Simply averring that an organization-member's unidentified individual member would have standing or that an unidentified non-member voter somewhere in Wyoming would have standing is insufficient to demonstrate Plaintiff's representational standing to sue on these unidentified individuals' behalf.

## CONCLUSION AND ORDER

Under Article III of the Constitution the exercise of judicial power is confined to Cases and Controversies, which requires Plaintiff to establish a personal stake in the outcome--standing. This "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might roam the country in search of governmental wrongdoing." *Alliance of Hippocratic Medicine*, 602 U.S. at 379 (internal citations and quotation marks omitted). Even accepting Plaintiff's standing-related allegations as true and construing the record in its favor, Plaintiff has not adequately demonstrated its standing to sue on its own behalf or on behalf of others in this action. Absent Plaintiff's showing of standing, the Court lacks subject matter jurisdiction over this lawsuit, and consequently it must be dismissed without prejudice. The Court has not considered nor makes any comment on the merits of Plaintiff's claims.

**IT IS THEREFORE ORDERED** that Defendant Chuck Gray's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) (ECF 66) is **GRANTED**. Pursuant to Federal Rule of Civil Procedure 12(b)(1), this action is **DISMISSED WITHOUT PREJUDICE FOR LACK OF SUBJECT MATTER JURISDICTION**.

**IT IS FURTHER ORDERED** that all other pending motions in this case are hereby **DENIED WITHOUT PREJUDICE AS MOOT**. The Clerk of Court will please enter a general judgment consistent herewith in the Defendants' favor and close this case.

**ORDERED:** July _22nd_, 2025.

_Scott W. Skavdahl_
Scott W. Skavdahl
United States District Judge